**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

ESTATE OF ELIJAH JAVON MCCLAIN, by and through its personal representatives Sheneen McClain and Lawayne Mosley;
SHENEEN MCCLAIN, individually;
LAWAYNE MOSLEY, individually;

      Plaintiffs,

v.

CITY OF AURORA, COLORADO, a municipality;
OFFICER NATHAN WOODYARD, in his individual and official capacity;
OFFICER RANDY ROEDEMA, in his individual and official capacity;
OFFICER JASON ROSENBLATT, in his individual and official capacity;
OFFICER MATTHEW GREEN, in his individual and official capacity;
SERGEANT DALE LEONARD, in his individual and official capacity;
OFFICER ALICIA WARD, in her individual and official capacity;
OFFICER KYLE DITTRICH, in his individual and official capacity;
OFFICER ERICA MARRERO, in her individual and official capacity;
OFFICER JAMES ROOT, in his individual and official capacity;
OFFICER JORDAN MULLINS-ORCUTT, in his individual and official capacity;
OFFICER DARREN DUNSON, in his individual and official capacity;
SERGEANT RACHEL NUNEZ, in her individual and official capacity;
LIEUTENANT PETER CICHUNIEC, in his individual and official capacity;
PARAMEDIC JEREMY COOPER, in his individual and official capacity;
DR. ERIC HILL, in his individual capacity.

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

     Plaintiffs, by and through their attorneys, Mari Newman, Michael Fairhurst, and Liana

Gerstle Orshan of KILLMER, LANE & NEWMAN, LLP, respectfully allege for their Complaint and

Jury Demand as follows:

## I. **INTRODUCTION**

     "I can't breathe. I can't breathe please. I can't. I can't breathe. I can't breathe, please

stop. [Groans of pain]. I have my ID right here. I have my ID right (inaudible). My name is Elijah McClain. That's all. That's what I was doing. I was just going home. I'm an introvert and I'm different. [Sobbing]. I just (inaudible). I'm just different. I'm just different, that's all. That's all I was doing. I'm so sorry. I have no gun. I don't do that stuff. I don't do any fighting. Why were you attacking me? I don't do guns. I don't even kill flies. I don't eat meat…. I am [ ] a vegetarian. I don't judge people for anything. I try to live (inaudible), and I respect all life. Forgive me. All I was trying to do was become better…. But I'll do it. I'll do it. .... To help all life. I will do (inaudible). Even if I have to sacrifice my identity. I'll do it. I'll do it. You all are phenomenal. You are beautiful. [Groans of pain]. Forgive me. …. [Cry of pain]. I'm so sorry. I'm so sorry. Ow. Ow, that really hurt. You guys are very strong. Teamwork makes the dream work. [Sobbing]. Ow that hurts. (Multiple very quiet, inaudible statements). Oh yeah I'm sorry. I wasn't trying to do that. I can't breathe correctly because— [Vomiting] …. Ok, ok…I can't sense myself. Ow! Ah! Ow! Stop please!... I'm trying…. Please help me."

1.      These were the last words spoken by 23-year-old Elijah Javon McClain, killed by

Aurora, Colorado, police and paramedics on August 24, 2019.

2.      Elijah was listening to music, enjoying the short walk home from the corner store

with some iced tea when Aurora police officers grabbed, tackled, and assaulted him. Officers

continued to brutalize Elijah for nearly eighteen minutes—approximately fifteen minutes of

which he was handcuffed. The force that Aurora officers used against Elijah included

compressing his neck and the blood flow to his brain with *two* consecutive carotid holds,

cranking his left shoulder with an armbar hammerlock that caused it to repeatedly pop, and, even

after he was handcuffed with his hands behind his back, continuing to crush him under the

weight of their bodies and slamming him to ground when he arched up slightly to vomit or in

response to the pain. One officer also jammed his knee into Elijah's arm for minutes on end, with

the sole purpose of inflicting pain by forcefully separating Elijah's bicep and triceps muscles. All

the while, the officers terrorized Elijah with additional threats that they would tase him and sic a

police dog on him.

3.      As Elijah lay handcuffed, in his own vomit, on the ground, under the hundreds of

pounds of combined weight of Aurora Police Department officers, Aurora Fire Rescue paramedics involuntarily injected him with a massive dose of ketamine. Elijah was not experiencing, and did not appear to be experiencing, any medical condition that would be treated with ketamine, a powerful sedative that frequently causes devastating side effects. Worse, even if the use of ketamine had been medically indicated (it was not), the Aurora Fire Rescue Paramedics injected Elijah with a dose well beyond what a man Elijah's size should receive.

4.      Minutes after the injection, paramedics noticed that Elijah was not breathing and had no pulse. Elijah never regained consciousness, and he passed away a few days later. The extended, needless use of excessive force and torture by Aurora Police Department officers and the subsequent injection of a massive ketamine overdose by Aurora Fire Rescue paramedics overwhelmed Elijah's body. He could not recover.

5.      Elijah's family and community remember him for his outsized kindness and grace, his desire to help and heal, and his thoughtful, spiritual approach to life. As a massage therapist, he sought to soothe his clients' pain. As a violinist, he would often play for animals awaiting adoption at a local pet rescue, believing that music would alleviate their loneliness. As a son, brother, cousin, and friend, Elijah's outward shyness gave way to an effervescent, goofy, creative personality that made him a beloved member of his community. Aurora's brutality denied Elijah almost his entire adult life, a life of bright promise both for him and for the many people with whom he would have shared his light and compassion.

6.      Aurora's unconstitutional conduct on the night of August 24, 2019, is part of a larger custom, policy, and practice of racism and brutality, as reflected by its conduct both before and after its murder of Elijah McClain, a young Black man. For decades, Aurora police have persistently brutalized people of color, and especially Black people, at a rate significantly greater

than their proportion in the Aurora community. Some—but by no means all—examples of cases brought by victims of Aurora's racist brutality are set forth herein.

7.      Aurora's custom, policy, and practice of unconstitutional racist brutality is reflected in its recent conduct as well. The City of Aurora refuses even basic accountability, having failed to fire or even discipline *anyone* in relation to Elijah's death. Instead, the City has acted aggressively to lash out at and deflect those who insist on justice for Elijah. For example, Aurora Police Department forces beat and gassed peaceful protesters demanding justice for Elijah outside the police headquarters. And, pressed by the City's elected council members to perform an independent investigation of Elijah's killing, Aurora's city manager announced that such an investigation was already underway—only to be forced to reveal that the City had not hired an independent investigator at all, but instead hired a former police officer and municipal defense attorney whose apparent purpose was to help the City dodge liability for its police officers' and medics' actions.

8.      Aurora permits and encourages a culture of racial violence in its police department that is so rampant that a trio of on-duty, uniformed Aurora police officers returned to the scene of Elijah's killing to take pictures of themselves smiling while reenacting the chokehold performed on Elijah. The officers proceeded to text message the photos to other members of the department. Notably, two of the officers who reenacted Elijah's murder were among those Defendants who stood idly by and failed to intervene the night their colleagues tortured and killed Elijah; one recipient of the photo was hands-on killer Defendant Jason Rosenblatt, who responded to the text of the photo as though Elijah's killing were a joke. Under mounting public pressure, the City fired these officers. Yet, the City still has not taken any steps to discipline anyone for the killing of an innocent young man.

9.     Plaintiffs bring this action seeking both accountability for the profound loss of a beautiful soul, and to ensure that Elijah did not die in vain by sending a resounding message that racism and brutality have no place in American law enforcement.

## II.  <u>JURISDICTION AND VENUE</u>

10.     This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

11.     Jurisdiction for Plaintiffs' supplemental state law claims, brought under Colorado state law, including the wrongful death act, C.R.S. § 13-21-201 *et seq.*, is conferred by 28 U.S.C. § 1367.

12.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the State of Colorado.

## III.  <u>PARTIES</u>

### A.  <u>Plaintiffs</u>

13.     At all times relevant to the subject matter of this Complaint, the decedent Elijah McClain was a citizen of the United States of America and a resident of and domiciled in the State of Colorado. At all relevant times, the decedent's parents, Sheneen McClain and Lawayne Mosley, were the co-personal representatives of the Estate of Elijah McClain.

14.     Plaintiff Sheneen McClain is Elijah McClain's biological mother. At all times relevant to the subject matter of this Complaint, Ms. McClain was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

15.     Plaintiff Lawayne Mosley is Elijah McClain's biological father. At all times

relevant to the subject matter of this Complaint, Mr. Mosley was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

**B.  Defendants**

**1.  Institutional Defendant**

16.     Defendant City of Aurora, Colorado ("Aurora") is a municipality organized under the laws of the State of Colorado, and is a "person" subject to suit under 42 U.S.C. § 1983. The Aurora Police Department ("APD") is a law enforcement agency that is part of the City of Aurora. Aurora Fire Rescue ("AFR") is a fire department that is part of the City of Aurora.

17.     At all times relevant to the subject matter of this Complaint, Defendant City of Aurora was responsible for the oversight, supervision, discipline, and training of APD and AFR personnel.

18.     At all times relevant to the subject matter of this Complaint, Defendant City of Aurora had a nondelegable duty to provide adequate medical care to individuals who received emergency medical responder services.

**2.  Aurora Police Department Defendants**

19.     At all times relevant to the subject matter of this Complaint, Defendant Nathan Woodyard was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Woodyard was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

20.     At all times relevant to the subject matter of this Complaint, Defendant Randy Roedema was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Roedema was acting within the scope of his official duties and

employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

21.     At all times relevant to the subject matter of this Complaint, Defendant Jason Rosenblatt was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Rosenblatt was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

22.     At all times relevant to the subject matter of this Complaint, Defendant Matthew Green was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Green was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

23.     At all times relevant to the subject matter of this Complaint, Defendant Dale Leonard was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Leonard was acting within the scope of his official duties and employment and under color of state law in his capacity as a Sergeant employed by the Aurora Police Department.

24.     At all times relevant to the subject matter of this Complaint, Defendant Alicia Ward was a citizen of the United States and a resident of and domiciled in Colorado. At all times, Defendant Ward was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed by the Aurora Police Department.

25.     At all times relevant to the subject matter of this Complaint, Defendant Kyle

Dittrich was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Dittrich was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

26.     At all times relevant to the subject matter of this Complaint, Defendant Erica Marrero was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Marrero was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed by the Aurora Police Department.

27.     At all times relevant to the subject matter of this Complaint, Defendant James Root was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant James Root was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

28.     At all times relevant to the subject matter of this Complaint, Defendant Jordan Mullins-Orcutt was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Mullins-Orcutt was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

29.     At all times relevant to the subject matter of this Complaint, Defendant Darren Dunson was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Dunson was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed

by the Aurora Police Department.

30.     At all times relevant to the subject matter of this Complaint, Defendant Rachel Nunez was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Nunez was acting within the scope of her official duties and employment and under color of state law in her capacity as a Sergeant employed by the Aurora Police Department.

31.     Defendants Woodyard, Roedema, Rosenblatt, Green, Leonard, Ward, Dittrich, Marrero, Root, Mullins-Orcutt, Dunson, and Nunez are collectively known herein as "APD Defendants."

### 3.  Aurora Fire Rescue Defendants

32.     At all times relevant to the subject matter of this Complaint, Defendant Peter Cichuniec was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Cichuniec was acting within the scope of his official duties and employment and under color of state law in his capacity as a Lieutenant and paramedic employed by Aurora Fire Rescue.

33.     At all times relevant to the subject matter of this Complaint, Defendant Jeremy Cooper was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Cooper was acting within the scope of his official duties and employment and under color of state law in his capacity as a paramedic employed by Aurora Fire Rescue.

34.     Defendants Cichuniec and Cooper are collectively known herein as "AFR Defendants."

35.     At all times relevant to the subject matter of this Complaint, Defendant Eric Hill

was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Dr. Hill was contracted by the City of Aurora to work as the Medical Director of Aurora Fire Rescue. At all relevant times, Defendant Dr. Hill was acting within the scope of his duties and under color of state law in his capacity as the AFR Medical Director. At all relevant times, as AFR's medical director, Dr. Hill had a duty to adequately train and supervise AFR paramedics in their treatment of patients.

### IV.  FACTUAL ALLEGATIONS

**A.  Elijah McClain was a peaceful and beloved young man with a promising future.**

36.     Elijah McClain's life was cut short at the age of 23, but even in that limited time, he developed a promising career and established a loving community of friends and family.

37.     Elijah was a gentle young man who had a fierce passion for learning. Elijah's mother, Sheneen McClain, homeschooled Elijah from a young age. Sheneen noticed early on that Elijah was highly disciplined and independent in his learning, but also possessed a fun-loving personality.



*Elijah McClain*

38.     Elijah's family and friends remember him as a constantly positive young man, who did his best to avoid conflict. Elijah's sister, Samara, explained that rather than engaging in an argument, "[Elijah] would just say, 'I love you,' and walk away."

39.     As a peaceful person who wanted to help heal others, Elijah dove head-first into his pursuit of a Massage Therapy Certification.

40.     Elijah would tell his family and friends about his dream to become such a successful massage therapist that he would be able to offer his services around the world. The interpersonal aspects of massage therapy and the opportunity to relieve the pain of others cemented Elijah's love of his trade.



*Elijah discovered his passion for massage therapy*

41.     Elijah was popular with everyone at the salon where he worked, from his co-workers to his clients. One of Elijah's regular clients said of Elijah, "He was the sweetest, purest person I have ever met. He was definitely a light in a whole lot of darkness."

42.     According to Elijah's family and friends, his gratitude for life and for those with whom he shared the world was palpable. He made others feel loved and important. Even in day-to-day interactions, Elijah was known to ask others around him, including strangers in a convenience store, how they were.

43.     Often after these kinds of interactions, Elijah would bow—what his family and friends termed his "gratitude bow"—to thank his companions for their conversation.

44.     Elijah's family mourns that Elijah will never have children, as Elijah's deep empathy and nurturing personality would have made him an excellent father. Elijah's parents will never have the opportunity to be grandparents to Elijah's children.

45.     Just as he cherished the people in his life, Elijah was passionate about helping animals.

46.     Elijah adopted a vegetarian diet because he was concerned about animals' suffering. He was so averse to causing harm to another living being that he would chase flies away rather that swatting them.

47.     Elijah used his lunch breaks during work to play his violin for animals waiting to be adopted from a local pet rescue, believing that the music eased their loneliness.



*Elijah plays his violin for animals awaiting adoption*

48.     Elijah was a lover of music. He taught himself to play the violin, guitar and other instruments. He listened to music often, including the night that he was killed by Defendants.

49.     On August 24, 2019, Elijah had before him a rich lifetime of instruments to learn, animals to comfort, and people to love and heal. Instead, Elijah leaves behind family and friends who grieve the loss of his love, his infectious smile, his extraordinary kindness – his life – every day.

**B.  APD Defendants unlawfully seized Elijah McClain as he walked home from a convenience store.**

50.     At approximately 10:30 p.m. on the evening of August 24, 2019, Elijah had just purchased some iced tea from a convenience store a few blocks away from his home in Aurora, Colorado, and was walking home.

51.     Unbeknownst to Elijah, a passing motorist had called 911 to report what the caller viewed as unusual behavior on Elijah's part: wearing a face mask and making arm motions as he

walked down the street.

52.     Elijah was known to his friends and family to easily become cold, and would often wear the mask in public for his comfort. Though it was August, the temperature at the time was approximately 67 degrees Fahrenheit.

53.     The caller assured the 911 operator that he had not seen Elijah with any weapons, and that neither he nor anyone else was in danger; indeed, the caller did not accuse Elijah of any criminal or otherwise suspicious activity, but simply believed that Elijah was behaving oddly. He even told the 911 operator that Elijah "might be a good person or a bad person." The caller advised the 911 operator that he was in his car, at substantial distance from Elijah, when he placed the call.

54.     The 911 caller also reported that the subject of the call was Black, and dispatch radioed that information to responding APD officers.

55.     Video footage of Elijah from the store where he had purchased the iced tea demonstrates that Elijah's behavior was neither dangerous nor particularly unusual. Elijah selected some cans of iced tea, waited in line, had friendly interactions with other customers in the store, paid for his tea, and departed with his signature "gratitude bow" to the customer behind him in line.

56.     The clerk at the convenience store would later say that Elijah laughed and joked with the other customers, and made polite conversation. She noted that Elijah was not at all threatening during his time in the store.

57.     Though there was obviously no need for police contact *at all*, APD dispatched three officers to find Elijah.

58.     Defendant APD Officer Nathan Woodyard drove one police vehicle, while

Defendant Officers Jason Rosenblatt and Randy Roedema occupied another.

59.     Defendant Woodyard quickly located Elijah, who was walking down the sidewalk normally, minding his own business as he walked the few blocks to his home. Defendant Woodyard performed a U-turn so that he could park his car in front of Elijah; Defendants Rosenblatt and Roedema parked behind Elijah.

60.     At this point, the officers should have recognized that there was no need to contact Elijah. Elijah was clearly doing nothing more than walking down the sidewalk, not doing anything that justified police contact.

61.     Defendants had no legal right to require that Elijah stop or engage with them, as they had neither reasonable suspicion nor probable cause to believe that he had committed or was about to commit any crime.

62.     Nonetheless, Defendant Woodyard exited his vehicle and demanded that Elijah stop.

63.     Elijah continued to walk peacefully down the sidewalk, calmly informing Defendant Woodyard that he had a right to walk to his destination. Elijah was correct; he had no legal obligation to stop to speak with Defendant Woodyard, and Defendant Woodyard had no legal authority to stop him.

64.     Defendant Woodyard quickly traversed the approximately 20 feet between himself and Elijah, seized Elijah's left arm, and advised him, incorrectly, that Defendant Woodyard had a right to stop him because Elijah was "being suspicious."

65.     Notably, the officers had been specifically told, via the computer-aided dispatch system (CAD), that the 911 call involved no known weapons, and Defendant Woodyard could see that Elijah did not have a weapon or anything dangerous in his hands. He was a couple of

15

blocks from a corner store, carrying a plastic shopping bag.

66.    Neither Defendant Woodyard nor any other APD officer had reason to suspect Elijah of criminal activity.

67.    During the lengthy, brutal use of force that followed Defendant Woodyard's contact with Elijah, Defendants Roedema, Woodyard, and Rosenblatt and other APD personnel on scene—including at least Defendant Sergeant Dale Leonard and Defendant Alicia Ward—repeatedly discussed whether or not the APD officers had any justification to stop Elijah beyond his "acting suspicious." No APD officer ever provided any reasonable basis for contacting Elijah, because there was none.

68.    When interviewed after the fact by an APD detective, neither Defendant Woodyard nor any other APD officer could name any specific crime that they suspected Elijah of committing.

69.    Defendant Woodyard instead offered an array of *post hoc* pretextual justifications for his generalized "suspicion," including Elijah's clothing, Elijah's location, the time of night, and Elijah's "actions." In fact, Elijah was engaged in the nonremarkable behavior of walking the few blocks between a convenience store and his home, on a public sidewalk, well before midnight, wearing a generic brown zip-up jacket, red t-shirt, black jogger pants, and running shoes.

70.    Similarly, Defendants Roedema and Rosenblatt offered numerous excuses for their decision to make contact with Elijah, none of which suggested that Elijah had done, was doing, or was about to do anything criminal.

71.    Defendants Woodyard's, Roedema's, and Rosenblatt's various articulated reasons for having contacted Elijah were mere pretext for race discrimination. Indeed, even before

making contact, they already knew Elijah was Black from the information that had been radioed by dispatch about the 911 call. Upon seeing Elijah, they observed that he was Black, and although he exhibited no suspicious behavior, the officers nonetheless elected to contact him and almost immediately decided to use force against him.

72.     Defendants Woodyard's, Roedema's, and Rosenblatt's race-based decisions to contact and inflict force on Elijah were consistent with APD's customs, polies and/or practices of seizing and using unnecessary force on Black individuals.

73.     As detailed below, APD officers have a lengthy history of seizing Black people and using excessive force against them even though they were suspected of committing only minor infractions or, as in this case, no infraction at all.[1]

74.     Defendant Woodyard seized Elijah by the left arm—without first warning Elijah that he was going to do so or otherwise communicating his intentions to Elijah. Defendant Woodyard immediately spun Elijah around as if to handcuff him, telling Elijah to turn around only as he was already manhandling him.

75.     Elijah offered no physical resistance whatsoever to Defendant Woodyard's unlawful seizure. Instead, he simply asked Defendant Woodyard to let go of him.

76.     Though Elijah was not suspected of any crime and had taken no action of any kind toward Defendant Woodyard, Defendant Woodyard later told investigators that at this point, he *already* was considering how take Elijah to the ground. Defendant Woodyard claimed that he had wanted to search Elijah for weapons (Elijah had none, the 911 caller and dispatch had each

---

[1] APD has a shocking pattern of using force against those suspected of committing misdemeanors (or no crime at all) much more often than APD officers use force against those suspected of committing felonies. In 2019, for example, 67% of total APD contacts with use of force involved force against individuals suspected of committing misdemeanors, compared to 28% involving use of force against individuals suspected of felonies (5% involved contacts with other circumstances).

reported that there was no weapon involved, and the APD officers had no reason to suspect that he had any); however, neither Defendant Woodyard nor any other APD officer ever advised Elijah that they wanted to search him. They simply seized and manhandled him without explanation.

77.     A few seconds later, Defendant Rosenblatt approached Elijah and seized him by the right arm. Neither he nor Defendant Woodyard had a legal basis to put their hands on Elijah.

78.     Elijah was rightfully terrified. Two officers of a notoriously racist, violent police department had just roughly seized him even though he had done nothing wrong.

79.     Elijah instinctively tensed his muscles as the officers suddenly grabbed him, leading both officers to begin shouting at him, "Stop tensing up, bro." Of course, they had caused Elijah to tense his muscles with their unlawful, unexplained seizure of his body and their refusal to honor his polite requests to be allowed to continue walking home.

80.     Defendant Rosenblatt later told investigators that he had been trained that some people tense their muscles when they are initially seized by police officers. Despite this training, he and his fellow APD officers treated Elijah's reflexive tensing of his muscles as conscious disobedience of their orders.

81.     Rather than address Elijah's obvious anxiety and requests for the officers to end their unlawful seizure of his body, Defendant Rosenblatt threatened Elijah, "This isn't going to go well."

82.     Elijah tried desperately to explain to the officers that they were causing him extreme anxiety, stating, "I am an introvert. Please respect the boundaries that I am speaking."

83.     Absurdly, even as Elijah told the officers that they were causing him distress, and as they continued to perform the very behaviors that were causing him such distress, the officers

ordered Elijah to relax.

84.     Elijah told the officers that he was just going home.

85.     Ignoring Elijah's statements, Defendant Woodyard menacingly threatened Elijah that if he did not stop tensing his body, the officers would "change the situation."

86.     Elijah calmly asked the officers to leave him alone. Defendant Randy Roedema, who had just approached Elijah, refused.

87.     Elijah explained to the officers that when Defendant Woodyard had approached him, he was wearing his headphones and he was trying to stop his music so that he could hear Defendant Woodyard.

88.     Though Elijah continued to speak calmly and reasonably, Defendants Woodyard, Rosenblatt, and Roedema totally disregarded Elijah's statements. They spoke over Elijah to discuss among themselves how they would "get him over to the grass" so they could take him to the ground—though they had absolutely no legitimate reason to tackle Elijah.

89.     The officers still offered Elijah no explanation for their contact or their seizure of him. Defendant Rosenblatt instead alerted Elijah that the officers planned to escalate the encounter and take him to the ground.

90.     Defendant Roedema snatched Elijah's plastic grocery bag containing the iced tea and threw it to the ground.

91.     Together, Defendants Woodyard and Rosenblatt frog-marched Elijah across a grass lawn and shoved him up against a brick apartment building, such that Elijah's back was to the brick wall with an officer on each side forcefully controlling his arms.

92.     By the time Defendants Woodyard and Rosenblatt had shoved Elijah against the wall, each officer's body-worn camera was detached from his uniform and had fallen to the

ground.[2]

93.     In order to create some justification for the use of force, Defendant Roedema told Defendants Woodyard and Rosenblatt—in a notably non-urgent tone—that Elijah attempted to grab Defendant Rosenblatt's holstered gun.

94.     Later, as Defendants Woodyard, Roedema, and Rosenblatt struggled to come up with a justification for their ongoing use of force against Elijah to present to their supervisor, Defendant Leonard, once he was on scene, Defendant Woodyard volunteered a totally different false story, that Elijah "tried to grab my [Defendant Woodyard's] gun"—*not* Defendant Rosenblatt's.

95.     Defendant Roedema provided a different version of events, contradicting Defendant Woodyard's story: "It was actually Rosenblatt's gun." Defendant Roedema then informed Defendant Rosenblatt, "He reached for your gun dude."

96.     Apparently forgetting what he had already said, Defendant Roedema provided yet *another* version of his story when interviewed after the fact, claiming that Elijah didn't just "reach" for the gun, but actually "grabbed it" and "wrapped his middle finger around it."

97.     Notably, Defendant Rosenblatt later reported that he never felt Elijah try to grab his gun.

98.     Despite his later admission that he had not felt anything, and his lack of any independent knowledge of whether or not Elijah had tried to grab his gun, Defendant Rosenblatt told other APD officers who arrived on scene later during the encounter that Elijah had tried to grab his gun.

---

[2] As described in more detail below, there is evidence that the officers intentionally tampered with, moved, and/or shut off body cameras in order to avoid accountability for their continued use of excessive force against Elijah.

99.     There is no evidence—beyond the conflicting claims of Defendants Roedema, Woodyard, and Rosenblatt—that Elijah ever tried to grab *any* gun.

100.     Defendant Roedema's body-worn camera, the only camera that remained affixed to an APD officer at this time, showed no such attempt by Elijah. This is because Elijah did not try to grab any officer's gun.

101.     Neither Defendant Woodyard nor Defendant Rosenblatt reported having seen Elijah reach for a gun.

102.     As all APD Defendants were aware, the holsters used by APD officers have an array of fail safes to prevent others from removing officers' firearms from their holsters. Even if any of Defendants' various conflicting versions of the story were true (which they clearly were not), Defendants Roedema, Woodyard, and Rosenblatt would have known that there was no realistic possibility of Elijah obtaining or using the weapon.

### C.   Defendants Roedema, Rosenblatt and Woodyard tackled Elijah and brutalized him with multiple, compounding forms of excessive force.

103.     At this point, Defendant Roedema seized Elijah by the head with both hands and forced his head and torso downward, putting Elijah in a standing "L" position.

104.     Defendant Rosenblatt placed Elijah in a carotid control hold, using his forearm and bicep to place pressure on either side of Elijah's neck and drastically reduce the flow of blood to his brain.

105.     Elijah was unarmed, weighed approximately 143 pounds (65 kilograms), and was surrounded by three armed police officers. Setting aside the obvious lack of need to use *any* force against Elijah, Defendant Rosenblatt could have selected any number of tactical options rather than the carotid hold.

106.     The carotid hold is a notoriously dangerous technique that at the time was banned

in many states and prohibited by other Colorado police and sheriffs' departments. The hold is now outlawed in Colorado.

107.     With Elijah in an entirely helpless and controlled position in Defendant Rosenblatt's grasp, Defendant Woodyard proceeded to tackle Elijah. Defendant Woodyard later told investigators that he tackled Elijah to the ground as hard as he could.

108.     Defendant Woodyard, like all of the involved Defendants, significantly outweighed Elijah.

109.     Defendant Woodyard's tackle took him, Elijah, and Defendant Rosenblatt to the ground. Defendant Roedema quickly followed, shedding his body camera in the process.

110.     Seconds after Defendant Rosenblatt released his carotid hold, Defendant Woodyard applied a second carotid hold to Elijah.

111.     Although the dangers associated with the use of more than one carotid hold on the same subject were well known, Defendant Woodyard readily applied the second hold, and neither Defendant Rosenblatt nor Defendant Roedema took any action to prevent Defendant Woodyard from doing so.

112.     Like Defendant Rosenblatt, Defendant Woodyard had a wide array of tactical options available to him, particularly given that he was confronting a small, approximately 143-pound, unarmed man in the company of two other heavily armed, trained police officers. He chose to use the dangerous carotid hold instead.

113.     While Defendant Woodyard compressed Elijah's neck in the carotid hold, Defendant Roedema inflicted an "armbar hammerlock"—a martial arts technique that involves placing intense, painful pressure on the subject's shoulder—on Elijah's left arm.

114.     Defendant Rosenblatt then pinned Elijah's right arm to the ground. At this point,

Elijah, who was already totally helpless, was laying on the ground with both arms painfully controlled and Defendant Woodyard attempting to choke him unconscious.

115.    Eventually, Defendant Roedema advised Defendant Woodyard to release the carotid hold, which Defendant Woodyard did. Defendant Woodyard later estimated that he had applied the second carotid hold for between five and ten seconds.

116.    Both during the use of force and during APD's subsequent investigation of the force, Defendants Woodyard, Rosenblatt, and Roedema expressed uncertainty as to whether Elijah was actually rendered unconscious by the carotid holds, or if he had merely approached unconsciousness.

117.    Defendant Woodyard reported that he heard a "snoring" sound from Elijah, a common side effect of an effective carotid hold, but was not sure if Defendant Roedema had advised him to release the control hold because Elijah was unconscious.

118.    Defendant Roedema reported that Elijah had begun to go unconscious, with his eyes partially, but not fully, rolling back in his head.

119.    Defendant Rosenblatt described Elijah as half in and half out of consciousness, and as teetering on the edge of unconsciousness.

120.    Whether or not he was rendered fully unconscious, Elijah was plainly left in a vulnerable state that only heightened his terror, confusion, and physical peril.

121.    Once Defendant Woodyard finally released Elijah's neck from the second carotid hold, Defendant Roedema jumped on top of Elijah, placing the entirety of his body weight on Elijah's back while Elijah was lying on his stomach. In his interview after the fact, Defendant Roedema stated that he weighs 260-270 pounds in his gear—almost twice as much as Elijah.

122.    As Defendant Rosenblatt later observed, it is dangerous to place pressure on a

subject's back or chest after a carotid hold; Defendant Rosenblatt told investigators that a subject

should instead be placed on their side in a recovery position.

123.    Despite this knowledge, Defendant Rosenblatt did nothing to prevent Defendant

Roedema from placing pressure of nearly twice Elijah's own body weight on Elijah's back as

soon as Defendant Woodyard had released the second carotid hold.

124.    In fact, rather than taking any action to protect Elijah, Defendant Rosenblatt

assisted Defendant Roedema in this endeavor, straddling and crushing Elijah's legs as Defendant

Roedema continued to apply the armbar hammerlock to Elijah's arm and shoulder from his

position atop Elijah's back.

125.    Defendant Roedema reported that he cranked on Elijah's left shoulder as he

applied the armbar hammerlock, and that he heard Elijah's shoulder pop three times.

126.    At approximately this time, Elijah began to retch and vomit.

127.    Defendant Roedema and Defendant Rosenblatt later reported that all three officers

simultaneously placed their body weight on Elijah at this point, still only seconds after the

carotid hold. Defendant Roedema estimated their collective weight at a crushing 700-plus

pounds.

128.    From his position on Elijah's back, Defendant Roedema quickly regained his

armbar hold on Elijah's left arm.

129.    Defendant Roedema later told investigators that he had pushed Elijah's arm

unusually far forward in the course of applying his armbar hammerlock, such that Elijah's elbow

was parallel to his head.

130.    Defendant Rosenblatt drew his Taser and threatened to electrocute Elijah.

131.    Elijah repeatedly cried out, "I can't breathe" and "I can't breathe, please!"

Absurdly, the APD officers responded not with concern for Elijah's ability to breathe, but by again repeatedly ordering him to "Relax!" and continuing to inflict force against him.

132.    Defendant Woodyard seized Elijah's right arm, and together with Defendant Roedema, placed Elijah in handcuffs.

133.    Any struggle offered by Elijah throughout his interaction with the officers consisted of attempts to breathe and to survive the officers' brutal, unprovoked assault.

134.    Even as Elijah struggled to survive the officers' attack—ultimately unsuccessfully—he never attempted to strike or otherwise injure any of the officers in any way.

135.    Defendant Roedema later acknowledged to investigators that he believed Elijah was in distress and attempting to get away, and tried to get the officers off of him without striking them.

136.    Though the discarded APD body cameras did not capture any of the aforementioned force after the officers tackled Elijah, Defendant Woodyard's camera and Defendant Rosenblatt's camera continued to record audio, including numerous sounds of Elijah in pain and multiple ragged, distraught cries from Elijah that he could not breathe.

137.    Defendant Roedema noted that Elijah's mask had come off in the process of handcuffing him, and that he observed pink vomit inside the mask.

138.    The time between Defendants' initial carotid hold and takedown and Defendants' application of the handcuffs was about two minutes.

**D.   Though Elijah was handcuffed and non-violent, APD Defendants continued to threaten and inflict force on him.**

139.    Shortly after the officers handcuffed Elijah, additional APD personnel began to arrive at the scene, while Aurora Fire Rescue, which Defendant Rosenblatt had requested after the application of the carotid holds, lagged far behind.

140.    Defendant APD Sergeant Dale Leonard was first to arrive; he found Elijah on the ground, handcuffed, and entirely under the control of Defendants Woodyard, Rosenblatt, and Roedema.

141.    It was apparent to everyone present that Elijah was not resisting, and that the APD officers did not have to expend any significant physical effort to maintain control of him.

142.    As Defendant Leonard approached Elijah, Elijah repeatedly affirmed that he meant the officers no harm, saying things like: "That's all—that's all I was doing. I was just going home. I'm an introvert and I'm different. I just don't like—[inaudible]. I'm just different. I'm just different! That's [moan of pain] that's all I was doing. I'm so sorry! I have no gun! I don't do that stuff. I don't do any fighting. Why were you [inaudible]? I don't do guns. I don't even kill flies. I don't eat meat…. I'm [ ] a vegetarian. I don't judge people for anything. I respect all life."

143.    After Defendants Woodyard, Roedema, and Rosenblatt informed him that they had used the carotid hold on Elijah, Defendant Leonard anxiously asked them whether there was any reason for their contact with Elijah beyond his "being suspicious." The officers responded in the negative.

144.    Under further questioning by Defendant Leonard, Defendants Woodyard and Roedema manufactured conflicting reasons for their ongoing use of force against Elijah, with Defendant Woodyard falsely claiming that Elijah tried to grab *his* gun, and Defendant Roedema falsely claiming that Elijah had tried to grab *Defendant Rosenblatt's* gun.

145.    Defendant Leonard ignored his subordinates' obviously contradictory stories, and came up with one of his own: on the basis of no evidence whatsoever, Defendant Leonard asserted that Elijah had been using drugs; at least one of the other three officers agreed.

146.     Defendants Woodyard, Rosenblatt, and Roedema each later adopted this baseless assertion and told investigators that they believed Elijah's behavior to be consistent with and potentially resultant from drug use, though they had not actually observed any behavior that suggested Elijah was using drugs.

147.     A toxicology screen later revealed that Elijah had no drugs or alcohol in his system beyond marijuana.

148.     Numerous other APD officers filtered into the crime following Defendant Leonard's arrival, including at least Defendants Officer Matthew Green, Officer Alicia Ward, Sergeant Rachel Nunez, Officer Jordan Mullins-Orcutt, Officer James Root, Officer Darren Dunson, Officer Kyle Dittrich, and Officer Erica Marrero.

149.     None of these additional officers took any action to prevent the ongoing application of what was obviously excessive force to Elijah, who was fully restrained, begging for his life, and in clear peril.

150.     Finding that Defendants Woodyard, Roedema, and Rosenblatt could not provide a satisfying reason for their violent contact of Elijah, Defendant Leonard asked Defendant Ward to call the 911 caller and find out "what the story was on the front end."

151.     Defendant Ward called the 911 caller; a few minutes later, she returned to speak with Defendant Leonard, who inquired if her call had yielded anything.

152.     Defendant Ward responded in the negative, and advised Defendant Leonard that the 911 caller just thought it was weird that Elijah had been wearing a mask and making hand gestures.

153.     Defendant Ward did not receive any information from the 911 caller that would have provided APD officers with legal justification to stop or seize Elijah, or continue the

unlawful seizure that was occurring.

154.    As additional APD personnel arrived, Defendant Rosenblatt continued to push Elijah's legs against the ground while Defendant Roedema imposed his considerable weight on Elijah's upper body. The officers alternated between positioning Elijah so he was lying face-down on his stomach and lying on his side.

155.    Though Defendant Roedema could easily have controlled the handcuffed Elijah through his simple presence or through light physical contact, he instead opted to inflict another pain compliance technique. Defendant Roedema drove his knee into Elijah's left arm between the bicep and triceps, causing them to painfully separate.

156.    Defendant Roedema would later tell investigators that the explicit purpose of this technique was to cause pain and to thereby gain compliance.

157.    Elijah was *already* clearly subdued and entirely submissive. There was no need to gain compliance, and no law enforcement purpose behind Defendant Roedema's use of the pain compliance technique; he was simply torturing Elijah.

158.    Without any justification, Defendant Roedema repeatedly inflicted this pain compliance technique on Elijah throughout the APD interaction—sometimes for minutes on end.

159.    Defendant Leonard later reported that he grew increasingly concerned that Elijah was in need of emergency medical attention as the officers awaited the arrival of AFR; yet, Defendant Leonard took no action to prevent his subordinate officers from continuing to inflict excessive and unnecessary force on Elijah.

160.    As he observed Defendant Roedema's continuing torture of Elijah, Defendant Leonard asked Defendant Roedema if he needed relief; Defendant Roedema declined, choosing to remain in a position in which he could continue to inflict needless force on Elijah.

161.     As his subordinates continued to abuse Elijah, Defendant Leonard repeatedly asked Elijah what drugs he had taken. Exhausted from the struggle but cooperative as always, Elijah replied, "Mary," common slang for the legal drug marijuana. As with every other statement Elijah made to APD officers that night, this was the truth—Elijah had used only marijuana earlier that day.

162.     Sergeant Defendant Leonard ignored Elijah's statement, and later falsely reported that Elijah was unresponsive to attempts to communicate with him.

163.     Elijah retched and vomited repeatedly as the APD officers awaited the arrival of AFR.

164.     APD Defendants issued Elijah a confusing mishmash of contradictory orders as he retched and vomited from their continued abuse. While some officers advised Elijah to vomit and "get it out," others, especially Defendant Roedema, treated Elijah's involuntary movements as he helplessly vomited as intentional resistance.

165.     Defendant Roedema repeatedly commanded Elijah to stop, roughly jerked Elijah around on the ground, and continued to inflict the muscle-separating pain compliance technique to Elijah's left arm.

166.     Similarly, when Elijah made involuntary motions in response to Defendant Roedema's repeated applications of the pain compliance technique, Defendant Roedema shouted at Elijah and intentionally inflicted further pain on him.

167.     Defendant Roedema directed another APD Defendant to place pressure on Elijah's ankle as Defendant Roedema continued to apply the pain compliance technique to Elijah's left arm.

168.     Despite his professed concern for Elijah's health, Defendant Leonard also

personally participated in the excessive force, stepping on Elijah's lower legs and leaning on them with the bulk of his body weight as Defendant Roedema persisted in torturing Elijah.

169.     Elijah informed APD Defendants on several occasions that his movements were involuntary, that the officers' application of force was causing him significant pain, and that he was having difficulty breathing. In one instance, he pleaded, "Oh yeah, I'm sorry, I wasn't trying to do that. It's just, *I can't breathe correctly*."

170.     APD Defendants ignored Elijah's pleas and explanations that his movements were involuntary and were the result of the ongoing use of force against him.

171.     Defendant Green, a K-9 officer, took the opportunity to further terrify Elijah in the finest tradition of racist American policing, enthusiastically threatening, despite Elijah's total compliance, to sic his dog on the handcuffed, helpless Black man: "Dude, if you keep messing around, I'm gonna bring my dog out; he's gonna dog-bite you, you understand me? Keep messing around."

172.     Shortly thereafter, Defendant Green replaced Defendant Rosenblatt in holding Elijah's legs.

173.     Disregarding Elijah's repeated vomiting and pleas that he was struggling to breathe, all APD Defendants failed to keep Elijah in a recovery position on his side and instead repeatedly lay him on his stomach even though they plainly had the manpower to easily ensure he remained on his side and, like all law enforcement officers, knew the dangers of restraining someone lying face-down.

174.     APD Defendants subjected Elijah to at least the above-described force over the course of approximately 18 minutes.

175.     Elijah had committed no crime nor was he suspected of committing any crime,

and at no point attempted to strike or otherwise harm any APD officer or anyone else. Yet, the

APD Defendants unlawfully seized Elijah; tackled him to the ground; inflicted a variety of

painful and dangerous control holds and the crushing force of their collective body weight;

tortured him with plainly unnecessary pain compliance techniques—even during the

approximately fifteen minutes after they handcuffed him—and threatened him with electrocution

and the bite of a police dog, among other forceful and terrorizing actions.

### E. __Despite ample evidence to the contrary, AFR Defendants falsely, recklessly, and intentionally claimed that Elijah was experiencing so-called "excited delirium."__

176.    Aurora Fire Rescue personnel arrived at the scene approximately nine minutes

after Defendant Woodyard initially seized Elijah.

177.    Defendant Leonard repeatedly advised the AFR personnel that Elijah had been

subjected to carotid holds and may have briefly been unconscious.

178.    Despite these advisements, Defendant AFR Paramedics Jeremy Cooper and

Lieutenant Peter Cichuniec later denied knowledge that Elijah had been subjected to carotid

holds and had possibly been unconscious prior to their arrival.

179.    Defendant Cooper repeatedly told the APD Defendants in contact with Elijah,

including at least Defendants Roedema and Green, to place Elijah on his side. Though the

numerous officers on scene could easily have done so, they intentionally kept Elijah on his

stomach for an extended period instead.

180.    Defendants Cooper and Cichuniec intentionally and recklessly reported false

observations in order to claim that Elijah suffered from excited delirium, even though Elijah did

not display the symptoms of that condition sufficient to diagnose it, such as paranoia,

hallucinations, incoherent speech or shouting, hyper-aggression, increased strength, or extreme

agitation.

181.    Defendant Cooper falsely insisted to APD investigators that he never heard Elijah use coherent speech, and never heard Elijah even form words.

182.    Body camera footage reveals that Defendant Cooper was observing Elijah while standing approximately one foot away from his head as Elijah loudly begged Defendant Roedema for mercy, saying "Stop, please!"

183.    When Defendant Roedema replied, "Then stop fighting us," Elijah replied, entirely coherently, "I'm trying," indicating that his movements were involuntary.

184.    Shortly thereafter, Elijah even directly begged Defendant Cooper and another nearby AFR firefighter, pleading with them: "Pease help me!" Defendant Cooper ignored Elijah's plea.

185.    Similarly, Defendants Cooper and Cichuniec lied to APD investigators about observing Elijah resisting the APD officers.

186.    Defendant Cichuniec falsely claimed that Elijah was fighting off officers and throwing them off, but body-worn camera footage—including from the time period in which Defendant Cichuniec was present—demonstrates that these claimed observations are false; Elijah neither fought with the APD officers, nor did he throw anyone off of him.

187.    Defendant Cooper falsely told APD investigators that he observed that Elijah was hyper-aggressive and had unusual strength. Body-worn camera footage likewise demonstrates that Defendant Cooper witnessed neither of these non-existent symptoms; in fact, Defendant Cooper witnessed Elijah begging for his life as Defendant Roedema tortured him and jerked him around like a rag doll.

188.    The AFR Defendants made these false claims to police investigators in a transparent effort to justify their false claim that Elijah had excited delirium, which is often said

to be characterized by aggressive, violent behavior and nonsensical speech—none of which Elijah actually presented.

189.    AFR's protocol for patients suffering from excited delirium specifies that they be treated with ketamine.

190.    As Defendant Cooper continued to observe Elijah, Defendant Cichuniec asked Defendant Cooper if he needed narcotics to administer to Elijah. Defendant Cooper replied in the affirmative.

191.    Defendant Cichunic then further asked whether Defendant Cooper wanted to use narcotics or ketamine. Defendant Cooper requested ketamine.

192.    The AFR paramedics did not carry ketamine themselves; instead, a private ambulance company provided ketamine to AFR paramedics

193.    As Elijah's health continued to erode under the weight of Defendants Roedema and Rosenblatt and the pain inflicted by Defendant Roedema and other APD Defendants, Defendant Cichuniec walked away from the scene and radioed to the private ambulance company that they were going to need ketamine.

194.    Defendant Cooper announced to the nearby APD defendants that he was going to administer ketamine to Elijah. Defendant Rosenblatt enthusiastically responded, "Yep, sounds good!" Defendant Roedema also greeted the idea of ketamine with excitement, telling Defendant Cooper, "Perfect, dude, perfect."

195.    Several more minutes passed before the ambulance arrived with the ketamine.

196.    As the AFR Defendants waited for the ambulance, they observed Elijah on the ground. Elijah scarcely moved at all, other than to vomit, as the APD Defendants continued to inflict needless pain compliance techniques. On one occasion, Defendant Roedema slammed

Elijah to the ground when Elijah pushed himself up slightly to vomit—with Elijah's arms still cuffed behind his back.

197.    Both AFR Defendants later falsely claimed that Elijah was actively resisting the officers on top of him throughout their time at the scene, even though body camera footage reveals this is obviously false.

198.    Whether from implicit or explicit bias, the AFR Defendants repeatedly reported false observations that painted a small passive Black man, begging for his life, as some sort of dangerous beast that needed to be injected with a tranquilizer.

199.    In fact, Elijah was so thoroughly subdued that Defendant Roedema took the opportunity to demonstrate his muscle-separating pain compliance technique to Defendant Ward.

200.    Although Elijah was handcuffed, passive, and still under the unnecessary force of other Defendants, Defendant Ward joined Defendant Roedema near Elijah's head, and went hands-on with Elijah as well, placing pressure on Elijah's head and upper back as Elijah retched and groaned in pain.

201.    By this time, as a result of the various forms of excessive force and physical struggle detailed above, Elijah was suffering from a condition known as metabolic acidosis, which occurs when panic and strenuous physical activity (including the struggle to survive) cause a dramatic increase in lactic acid in the blood, leading to a significant drop of the blood's pH.

202.    Along with the general physical exertion of the force to which APD Defendants subjected Elijah, the carotid holds executed by Defendant Rosenblatt and Defendant Woodyard substantially contributed to and worsened the metabolic acidosis.

203.    Metabolic acidosis can lead to organ failure and death.

**F.  AFR Defendants compounded Elijah's worsening medical condition by giving him a dangerous overdose of ketamine, which, combined with the acidosis caused by the excessive force, caused Elijah's death.**

204.    Upon the eventual arrival of the ambulance, the AFR Defendants requested that a paramedic with the private ambulance company draw 500 milligrams of ketamine to be administered to Elijah.

205.    AFR's protocol for the use of ketamine in excited delirium patients specifies that patients should be dosed with five milligrams of the drug per kilogram of bodyweight (5 mg/kg).

206.    Elijah weighed 65 kilograms (143 pounds); at that weight, per the AFR protocol and generally accepted standards of care in the medical community, the appropriate dosage for a person *actually* experiencing excited delirium (which Elijah clearly was not) would have been 325 milligrams.

207.    The paramedic from the private ambulance company later reported that Defendant Cooper failed to discuss Elijah's weight and the appropriate weight-based dosage of ketamine for Elijah when requesting the dose of 500 milligrams.

208.    Defendant Cooper falsely advised the paramedic from the private ambulance company that Elijah was exhibiting signs of excited delirium, even though he had not observed sufficient signs or symptoms of excited delirium to make such a diagnosis, and had in fact heard statements by Elijah that excluded excited delirium as a potential diagnosis.

209.    It was not appropriate to administer ketamine in *any* amount, but even if it had been, the 500 milligrams of ketamine that the AFR Defendants requested constituted a substantial overdose of the drug.

210.    Defendant Paramedic Cooper injected the 500 milligrams of ketamine into Elijah's right deltoid with the assistance of APD Defendants, including at least Defendants

Roedema, Ward, and Green.

211.    As Defendant Cooper performed the injection, Defendant Roedema instructed Defendant Ward to be prepared to inflict yet another pain compliance technique, urging her to drive her fingers into Elijah's neck in the event that he began fighting during the injection. Elijah did not offer any resistance.

212.    No APD or AFR Defendant made any attempt to assess Elijah's breathing or vital signs as they waited for the ketamine to take effect, even though Defendant Cooper later told investigators that he was aware that respiratory depression was a potential effect of ketamine.

213.    The AFR Defendants asked the APD officers to remove Elijah's handcuffs so that he could be moved to a gurney and taken into the ambulance. Demonstrating his complete disregard for Elijah's health, Defendant Roedema refused this medical directive and insisted that the handcuffs be removed after Elijah had been moved.

214.    The officers and paramedics moved Elijah's limp body to the gurney approximately three minutes after the ketamine injection.

215.    Approximately 40 seconds later, Elijah began to take labored, abdominal-breathing, agonal breaths, a sign that he was struggling to breathe *at all* in a moment when his body desperately needed to hyperventilate to relieve the deadly effects of the acidosis.

216.    As the blood pH drops, the body's natural response is to increase the rate and depth of breathing—hyperventilation. Hyperventilation is critical to the body's efforts to maintain the blood pH at a level that can sustain life during an instance of metabolic acidosis.

217.    Agonal breathing is often a symptom of a severe medical emergency, such as stroke or cardiac arrest.

218.    The officers and paramedics moved Elijah into the private ambulance.

219.    The paramedic from the private ambulance company reported that approximately one minute after Elijah was moved to the ambulance—approximately four-and-a-half minutes after the ketamine injection—the paramedics noticed that he was not breathing and had no pulse.

220.    The medical personnel attempted life-saving measures and rushed Elijah to the hospital.

221.    Elijah never regained consciousness. He could not overcome the massive damage to his body caused by the unmitigated acidosis from the excessive force inflicted on him, combined with and exacerbated by the respiratory depression from the ketamine.

222.    Elijah was pronounced brain dead on August 27, 2019, after several days on life support. He was taken off life support on August 30, 2019, and his organs were donated for the benefit of others.

223.    Elijah committed no crime, yet, like many interactions between Black people and the City of Aurora, his ended in tragedy. In a span of eighteen minutes, Defendants subjected Elijah to a procession of needless and brutal force techniques and unnecessary, recklessly administered medication, the combined effects of which he could not survive.

**G.  The AFR Defendants offered contradictory reasoning for the ketamine overdose.**

224.    The AFR Defendants each later told APD investigators that they were responsible for the ketamine dosage, and also offered contradictory stories for how they arrived at the decision to use the dangerous, incorrect dosage of this powerful drug, which they had no legitimate reason to administer to Elijah in any amount.

225.    Defendant Cichuniec claimed he incorrectly estimated Elijah's weight at 85 kilograms (approximately 187 pounds); at that weight, AFR's 5mg/kg dosage protocol would have required a 425-milligram dose, meaning that had Defendant Cichuniec followed the dosage

protocol, he would *still* have administered Elijah a dose too large by 100 milligrams.

226.    Defendant Cichuniec also claimed that the syringe used to draw the ketamine only displayed measurements in increments of 1 cubic centimeter—ketamine is distributed in 100 milligram per cubic centimeter solutions. Defendant Cichuniec stated that he could therefore only provide ketamine in 100 milligram increments.

227.    Defendant Cichuniec reported that he decided to round up to a 500-milligram dose rather than down to a 400-milligram dose, even though his AFR training specifically noted the dangers of using large doses of ketamine, including respiratory depression.

228.    Defendant Cichuniec then admitted to investigators that he actually did have the ability to prepare a dose of 450 milligrams (which still would have been too high of a dose).

229.    When asked why he had not rounded up to that figure rather than all the way to 500 milligrams, Defendant Cichuniec stated that he had taken into account two irrelevant and inappropriate factors in making that decision.

230.    One such factor was Elijah's behavior at the time of the injection (though the evidence shows that Elijah was totally passive and cooperative). AFR's protocol and accepted standards of care do not permit paramedics to alter their dosage of ketamine on the basis of the subject's behavior, or indeed to take any factor other than the patient's weight into account in deciding the appropriate dosage.

231.    The second such factor was Defendant Cichuniec's desire not to radio back to AFR base for permission to use a second dose of ketamine. AFR protocol requires that paramedics receive permission from base in order to administer ketamine beyond the first dose. Defendant Cichuniec feared that he would have to go through this slightly inconvenient process to gain permission for a second dose if the first dose did not take effect, so he simply gave Elijah

an overdose to begin with.

232.     There was no medical basis behind Defendant Cichuniec's decision to administer any ketamine to Elijah, much less such an obvious and egregious overdose.

233.     Defendant Cooper offered APD investigators an entirely different decision-making process with regard to the ketamine dosage, stating that he had estimated Elijah's weight to be 100 kilograms (220.46 pounds) and had therefore precisely followed the 5mg/kg protocol to arrive at the 500mg dosage of ketamine.

234.     In fact, Elijah weighed approximately 65 kilograms (143.3 pounds), a difference of 35 kilograms (over 77 pounds).

235.     Defendant Cooper thus administered a dose appropriate for a man of over 50% greater body weight than Elijah.

236.     Defendant Cooper observed Elijah directly for several minutes prior to the arrival of the private ambulance. He had every opportunity to make an appropriate weight estimate, but failed to do so. He also, like Defendant Cichuniec, had every opportunity to observe that Elijah was not exhibiting signs of excited delirium and there was no justification to medicate him at all.

237.     Defendant Cooper later admitted that part of his error was simply lazy math—he had estimated Elijah to be 200 pounds (still 77 pounds too many), which he divided neatly in half to reach 100 kilograms.

238.     Other people on scene did not so wildly misestimate Elijah's weight. For example, the paramedic from the private ambulance company reported that he had not seen Elijah prior to providing the AFR Defendants with the amount of ketamine they had requested and thus relied on their dosage decision, but once he saw Elijah, he estimated him at 160 pounds or approximately 72.6 kilograms. Defendant Roedema likewise estimated Elijah to be "160, 170

[pounds] at the absolute most, soaking wet."

239.   Defendant Cooper's estimate of 100 kilograms (approximately 220 pounds), provided in his after-the-fact interview with APD investigators, appears nowhere in AFR's records of the event; the only recorded estimate of Elijah's weight is 85 kilograms (approximately 187 pounds).

240.   Both AFR Defendants also later claimed that although they were aware that the AFR protocol required a specific weight-based dosage, they had received training to ignore that protocol in favor of a highly dangerous set of informal guidelines: 500 milligrams of ketamine for "large" patients, 400 milligrams of ketamine for "medium" patients, and 300 milligrams of ketamine for "small" patients.

241.   Of course, Elijah was not a "large" patient by any stretch; he weighed 143 pounds (65 kilograms). Defendant Rosenblatt described him as "skinny" and "slim."

242.   Given the several minutes that Defendant Cooper—a man who claims 25 years' experience as a paramedic—spent observing Elijah prior to injecting him with ketamine, it is less than plausible that he made such a wildly inaccurate estimate of Elijah's weight, or that he believed Elijah to be "large."

243.   AFR ketamine training specifically noted that "everyone gets 500 mg" is poor practice; yet, that appears to be exactly the practice that AFR Defendants elected to use, and a common practice among AFR paramedics, as described below. AFR Defendants' reckless decision, combined with the prolonged and excessive use of force and restraint against Elijah by APD Defendants, cost Elijah his life.

**H.   Multiple APD Defendants intentionally turned off body cameras or directed others to move or turn off body cameras such that the body cameras failed to capture critical moments of the use of force.**

244.     Though Defendants Woodyard, Rosenblatt, and Roedema were each equipped with a body-worn camera, each of the three officers shed their cameras almost as soon as the use of force began.

245.     Defendant Woodyard's camera came off as the officers moved Elijah off the sidewalk toward the brick wall. Defendant Rosenblatt's camera came off seconds later. Defendant Roedema's camera came off as he ran to join the assault on Elijah after Defendant Woodyard tackled Elijah to the ground.

246.     No APD body-worn camera captured video footage of the carotid holds exerted by Defendants Rosenblatt and Woodyard, Defendant Rosenblatt's threatened use of his Taser to menace Elijah, Defendant Roedema's repeated infliction of the armbar hammerlock pain compliance technique, these Defendants' use of their bodyweight to crush Elijah, or any of the force used between Defendant Woodyard's initial tackle of Elijah and his placement in handcuffs.

247.     The above-described forms of force that Defendants inflicted on Elijah during the period when he was on the ground before he handcuffed include only those that Defendants Rosenblatt, Roedema, and Woodyard described to APD investigators. Indeed, they may have inflicted additional force that they did not report.

248.     Had the officers kept their body-worn cameras attached to their bodies, the Court and the public might be afforded a much fuller accounting of the force used against Elijah.

249.     Instead, Defendants Roedema, Rosenblatt, and Woodyard attempted to eliminate such potentially probative, objective video evidence from nearly the moment they seized Elijah, with the hope that their own highly biased (but wholly conflicting) reports would be the only source of information about Elijah's actions and their own as they handcuffed him.

250.     Later during the encounter, after Defendants Roedema and Woodyard had handcuffed Elijah and additional APD personnel had begun to arrive, APD Defendants took additional action to prevent body-worn cameras from capturing further footage of the use of force.

251.     Defendant Roedema picked up his own body-worn camera shortly after Elijah was handcuffed. As Elijah continued to cry out to the officers that he was in pain, Defendant Roedema deactivated the camera without a word. He later handed the camera to another officer, and advised that he had turned it off because it had been damaged, even though it had been recording.

252.     Minutes later, Defendant Rosenblatt picked up his body-worn camera. Defendant Rosenblatt pointed the camera towards Elijah, almost immediately capturing a statement from Elijah that he was in pain and having difficulty breathing. In response, Defendant Roedema pointedly directed Defendant Rosenblatt, "Move your camera, dude."

253.     Defendant Rosenblatt ultimately shut off his own body-worn camera after Defendant Woodyard made a hand signal to him to step aside and speak with him. Defendant Rosenblatt intentionally shut off the camera while the use of force against Elijah was still ongoing and never reactivated it.

254.     An AFR firefighter recovered Defendant Woodyard's camera after Elijah had been moved to the gurney and taken toward the ambulance. Defendant Ward took Defendant Woodyard's camera, still recording, from the AFR firefighter, and walked toward a group of APD Defendants including Defendants Woodyard and Rosenblatt, among others. Defendant Leonard—one of the two sergeants on scene—directed Defendant Ward to turn off the camera, and she did so immediately, then turned off her own body-worn camera as well.

**I.   To attempt to justify the use of excessive force against Elijah, APD charged Elijah with aggravated assault against a police officer, despite the lack of any objective evidence supporting the charge.**

255.    In order to justify their deadly use of force against Elijah, APD Defendants charged Elijah with aggravated assault, a felony.

256.    As discussed below, it is the common custom, practice, and *de facto* policy of the Aurora Police Department to falsely charge citizens who are subject to police force with crimes in order to justify the use of force by police.

257.    Defendant Ward falsely reported that Elijah had assaulted Defendants Woodyard, Roedema, and Rosenblatt with his hands, fists, or feet.

258.    Though Defendants Woodyard, Roedema, and Rosenblatt each falsely claimed that they escalated their use of force against Elijah due to his alleged attempt to grab one of the officers' guns (though they could not agree whose), Defendant Ward made no mention of any of the various conflicting versions of those purported events.

259.    The notion that Elijah assaulted Defendants Woodyard, Roedema, and Rosenblatt with his hands, fists, or feet is belied by the evidence gathered by APD investigators.

260.    No APD officer reported that Elijah punched, kicked, or otherwise attempted to harm them in any way.

261.    Defendant Roedema told investigators that Elijah never attempted to strike any of the APD Defendants in any manner.

262.    With no evidence to support this totally false allegation against Elijah, Aurora's offense report included a notation typically used to denote that the suspect was a member of a gang or other criminal organization.

263.    No APD officer at any time had any basis to suspect Elijah was involved in any

gang or criminal organization.

264.    Elijah never was a member of or otherwise involved with any gang or criminal organization.

265.    The inclusion of the gang-related notation in the APD General Offense report reflects APD's application of the common racist stereotype of Black people as gang members, as well as APD's desire to falsely paint Elijah as a criminal in order to justify its own violent conduct towards him.

**J.    Defendant Aurora's customs, policies, and/or practices within the APD caused the violations of Elijah's constitutional rights.**

266.    APD Defendants' treatment of Elijah was engaged in pursuant to Aurora's custom, policy and/or practice of unlawful conduct, including but not limited to: racially-biased policing; aggression and violence when policing Black people; using excessive force in its law enforcement practices, particularly against Black people; unlawfully detaining, arresting, or charging people, particularly Black people, in order to cover up and justify unconstitutional uses of excessive force; failing to discipline officers, or even find the officers engaged in wrongdoing, in the face of obvious constitutional violations; and failing to adequately train and supervise APD officers.

267.    Aurora has a longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying use of excessive force, particularly against Black people.  As a result, it has become customary among Aurora police officers to use unjustified and excessive force, particularly against Black people, because Aurora has communicated to APD officers that such force is authorized and, indeed, expected, and when used will be defended or covered up by the supervisory and municipal apparatus of the City.

268.    It is the longstanding, widespread, and deliberately indifferent custom, habit,

practice, and/or policy of Aurora to encourage or tolerate law enforcement officers to use race and race-based animus as motivating factors in police decisions and actions, as well as to fail to supervise and train APD officers in the rights of individuals to be free from such race-based decision making in law enforcement. This custom, policy, and/or practice has led to Aurora police officers, on a regular basis, using elevated and unjustified levels of force against Black people.

269.    It is the longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of Aurora to permit law enforcement officers to use any hesitation to comply with an officer's (legal or illegal) commands—even when officer safety is not jeopardized by the hesitation—as justification to use force. In other words, Aurora police officers commonly demand immediate and complete submission, especially by Black people, to any police directive, no matter the command. Failure to utterly and immediately submit customarily triggers hostility, aggression, and violence by Aurora police officers.  This custom, policy, and/or practice has led to Aurora police officers, on a regular basis, using elevated levels of force, especially against Black people, including Elijah.

270.    The APD Defendants' violation of Elijah's constitutional rights, standing alone, is sufficient evidence of Aurora's herein-described customs, policies, and/or practices because all of the involved officers acted in such a similar egregious manner. The sheer number of officers involved—all of whom took active part and/or failed to intervene to prevent fellow officers' use of obviously excessive force—makes clear that their actions were caused by APD's training, customs, policies, and practices. Of particular importance, the active and observational involvement of Sergeants in the overwhelmingly excessive force and their failure to intervene to prevent or reduce the force, also proves that the concerted use of force was pursuant to and

caused by APD's official and/or de facto training, customs, policies, and practices.

271.     Aurora's unconstitutional customs, policies, and practices are further demonstrated by its history of race-based discrimination and brutality as reflected in both a statistical analysis of its policing and by the many cases brought by the victims of such brutality, and its additional misconduct and cover-up after killing Elijah.

> **1. Aurora's unconstitutional customs, policies, and/or practices are demonstrated by statistics that Aurora Police are more likely to use force against Black people, even though Black people comprise a minority of the Aurora population.**

272.     APD targets Black people and subjects them to greater force as compared with other members of the Aurora community.

273.     For example, from January 2013 through December 2019, the Aurora Police Department ranked 8th out of the 100 largest cities in the United States for most police killings per capita. During that same period, APD killed Black people at 4 times the rate it killed white people.[3]

274.     Statistical analysis of APD's recent history with Black people also demonstrates the widespread, systemic nature of APD's unconstitutional pattern of using force against Black people. Statistical analyses show that a statistically significant racial disparity exists in APD's use of force against Black people compared to its rate of using force against Caucasians and its rate of using force all other races besides Black people.[4]

275.     Statistics show that APD's use of force per arrest is 1.26 times greater against Black arrestees than against arrestees of other races. APD's deadly and injurious use of force per

---

[3] Police Accountability Tool, https://mappingpoliceviolence.org/cities (last visited July 9, 2020).

[4] July 14, 2020, Report by Dr. Lance Kaufman of Bardwell Consulting Ltd.

arrest is 1.43 times greater against Black arrestees than against arrestees of other races. APD's use of Taser weapons per arrest is 1.40 times greater against Black arrestees than against arrestees of other races. APD's use of force per arrest was also higher against Black arrestees than against only Caucasian arrestees. Black people arrested by APD thus had a disproportionately high risk of experiencing use of force compared to arrestees of all other races, as well as specifically compared to Caucasians.[5]

276.    In 2017, APD's rate of use of force per person was 5.5 times greater against Black people than people of other races.[6]

277.    Departmental data similarly showed that in 2019, almost half of the people against whom APD officers used force were Black, even though Black people only make up 16% of Aurora's population.

278.    Statistics show that Black people present no higher risk of officer injury during arrest than Caucasian arrestees, meaning that risk to officer does not explain APD's higher use of force against Black people relative to Caucasians.[7]

279.    Despite the consistently disproportionate use of force against Black people—the percentage of Black people whom APD officers have used force against has stayed between 38% and 53% of all APD uses of force since 2014—Aurora's annual use of force reports do not attempt to explain or understand the persistent disparately negative treatment of Black people over the course of many years.

**2.    Aurora's unconstitutional customs, policies, and/or practices are demonstrated by many incidents of unconstitutional brutality by APD, especially against Black victims, and racially-biased policing by APD.**

---

[5] *Id.*

[6] *Id.*

[7] *Id.*

280.     In addition, many other instances of Defendant Aurora's similar constitutional violations show that use of excessive force by APD officers, especially against Black people and other people of color, is customary and the standard operating procedure in the City of Aurora Police Department, as is racially-biased policing. This pernicious, racist custom and practice persists today.

281.     For example, on August 2, 2020, APD officers detained and handcuffed Brittany Gilliam, a Black woman, and four Black children, including her six-year-old daughter, at gunpoint after supposedly mistakenly identifying Ms. Gilliam's car as a stolen motorcycle. APD officers pointed guns at the children and forced them to exit the car and lie on their stomachs; the officers handcuffed two of the children behind their backs. The officers likewise forced Ms. Gilliam to exit the car at gunpoint, handcuffing her and placing her in the back of a patrol vehicle. Video footage of the stop shows the children crying hysterically while surrounded by police officers. The use of force by the officers was clearly excessive, and obviously motivated by racial profiling.

282.     On March 1, 2020, an APD officer confronted Dr. P.J. Parmar, a person of color, when Dr. Parmar arrived at his business. As Dr. Parmar drove up to his garage, he found an APD officer parked on his property. Dr. Parmar stopped immediately and honked. At that point, the officer jumped out of his car and swore at Parmar. The officer then pulled out his gun while running toward Dr. Parmar's car. The officer pointed his gun at Dr. Parmar's head without having any reason to believe that Dr. Parmar was committing or had committed a crime, or posed any threat to the officer or anyone else. Dr. Parmar calmly and repeatedly asked the officer to leave his property, to which the officer repeatedly demanded—without any legal justification—that Dr. Parmar prove that it was his property. Instead of leaving, the officer called in two other

APD officers. APD had no reasonable suspicion much less probable cause for its officers' seizure of Dr. Parmar, which was clearly motivated by racial profiling.

283.    On August 27, 2019, just days after Defendants killed Elijah McClain, APD Officer Levi Huffine arrested an unidentified Black woman for a suspected municipal code violation. Officer Huffine handcuffed the woman and left her hobbled in the back of his patrol car. At some point, the woman slipped such that she was inverted and her head was at the floor of the patrol car in a dangerous and exceedingly uncomfortable position. Though the woman begged Officer Huffine for help, telling him repeatedly that she could not breathe, that her neck was breaking, and that she didn't want to die this way, Officer Huffine ignored her pleas, leaving her in the dangerous, painful position for approximately 21 minutes. Officer Huffine did not so much as look at her as he drove.

284.    On November 21, 2018, Jamie Alberto Torres was fixing a car in his garage with friends when a neighbor complained about noises coming from the garage. APD officers came to Mr. Torres' home solely to investigate this noise complaint, and one of the officers illegally ordered Mr. Torres to exit his garage, threatening to take him to jail. Because Mr. Torres paused momentarily before complying with the illegal order, the officer grabbed Mr. Torres, wrenched his arm behind his back, picked him up, and slammed him to the ground. Even after handcuffing Mr. Torres, the officer continued to attack Mr. Torres by slamming him to the ground again and wrenching his arm behind his back multiple times. During this encounter, Mr. Torres repeatedly screamed in pain. To justify their illegal conduct, the APD officers charged Mr. Torres with resisting arrest and failure to obey a lawful order. A jury found that Mr. Torres was not guilty of these charges at trial. The Aurora Police Department investigated its officers' use of force against Mr. Torres but, as is customary, found no wrongdoing. A lawsuit based on this incident,

claiming excessive force and racial bias, among other things, is ongoing.

285.    In November 2018, APD contacted Tevon Thomas and his companion, a Black woman, because a woman had called 911 to report that she was frightened by them sitting in their car in her apartment building's parking lot at around 4:00 a.m. According to the 911 caller, Mr. Thomas and his companion "did not belong there." APD officers contacted Mr. Thomas and his friend, who provide the officers with a reasonable explanation for their presence in the parking lot and did not give any indication that they posed any danger or threat to the officers or anyone else. Nevertheless, APD officers forced Mr. Thomas and his friend to exit the car, with the intention of searching the vehicle. Ultimately, a federal judge ruled that although the police had a valid reason to contact Mr. Thomas, APD "unlawfully extended and turned [it] into an unjustified or extended stop that had, as its motivation and intention, the search of the car and/or Mr. Thomas." Like in Elijah's case, the officers' lack of any other legitimate reason for their prolonged seizure of Mr. Thomas raises the strong inference that Mr. Thomas's race was the prime motivation.

286.    On September 6, 2018, APD officers used excessive force when, after responding to a car accident involving Andre Williams, a Black man. The officers beat and tased Mr. Williams for not responding immediately to their order. Even though Mr. Williams showed no signs of aggression or attempting to flee, and in fact was having a seizure, the officers took him to the ground; then, after Mr. Williams had complied with an order to get on his stomach and was surrounded by at least three APD officers, the officers punched him in the head, struck his legs with their knees, and tased him twice. A lawsuit based on this incident, claiming excessive force and racial bias, among other things, is ongoing.

287.    On July 13, 2017, one APD officer choke-slammed Vanessa Peoples, a Black

woman, while police were performing a welfare check in her home. Several other APD officers then piled on Ms. Peoples. What "provoked" the officers' attack was Ms. Peoples' protestations of the officers' misconduct and her failure to be 100% compliant with every single police directive (legal or illegal). Eventually, the officers hog-tied Ms. Peoples so tightly that they dislocated her shoulder. Despite Ms. Peoples' continued cries of pain, APD officers kept her hog-tied for 30 minutes with her shoulder dislocated. APD officers had no reason to believe Ms. Peoples had committed a crime; yet they charged her with obstruction. Those charges were later dismissed. Ms. Peoples settled her potential claims against Aurora for $100,000 pre-litigation. Aurora did not discipline any of the involved officers for their unconstitutional actions.

288.    On April 22, 2017, multiple APD officers responded to a car accident that involved Brandon Washington, a Black man. When Mr. Washington, who had hit his head on his vehicle's steering wheel during the crash, dazedly attempted to stand up out of his vehicle, the officers used excessive force by tasing him repeatedly and subjecting him to a variety of other unwarranted physical force, hospitalizing him. Aurora did not discipline any of the involved officers for their unconstitutional actions. A lawsuit based on this incident, claiming excessive force and racial bias, among other things, is ongoing.

289.    On September 14, 2016, an APD officer used unwarranted excessive force against Dennis Seabaugh while Mr. Seabaugh was detained in an Aurora jail cell. After getting frustrated with Mr. Seabaugh's repeated but ineffectual attempts to hang himself by tying a t-shirt around his neck, the officer stormed into the cell, and without providing Mr. Seabaugh reasonable warning, command, or an opportunity to comply, the officer got on top of Mr. Seabaugh and smashed his head down while simultaneously applying his body weight to pin Mr. Seabaugh down. The officer then smashed Mr. Seabaugh's face into a bench in the cell multiple times,

while yanking on his arms; ultimately, the officer used so much force pulling on one of Mr. Seabaugh's arms that he broke Mr. Seabaugh's humerus bone. Aurora settled Mr. Seabaugh's excessive force lawsuit based on the incident.

290.    On August 12, 2016, two APD officers responding to a report of a Black man with a gun ordered several occupants out of a residence, including then-minor Julian Campbell, who was Black. Mr. Campbell came outside as commanded, and subsequently obeyed all orders the APD officers gave. Nonetheless, the officers grabbed him, slammed him to the ground, handcuffed him, and cited him for disobeying a lawful order. During the subsequent criminal trial of Mr. Campbell, the court granted a motion for judgment of acquittal at the end of the prosecution's case. A lawsuit based on this incident asserting, among other things, excessive force and racial bias against Aurora and the individual APD officers is ongoing.

291.    On March 16, 2016, multiple APD officers racially profiled Omar Hassan, a Black man, and ejected him from a coffee shop simply because he is a Black man who was wearing a hoodie.  The Aurora officers acted solely on the basis of Mr. Hassan's appearance; they had no reasonable grounds for suspecting that he was engaged in any criminal conduct. Aurora officers told Mr. Hassan that he had to leave the coffee shop, because Mr. Hassan's "kind of business [was] not welcome [t]here."  When he questioned the directive, one officer placed her hand on her gun, non-verbally threatening Mr. Hassan with use of deadly force. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid Mr. Hassan to settle his legal claims.

292.    On February 19, 2016, Aurora officers stopped and detained Darsean Kelley simply because he was a Black man who happened to be in the vicinity of a reported crime. He questioned the officers' orders and demanded to know whether or not he was being detained. Mr.

Kelley complied with officers' orders but also asserted "I know my rights," just as one officer tased him in the back. The Aurora officers conducting the stop had no reason to believe that Mr. Kelley had committed any crime or was armed or dangerous. To cover up the illegal stop and the unjustified tasing, Aurora charged Mr. Kelley with failure to follow a lawful order. That charge was eventually dismissed, but Aurora found no misconduct and did not discipline any of the officers involved in this unconstitutional detention and use of excessive force. Aurora paid Mr. Kelley $110,000 to settle his legal claims prelitigation.

293.    On December 22, 2015, several APD officers assaulted OyZhana Williams, a Black woman, who was simply visiting her boyfriend in the hospital. When Ms. Williams refused the officer's illegal order that she give him the keys to her car, the officer tackled Ms. Williams, choked her, slammed her head against the ground, and then stomped on her head. Aurora officers had no probable cause or reasonable suspicion to believe Ms. Williams had committed any crime. Yet, to cover up their excessive use of force, the officers charged Ms. Williams with a crime and arrested her. The charges were dismissed. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid over $350,000 to settle Ms. Williams' claims.

294.    On November 14, 2015, two Aurora officers ordered Dwight Crews, a 60-year-old, disabled Black man, out of his home under threat of force, despite the fact that the officers had no warrant and no legal justification to effect a warrantless arrest in the home. After Mr. Crews complied, the officers forcefully threw him to the ground because he had momentarily delayed complying with their illegal commands in order to prevent his cat from getting out of his house. To cover up their unconstitutional conduct, the Aurora officers charged Mr. Crews with resisting arrest. The judge dismissed the charge halfway through Mr. Crews' trial. Upon

information and belief, Aurora did not discipline the involved officers for their unconstitutional treatment of Mr. Crews. Aurora paid Mr. Crews to settle his legal claims.

295.    On June 29, 2015, APD officers used excessive force against Jeffrey Gale, an unarmed Black man, after a bystander called 911 to report that Mr. Gale had attempted to steal someone's wallet. The bystander reported to the 911 dispatcher that no physical force, threats, or weapon were used in the attempted theft. Mr. Gale was 49 years old, 5'7", weighed approximately 150 pounds, and suffered from gout in both ankles. After locating Mr. Gale, two APD officers handcuffed him then forced him to the ground, kicking him in the head and back. Five more APD officers joined in to hogtie Mr. Gale. After he was handcuffed, hogtied, and lying face-down on the ground, the officers tased Mr. Gale at least three times, both in the back of his ribs and the back of his head. A later medical evaluation showed Mr. Gale suffering from metabolic acidosis from the tasing. All of the officers' body cams were turned off or the tapes destroyed, with the exception of a small portion of video from one officer after Mr. Gale was hogtied. Although Mr. Gale could not be seen during most of this one recording, he could be heard crying out in pain and begging for the officers to stop. One officer responded to his cries of pain by saying, "You better shut the fuck up or this is going to get really ugly for you." Aurora settled an excessive force lawsuit brought by Mr. Gale based on this incident.

296.    On March 6, 2015, an Aurora police officer used excessive force in the unjustified shooting and killing of Naeschylus Vinzant-Carter, an unarmed Black man. Mr. Vinzant-Carter was being pursued by Aurora's SWAT team, near an elementary school, when he was confronted. One officer then opened fire, killing Mr. Vinzant-Carter. Aurora paid $2,600,000 to settle Mr. Vinzant-Carter's claims. Upon information and belief, Aurora did not discipline any of the involved officers for this use of excessive force.

297.    On September 25, 2014, an APD officer used excessive force in arresting Cory Scherbarth by using a leg sweep to drop Mr. Scherbarth to the ground despite his lack of aggression toward the officer or anyone else, but rather in response to Mr. Scherbarth's non-threatening questioning of the officer about his intentions. After Mr. Scherbarth was handcuffed with no resistance, while he was lying on his stomach, APD officers slammed his head into the ground and punched him in the face, and one officer pressed his body weight down against Mr. Scherbarth with his knee against Mr. Scherbarth's shoulder. A lawsuit based on this incident claiming excessive force against the individual APD officers is ongoing.

298.    On July 8, 2014, APD officers used excessive force against Gaye O'Malley, a 55-year-old Black woman, after she called 911 to request medical assistance for her friend who had fallen and injured herself at home. Without justification, an APD officer took Ms. O'Malley to the ground using an "arm drag takedown," a "twist-lock," and a "prone control hold." The APD officer had a history of unusually aggressive conduct toward citizens, particularly Black people. Ms. O'Malley was handcuffed, arrested, removed her from the home, and charged with assault, battery, obstructing a police officer, resisting arrest, and obstructing municipal operations. Aurora later settled an excessive force lawsuit brought by Ms. O'Malley.

299.    On July 3, 2014, APD officers used excessive force against Adam Bentz in response to his peacefully using his cellphone to record what he perceived as APD unlawfully towing his vehicle. Despite the fact that there was absolutely no indication that Mr. Bentz posed any physical threat to APD officers or anyone else, an APD officer grabbed Mr. Bentz around his neck, applied constricting pressure, and took Mr. Bentz down to the ground—very similar to the actions Defendant Rosenblatt and Defendant Woodyard used against Elijah when taking him to the ground. The APD officer maintained the hold of Mr. Bentz's neck for 80 seconds while other

APD officers restrained Mr. Bentz's limbs, leading Mr. Bentz to lose consciousness and stop breathing, although he was later revived. The force used against Mr. Bentz far exceeded that necessary to arrest him. Aurora later settled a lawsuit brought by Mr. Bentz asserting excessive force.

300.   On June 22, 2012, when APD officers were searching for three suspects described as Caucasian, they stopped Stetson Fields, a Black man, despite having no probable cause or reasonable suspicion to do so. After Mr. Fields left the encounter, the APD officers chased him until they located him behind a bush. Although Mr. Fields complied with the officers' request to come out from the bush and did not pose any threat to the officers, the officers released a police dog to attack Mr. Fields, leaving him with injuries.

301.   On July 23, 2011, an APD officer conducting an impromptu police undercover investigation shot and killed Juan Contreras, a Latino man. Mr. Contreras had found a set of lost car keys and was attempting to return them to the owner when he was wrongfully suspected of committing a minor crime, and APD shot and killed him. Aurora paid $400,000 to settle Mr. Contreras' claims.

302.   On January 14, 2011, APD officers arrested Jovan McGlothin, a Black man. During the arrest, one of the officers used a racial slur to refer to Mr. McGlothin (saying, "we have you now, [n-word]," or words to that effect). After two officers had Mr. McGlothin entirely within their control such that he posed no threat to them or anyone else, one of the officers used excessive force by kicking Mr. McGlothin in the mouth and chipping one of his teeth. Aurora settled an excessive force lawsuit based on this incident.

303.   On December 18, 2010, Aurora police officers used excessive force in their brutal treatment of Rickey Burrell, a Black man lying helpless in his bed after suffering a seizure. The

officers had responded to a 911 call from Mr. Burrell's family. Rather than render assistance, Aurora officers inexplicably jumped on Mr. Burrell, wrenched his arm behind his back, and handcuffed him. The officers proceeded to roughly drag Mr. Burrell outside, though he was clad only in underwear that he had soiled during his seizure. Mr. Burrell suffered a wrist fracture and other injuries to his back and shoulder as a result of the officers' actions. Aurora paid $100,000 to settle Mr. Burrell's claims. Aurora did not discipline any of the involved officers for their unconstitutional actions.

304.    On May 10, 2009, Aurora police used excessive force in severely beating David Walker, a Black man, after responding to a call at his house in Aurora. APD officers unlawfully entered the house without a warrant, and tased Mr. Walker at least seven times without any reason or justification to do so. APD officers further hit Mr. Walker multiple times with batons, and hit and kicked him. ADP's excessive force caused Mr. Walker to suffered nerve damage. At least one of the APD officers involved had an extensive history of excessive force allegations. Aurora settled an excessive force lawsuit based on the incident brought by Mr. Walker.

305.    On February 12, 2009, Aurora police officers used excessive force in effecting the arrest of Carla Meza, a Latina woman. Aurora officers responded to a domestic violence report after Ms. Meza was accused of assaulting her girlfriend. Officers handcuffed Ms. Meza and proceeded to make homophobic remarks towards her before one of the officers kicked her in the head while she was handcuffed, breaking her eye socket. The officer kicked her in the head because she refused to comply with his unlawful commands. Surprisingly, even Aurora conceded that the officer used excessive force.

306.    In June 2006, an APD officer choked, slapped, and slammed to the ground twelve-year-old Cassidy Tate, a Black girl. The officer had accused the girl's mother of illegally

parking in a handicapped spot, despite the fact that Ms. Tate's mother had a handicap placard and used portable oxygen. In contacting Ms. Tate and her mother, the Aurora officer stated, "can you believe these fucking N's," which was a clear reference to the "n-word." Ms. Tate's claims settled for $175,000. Not only did Aurora not discipline the officer, it later promoted him. Later, the same officer who brutalized Ms. Tate was caught on body camera footage referring to Black people as "Alabama Porch Monkeys."  The officer was later terminated by APD, but the City of Aurora reinstated him.

307.    In December 2003, APD officers shot and killed Jamaal Bonner, a young Black man, during a prostitution sting. When an Aurora SWAT team burst into his hotel room, Mr. Bonner, who was unarmed, stood up in surprise. Aurora officers tased him, causing him to go the ground face down. Though Mr. Bonner had already been effectively tased, was surrounded by Aurora police officers, and was not armed, an Aurora officer shot Mr. Bonner three times, killing him. Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid $610,000 to settle the family's legal claims.

     **3.**   **Aurora's unconstitutional customs, policies and/or practices are demonstrated by APD's continuing misconduct and cover up after killing Elijah.**

          ***a.***   ***Aurora's approval of Defendants' conduct is reflected in its failure to discipline any of the APD Defendants for their role in killing Elijah***

308.    Consistent with APD's longstanding pattern in response to officers who use excessive force against Black people, APD did not impose ***any*** discipline against any of the APD Defendants for killing Elijah.

309.    On February 6, 2020, APD released a statement that the APD Defendants were within APD policy and followed APD training in their actions toward Elijah.

310.    APD specifically confirmed that a Force Review Board had determined that the

force applied to Elijah was within policy and consistent with training.

311.    APD's public statement and failure to discipline any of the APD Defendants makes clear that their conduct was carried out pursuant to the customs, policies, practices, and training of APD, and that such conduct is customary within APD.

> ### b. Defendants Dittrich and Marrero, along with APD Officer Jaron Jones, took photographs at the site where Defendants killed Elijah, reenacting the chokehold that contributed to his death, and sending them to Defendants Rosenblatt and Woodyard as a "joke."

312.    On June 30, 2020—shortly after news of Aurora's murder of Elijah McClain gained international prominence—APD Interim Chief Vanessa Wilson announced that multiple APD officers were the subjects of a completed internal affairs investigation that had revealed that many months earlier, those officers had returned to the scene of Elijah's killing to take photographs of themselves re-enacting elements of that use of force. The photos included mimicry of the carotid chokeholds employed by Defendants Rosenblatt and Woodyard.

313.    The three smiling officers depicted in the photos were Defendant Kyle Dittrich, Defendant Erica Marrero, and APD Officer Jaron Jones.

314.    The actions of Defendants Dittrich and Marrero, along with APD Officer Jaron Jones, in creating and distributing smiling photos of themselves reenacting the chokehold that killed Elijah at the site of his killing by APD officers, demonstrate that rank-and-file APD officers operate under the assumption that racist behavior will be tolerated or approved of by their colleagues.

315.    The APD officers who participated in the offensive photoshoot, which emulated the American racist tradition of white citizens taking photos of themselves at the scenes of lynchings, felt so comfortable in doing so that they took the photos in their APD uniforms.

316.    Indeed, the officers were so unafraid of professional consequence for their racist

mockery of Elijah's death that they freely distributed their photos to other APD officers—again, emulating the tradition of white, racist American citizens who turned their photographs of themselves at lynchings into so-called "lynching postcards" to be mailed to friends and family.

317.     Defendant Dittrich described the decision to take the photos and to select the mocking poses struck by the APD officers as follows: "We had uh Officer Jaron Jones who just came back to team 30 after he was on a suspension, um and I just wanted to show Officer Woodyard that we were together, um, in solidarity thinking of him. So, I thought it would be funny if we took a photo there, and uh the three of us took a photo at the scene. It was just a quick, you know one photo, um, we had Officer Jaron Jones put his arm around my head kind of in a half buddy-buddy but also sort of **as homage to the carotid control hold.**" (Emphasis added.)

318.     Defendant Dittrich sent the photos that he had taken with Defendant Marrero and Officer Jones to a text message group that included at least Defendant Woodyard, Defendant Rosenblatt, Defendant Marrero, Officer Jones, himself, and one other APD officer.

319.     Defendant Dittrich stated that his purpose in sending the photos to Defendants Woodyard and Rosenblatt was to "cheer them up."

320.     Defendant Dittrich further noted that one of his purposes in taking the photos was to cheer up Officer Jones, who had just returned from a lengthy suspension for drinking and driving.[8]

---

[8] APD's and its officers' loyalty to protect one another from accountability for misconduct is illustrated by their March 2019 treatment of APD Officer Nate Meier, who was found passed out drunk behind the wheel of his patrol car while on duty. APD did not conduct a criminal DUI investigation of Officer Meier despite the obvious criminality of his actions. APD has continued this de facto policy of not conducting criminal investigations of officers who drink and drive. In December 2019, APD Officer Annette Brook drove herself to work, where an APD sergeant who contacted her believed she showed "signs consistent with the consumption of alcoholic beverages." A portable breath test demonstrated that she had a blood alcohol content at .138,

321.     Defendant Rosenblatt evidently was cheered by the photos, and replied to the text message group, "HaHa."

322.     Defendants Dittrich, Marrero, and Rosenblatt were ultimately terminated from APD as a result of their actions with regard to the photo. Officer Jones resigned from APD prior to the imposition of discipline.

323.     Defendants Woodyard and Rosenblatt both failed report the racist photoshoot to their APD superiors upon receiving the photos, demonstrating that APD officers do, in fact, protect their colleagues who take racist actions on duty and in uniform. However, Aurora did not discipline Defendant Woodyard for his failure to do so.

324.     Defendants Dittrich, Rosenblatt, and Marrero were never disciplined for their actions (and inactions) on the night of August 24, 2019, that caused Elijah McClain's death, evincing Defendant Aurora's preoccupation with harm to the reputation of its police force rather than the physical harm that its officers, including APD Defendants, cause to the Aurora community.

### c. Defendant Aurora falsely, publicly claimed to have hired an "independent" investigator to examine the use of force against Elijah.

325.     On June 9, 2020, three members of Aurora City Council's public safety committee—Allison Hiltz, Curtis Gardner, and Angela Lawson—issued a statement calling on Aurora City Manager Jim Twombly to order an independent, neutral, third-party review of Elijah's killing.

326.     In response to the statement, Mr. Twombly claimed that the City had already hired an "independent investigator," Eric Daigle.

---

well beyond the threshold for a DUI charge, but APD initiated only an internal affairs investigation, and did not collect evidence for a DUI investigation.

327.     Despite Defendant Aurora's assurances that Elijah's parents would be advised and kept abreast of any investigation conducted into Elijah's death, Defendant Aurora *never* advised Elijah's parents or their counsel of Mr. Daigle's hiring or activities.

328.     Mr. Daigle is a police officer, and his firm's website announces that he has devoted a substantial portion of his career as an attorney to representing, counseling, and advising law enforcement personnel.

329.     The website further boasts, "Defending municipalities, police chiefs, and individual officers from law enforcement liability claims is, and has been, a significant portion of the experience that Attorney Daigle brings to our clients."

330.     Indeed, rather than hiring a truly independent investigator to examine the death of Elijah McClain and to determine what failures within APD led to such a tragic outcome, it appears that Defendant Aurora actually hired a municipal defense attorney to prepare a legal defense for itself and the APD Defendants, while publicly claiming that it had complied with City Council's request for an independent, neutral, third-party review.

331.     Mr. Twombly's decision to mislead the public and city councilors about Mr. Daigle's role, and to claim that an independent investigation was underway when in fact such was only for litigation defense, is emblematic of Defendant Aurora's efforts to simply *appear* to investigate and address the APD Defendants' egregious actions, rather than to *actually* investigate and take accountability for those actions.

332.     After this breach of trust was publicly revealed and the three council members who initially requested an independent, neutral, third-party review of Elijah's death expressed their dissatisfaction with Mr. Twombly's cynical hiring of Mr. Daigle, Aurora officials announced that the City's contract with Mr. Daigle would be terminated.

333.    Under significant public scrutiny, a new investigator has now been announced.

        **d.   *Defendant Aurora actively and violently suppressed public protests calling for justice for Elijah McClain.***

334.    On June 27, 2020, thousands of protesters gathered at the Aurora Municipal Center—which houses APD headquarters—to protest Elijah's killing by APD and AFR personnel and to celebrate Elijah's life with a peaceful violin vigil.

335.    In a bizarre display of force, dozens of APD officers clad in riot armor and openly displaying weapons appeared at the peaceful protest.

336.    Though the protesters posed no threat to the APD officers, the officers began using force against protesters, including the use of batons, pepper spray, and smoke grenades. Video shows terrified protesters fleeing from the onslaught of heavily-armored APD officers, even as a group of violinists peacefully played an improvised melody in Elijah's honor.

337.    The plain intent of Defendant Aurora's use of excessive force to suppress constitutionally-guaranteed protest of its police practices was to chill the protected speech of the protestors present and the protected speech of any future protester. Any citizen who chooses to protest the Aurora government's actions knows that they face the risk of force at the hands of a ruthless APD.

        **4.   Defendant Aurora is liable for the APD Defendants' violations of Elijah's rights.**

338.    Defendant Aurora's unlawful conduct, as set forth in detail herein, amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

339.    Through Defendant Aurora's continuous ratification of unlawful arrests, excessive force, and biased decision making against people of color, particularly Black people,

Defendant Aurora caused the APD Defendants' illegal conduct.

340.    Given APD's long history and widespread practice of APD officers using excessive force against people, particularly Black people, and/or taking racially-biased actions against Black people, Aurora knew or had constructive knowledge that its officers used excessive and unnecessary force and/or would be influenced by racial bias when contacting Black People, and that such bias could cause the APD officers to utilize excessive and unnecessary force against Black people like Elijah.

341.    In light of this knowledge, Defendant Aurora could have and should have pursued reasonable methods for training and supervising APD officers, including the APD Defendants, in interacting with Black people and the appropriate use of force, but it failed to do so.

342.    Moreover, APD persistently failed to meaningfully investigate and discipline numerous APD officers for their similar uses of excessive force, especially those against Black people. Aurora's failure to find officer wrongdoing and failure to discipline officers in this case and in the cases described above and others reflects a custom, policy, and/or practice of encouraging, tolerating, and/or ratifying blatantly illegal and improper conduct. These encouragements, toleration of, and ratifications demonstrate that such police misconduct is carried out pursuant to the policies of and regimen of training provided by Aurora, and that such conduct is customary within APD.

343.    APD's deliberate and conscious failure to correct prior constitutional violations based on similar conduct constituted an affirmative choice to ratify the conduct, and to send a clear message to its law enforcement officers that such misconduct is acceptable and approved. It is Aurora's responsibility to properly train its officers to ensure they perform their duties correctly and to discipline, rather than ratify and encourage, their improper conduct, so that

officers can learn from their mistakes and the mistakes of their colleagues and be deterred from engaging in misconduct that violates the constitutional rights of people with whom the police interact. Aurora's failure to do so has clearly communicated to APD Defendants that excessive force, especially against Black people, as well as racially-biased policing, is authorized and tacitly (or explicitly) encouraged.

344.    Aurora's past ratification and toleration of similar illegal conduct thus caused and was the moving force behind the APD Defendants' use of excessive force against Elijah, and Aurora's failure to discipline the APD Defendants for this illegal use of force will predictably lead to more unconstitutional conduct in the future.

345.    Accordingly, Defendant Aurora knew or had constructive knowledge of the need to provide additional or better training and supervision in and the areas of use of force and avoiding racially-biased policing and made a deliberate choice to not adequately train and supervise APD officers in avoiding excessive force and racially-biased policing.

346.    Aurora knew or should have known that its acts or omissions in this regard were substantially certain to cause APD officers to violate individuals' constitutional rights, like Elijah's, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to its policy and custom of excessive force, especially against Black people, and/or racially-biased policing, and of failing to provide additional or better training and supervision to APD officers in these areas.

347.    Defendant Aurora was deliberately indifferent to Plaintiffs' constitutional rights, because Aurora knew or had constructive knowledge that individuals in Elijah's position would be at a substantial risk of suffering dangerous consequences from Aurora's customs, patterns, practices and/or failure to properly train and supervise its employees.

348.     Defendant Aurora could have and should have pursued reasonable methods for the training and supervising of such employees, or disciplining them if they engaged in misconduct, but intentionally chose not to do so.

349.     Defendant Aurora fostered "a policy of inaction" in the face of knowledge that APD officers were routinely violating specific constitutional rights, which constitutes the functional equivalent of a decision by Aurora itself to violate the Constitution.

350.     Because Defendant Aurora created and tolerated a custom of deliberate indifference and has continuously failed, despite the obvious need to do so, to adequately train and supervise APD officers in use of force and avoiding racially-biased policing, individuals in Aurora, especially Black people, including Elijah, have repeatedly been subjected to violations of their constitutional rights.

351.     Defendant Aurora's policy of failing to act in the face of a long history of excessive force against people, particularly Black people, and its custom, policy, and practice in failing to properly train and supervise its employees despite such history and knowledge or constructive knowledge of such history, were the moving force and proximate cause of Defendants' violation of Plaintiffs' constitutional rights.

352.     Defendant Aurora's custom, policy, and practice of encouraging, condoning, tolerating, and ratifying racially-biased policing and excessive force, as described herein, and the subsequent cover-ups of such constitutional violations, were the moving force behind, and proximate cause of, Defendants' violation of Plaintiffs' constitutional rights.

353.     Defendant Aurora's acts or omissions caused Elijah's death and Plaintiffs' significant damages.

354.     Defendant Aurora's actions, as described herein, deprived Plaintiffs of the rights,

privileges, liberties, and immunities secured by the Constitution of the United States of America.

**K.  Defendants Aurora's and Dr. Hill's customs, policies, and/or practices within the AFR caused the violations of Elijah's constitutional rights.**

355.    The State of Colorado requires the medical directors of EMS agencies to obtain

authority (a "waiver") from the State for the agency's paramedics to be able to administer

ketamine to patients in a pre-hospital setting. The only two reasons for which the waiver allows

the use of ketamine are the treatment of excited delirium and/or extreme or profound agitation.

356.    The Emergency Medical Practice Advisory Council ("EMPAC") provides

recommendations to the Colorado Department of Public Health and the Environment

("CDPHE") regarding which agencies should receive waivers. Guidance issued by EMPAC for

EMS medical directors makes clear that ketamine should not be used for law enforcement

purposes, that there are significant dangers associated with ketamine administration, and that

close supervision is necessary when paramedics are allowed to administer it:

- "Agitation that is not thought to be due to an underlying medical or psychological etiology should be managed by police or other public safety providers. EMS providers should not engage in restraining people for law enforcement purposes";

- "Extreme or profound agitation…is uncommon";

- "[Ketamine] is associated with a significant potential for complications and may lead to the need for intubation and admission to the Intensive Care Unit," and "therefore the use of ketamine should be approached with caution."

- "The EMPAC believes it is wise for interested medical directors to be aware of the most current reported data by CDPHE…from August 2017 to July 2018, [including that]…[p]re-hospital intubations occurred in 1% of cases [and] [h]ospital intubations were reported in 18% of cases."

- Data by Denver paramedics similarly showed a 20% intubation rate of patients who received ketamine injections from Denver paramedics during the same time period; and

- "A successful ketamine waiver will demonstrate significant medical oversight

by the EMS agency medical director receiving the waiver over the EMS providers to whom the medical director extends this practice."

357.    Data collected by CDPHE for 2019 likewise shows the dangers of complications associated with pre-hospital ketamine administration: in 24% of waivered ketamine incidents reported to the agency, complications occurred;

358.    In 2019, AFR was one of 98 agencies that received waivers to use ketamine in a pre-hospital setting for patients who met the clinical criteria for excited delirium and/or extreme or profound agitation.

359.    Of the 98 agencies that received the waiver in 2019, only 30 (less than a third of the agencies) actually used it. AFR was one of those agencies.

360.    Of the 30 agencies that used ketamine under the waiver in 2019, only six agencies—including AFR—used it more than 15 times.

361.    Of the 30 agencies that used ketamine under the waiver in 2019, over 77% of the agencies used it 10 times or less, 57% used it five times or less, 37% used it only once or twice.

362.    Though AFR protocols concerning the use of ketamine require that AFR paramedics provide a weight-based dosage of ketamine, at a rate of five milligrams of ketamine per kilogram of the patient's body weight, AFR paramedics routinely fail to obtain even an estimated weight for patients prior to injecting them with ketamine.

363.    In response to a July 2020 open records request for "[a]ll patient care reports (PCRs) from any incident in which AFR personnel injected any person with ketamine from January 1, 2014, through the present date," the City of Aurora produced a total of twenty-five patient care reports (PCRs).

364.    The standardized form for AFR's PCRs includes a field for "Patient Weight" in the "Patient Hx" section of the form. This field is left blank in nine PCRs, where no weight

information is provided in any part of the report. In other words, nine of the twenty-five PCRs (36%) make no mention at all of patient weight or estimated patient weight.

365.    **In all of the encounters in which AFR medics failed to note the patient's weight, AFR medics administered 500 milligrams of ketamine to the patient.** The fact that AFR injected 500 milligrams of ketamine in each case where it failed to note the patient's weight is evidence of AFR's dangerous *de facto* custom, policy and/or practice of administering a dose of 500 milligrams in cases in which a paramedic cannot or simply fails to estimate a patient's weight.

366.    As noted above, AFR training materials acknowledge the *de facto* custom, policy and/or practice, reminding that "'Everyone gets 500 mg [of ketamine]' practice is not good practice."

367.    The repeated instances in which no patient weight was listed in the PCR and AFR gave the patient 500 milligrams of ketamine is evidence that AFR included this statement in the training materials because it knew that the custom among its paramedics was to provide 500 milligrams of ketamine as the default dose.

368.    Eight of the nine instances of AFR paramedics providing 500 milligrams of ketamine without obtaining an estimated patient weight occurred prior to the encounter with Elijah, the earliest occurring in November 2018.

369.    Just over a month prior to the encounter with Elijah, on July 19, 2019, Defendant Cooper was personally involved on such a call. On that day, AFR paramedic Robert Hodges injected a patient with 500 milligrams of ketamine, and provided no patient weight or estimated patient weight in his report. Defendant Cooper was a part of the four-man AFR team who responded to that call.

370.    Both Defendants Cooper and Cichuniec received training on the use of ketamine from AFR paramedic Sean Dolan in May 2018.

371.    Medic Dolan was among the AFR personnel who responded to an April 10, 2019, call during which AFR medics administered a 500-milligram injection of ketamine despite AFR failing to obtain the patient's weight.

372.    *Every time* that Defendant Cooper, Defendant Cichuniec, or Medic Dolan responded to a call in their capacities as AFR paramedics in which ketamine was administered, a 500-milligram dose was used, regardless of patient size.

373.    Aurora thus knew prior to Elijah's death that its paramedics customarily engaged in a practice known to be dangerous and potentially deadly—injecting patients with 500 milligrams of ketamine when that dose was too high based on their weight—yet Aurora did not take sufficient actions to ensure that AFR paramedics stopped doing so.

374.    Aurora's conscious decision not to adequately act in the face of its knowledge of this custom policy and/or practice among AFR paramedics was a moving force behind AFR Defendants' illegal conduct.

375.    Defendant Cooper never wrote down his supposed estimate of Elijah's weight at 100 kilograms, and never so much as mentioned that estimate until questioned by APD investigators after the fact.

376.    Defendant Cooper knew that in order for the 500-milligram dose to have been in accordance with AFR's five milligrams of ketamine per kilogram of body weight protocol, Elijah would have needed to be an estimated weight of 100 kilograms.

377.    However, this 100-kilogram estimate was wildly inaccurate. Elijah weighed approximately 65 kilograms; Defendant Cooper's estimate was off by over 50%.

378.     As no contemporaneous AFR documentation of the ketamine administration to Elijah ever included Defendant Cooper's 100-kilogram weight estimate, the outlandishly inaccurate estimate was nowhere close to Elijah's actual weight, and Defendant Cooper's assertion that Elijah weighed 100 kilograms, the exact number of kilograms required to make it appear that he had followed the AFR protocol, occurred only after police questioning, the most plausible explanation for the 500 milligram dose in this case is that Defendant Cooper failed to estimate Elijah's weight before the ketamine administration and rather followed AFR's *de facto* custom, policy and/or practice of providing 500 milligrams of ketamine to patients whose weights were not estimated prior to administration.

379.     Defendant Cichuniec's inconsistent explanation of how AFR Defendants decided to administer a dose of 500 milligrams of ketamine to Elijah provides further evidence that AFR Defendants did not in fact determine Elijah's weight before the injection, and, instead, provided *post hoc* explanations to try to cover up this fact.

380.     As further evidence of AFR's custom, policy, and/or practice of administering a blanket dose of 500 milligrams of ketamine to patients whose weight was not estimated before the administration, and that such practice was at least tolerated, if not encouraged, the practice has continued since Elijah's death.

381.     As recently as May 30, 2020, AFR paramedics provided a patient with a dose of 500 milligrams of ketamine without obtaining the patient's weight for the PCR.

382.     AFR's unlawful conduct, as set forth herein, amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law

383.     Aurora's failure to discipline or counsel the AFR Defendants for their role in

Elijah's death confirms that the AFR Defendants' conduct was carried out pursuant to the customs, policies, practices, and regimen of training of AFR, and that such conduct is customary within AFR. Had such conduct not been customary and pursuant to approved policy, Aurora would have taken disciplinary or ameliorative action in response to Elijah's death.

384.    Indeed, in an AFR news release posted on November 22, 2019, AFR Chief Fernando Gray provides the following quote: "The unwavering opinion of Aurora Fire Rescue is that the actions of the AFR medics on the scene of the [Elijah McClain] incident met the expectations set by applicable protocol and policy."

385.    Based on this custom, policy, and/or practice shown by the numerous incidents described above of 500-milligram ketamine administrations to patients whose weight AFR paramedics did not estimate, as well as AFR trainers' implicit recognition that AFR paramedics were adhering to such a practice, Aurora and Defendant Dr. Hill knew or should have known that AFR paramedics would display deliberate indifference to the serious medical needs of patients to whom ketamine was administered. By ignoring the requirement to estimate patient weight and adjust the ketamine dosage accordingly, AFR paramedics disregarded the needs of such patients to receive the correct ketamine dose. This is particularly true in light of AFR's *de facto* custom, policy, and/or practice of defaulting to a dose of 500 milligrams, regardless of patient size.

386.    In light of this knowledge or constructive knowledge, Aurora and Defendant Dr. Hill could have and should have changed its policies and/or pursued reasonable methods for training, supervising, and disciplining AFR paramedics in the area of ketamine administration, but these Defendants made a conscious and deliberate choice not to do so.

387.    Because Aurora and Defendant Dr. Hill created, tolerated and, at times, encouraged a custom, policy, and/or practice of deliberate indifference to patients' serious

medical needs and continuously failed, despite the obvious need to do so, to adequately train, discipline, and supervise AFR paramedics in this area, individuals including Elijah have been subjected to violations of their constitutional rights.

388.     Aurora and Defendant Dr. Hill knew or should have known that its acts or omissions in failing to ensure the proper administration of ketamine by AFR paramedics were substantially certain to cause AFR paramedics to violate individuals' constitutional rights, and these Defendants consciously or deliberately chose to disregard this obvious risk of harm in adhering to its policies, practices, and/or customs in this area, and failed to provide additional or better training and supervision in this area.

389.     Aurora and Defendant Dr. Hill were deliberately indifferent to Elijah's and Plaintiffs' constitutional rights because they knew that individuals in Elijah's position would be at substantial risk of suffering dangerous consequences from the AFR custom, policy, and/or practice of blanket administrations of 500 milligrams of ketamine and the failure to adequately train and supervise paramedics to rectify this custom, yet these Defendants failed to take adequate action to rectify this known deficiency.

390.     The need to put an end to this dangerous custom, policy, and/or practice and for related adequate training and supervision, as well as the probability that the failure to do so would cause an individual like Elijah to die or be seriously injured, was so obvious that Aurora's and Defendant Dr. Hill's failure to do so constituted deliberate indifference to Elijah's and Plaintiffs' constitutional rights.

391.     Elijah's death was the result of customary and known deficiencies in the medical care provided to patients by AFR, and Aurora's and Defendant Dr. Hill's unconstitutional policies, customs, practices, and/or lack of adequate training and supervision, as described

herein, were the moving force and proximate cause of AFR Defendants' violating Elijah's constitutional right to be free from deliberate indifference to his serious medical needs.

392.     Aurora's and Defendant Dr. Hill's deliberate indifference to Elijah's and Plaintiffs' constitutional rights caused Elijah's death and Plaintiffs substantial damages.

## V.  STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment**
**Excessive Force**
**(Estate of Elijah Javon McClain against Defendants City of Aurora, Officer Nathan Woodyard, Officer Randy Roedema, Officer Jason Rosenblatt, Officer Matthew Green, Sergeant Dale Leonard, Officer Alicia Ward, Officer Kyle Dittrich, Officer Erica Marrero, Officer James Root, Officer Jordan Mullins-Orcutt, Officer Darren Dunson, and Sergeant Rachel Nunez)**

393.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

394.     At all times relevant to the allegations in this Complaint, the APD Defendants acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers and sergeants of the APD.

395.     Aurora and the APD Defendants are "persons" under 42 U.S.C. § 1983.

396.     Under the Fourth Amendment, as incorporated against the states by the Fourteenth Amendment, Decedent Elijah McClain had a clearly established constitutional right to be secure in his person against unreasonable seizures through the use of excessive force.

397.     Under the application of the specific facts and totality of circumstances as described herein, APD Defendants violated Mr. McClain's clearly established constitutional rights.

398.     Any reasonable law enforcement officer knew or should have known of these clearly established rights at the time of Mr. McClain's death.

399.     APD Defendants did not have a valid legal basis to seize Mr. McClain. There was no reasonable suspicion or probable cause to believe that Mr. McClain had committed any crime.

400.     APD Defendants did not have a valid legal basis to seize Mr. McClain in the manner and with the level of force used under the circumstances present.

401.     APD Defendants unlawfully seized Mr. McClain by means of objectively unreasonable and excessive force when they had no reasonable belief Mr. McClain had committed or was going to commit a crime, possessed a weapon, or posed a threat to any officer or any other person.

402.     The APD Defendants who observed other APD Defendants' unlawful seizure and use of force against Mr. McClain had a legal duty to intervene to stop this illegal conduct.

403.     APD Defendants engaged in and/or failed to intervene in the use of force that was objectively unreasonable in light of the facts and circumstances surrounding them, violating Mr. McClain's Fourth Amendment rights.

404.     APD Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

405.     Any reasonable officer in their position would have known that it was unreasonable to use the amount, type, and duration of force used—or to fail to intervene to attempt to prevent the use of such force—and that to do so (or to fail to intervene to prevent the use of such force) would violate Mr. McClain's clearly established constitutional rights.

406.     APD Defendants' excessive use of force and/or failure to intervene to prevent the excessive use of force caused Mr. McClain to be unlawfully seized and thereby caused his death.

407.     APD Defendant Officers Woodyard, Roedema, Rosenblatt, Green, and Ward and Sergeant Leonard ("Direct Participation Defendants") are liable for the use of excessive force

against Mr. McClain based on their direct participation in the force used.

408.    Each individual APD Defendant, including the Direct Participation Defendants and Defendants Officers Dittrich, Marrero, Root, Mullins-Orcutt, and Dunson, and Sergeant Nunez, is liable for the use of excessive force against Mr. McClain for their failure to intervene and protect Mr. McClain from harm at the hands of each Direct Participation Defendant.

409.    At all relevant times, each individual APD Defendant had a duty to protect Mr. McClain, an individual in custody of APD officers, from harm and unconstitutional treatment at the hands of other APD officers.

410.    Each individual APD Defendant knew or reasonably should have known that the acts of each Direct Participation Defendant presented an excessive risk of harm to Mr. McClain, yet each APD Defendant failed to take reasonable steps to protect Mr. McClain from the objectively unreasonable use of force by each of the Direct Participation Defendants, despite being in a position and having an opportunity to do so. Each APD Defendant is therefore liable for the damages resulting from the objectively unreasonable force used by each of the Direct Participation Defendants.

411.    Each Direct Participation Defendant knew or reasonably should have known that the other Direct Participation Defendants presented an excessive risk of harm to Mr. McClain, yet none of Direct Participation Defendants took reasonable steps to protect Mr. McClain from the objectively unreasonable use of force by the other Direct Participation Defendants, despite being in a position and having an opportunity to do so.

412.    Each APD Defendant is therefore liable for the damages resulting from the objectively unreasonable force used by the Direct Participation Defendants, including the damages resulting from the aggregate effects of the multiples uses of force, Mr. McClain's pain

and suffering preceding his death and his death itself.

413.    Defendants Sergeants Leonard and Nunez ("Supervisory Defendants") were the sergeants and thus supervisors on site when the Direct Participation Defendants subjected Mr. McClain to excessive force and all APD Defendants failed to intervene.

414.    At all relevant times, the Supervisory Defendants possessed supervisory authority over all APD Defendants, including Direct Participation Defendants.

415.    At all relevant times, the Supervisory Defendants had a legal duty to adequately supervise all APD Defendants, including Direct Participation Defendants. They failed to do so here by, inter alia, failing to properly direct the conduct of their subordinates, failing to enforce proscriptions against the use of excessive force, and/or failing to intervene to stop their subordinates' excessive use of force despite knowing or reasonably constructively knowing that the Direct Participation Defendants presented an excessive risk of harm to Mr. McClain, and knowing that those Defendants were inflicting excessive force on Mr. McClain.

416.    All APD Defendants, including Supervisory Defendants, caused Mr. McClain to be deprived of his constitutional right to be free from excessive force because, by failing to protect him from the use of excessive force by each of the Direct Participation Defendants, these Defendants set in motion a series of events that they knew or reasonably should have known would cause the Direct Participation Defendants to deprive Mr. McClain of his constitutional rights.

417.    APD Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. McClain's federally protected rights, and they engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. McClain's constitutionally protected

rights.

418.     The acts and omissions in which the APD Defendants engaged were because of
and pursuant to the customs, practices, policies, and/or training of Defendant City of Aurora.

419.     As alleged in detail above, Defendant Aurora has a custom, policy, and practice of
encouraging, condoning, tolerating, ratifying, and even rewarding the use of excessive force by
APD officers. This is manifested through, among other things, APD's grossly inadequate
training, supervision, and discipline of APD officers relating to the use of excessive force.

420.     Defendant Aurora and the Supervisory Defendants were on notice of APD's
defective customs, policies, and/or practices before APD Defendants' excessive use of force
against Mr. McClain.

421.     The need for additional and effective use of force policies, training, and/or
supervision was obvious, and the Supervisory Defendants and Defendant Aurora exhibited
deliberate indifference to the known and substantial risk of harm to Mr. McClain and others by
failing to create adequate use of force policies and/or to adequately train or supervise APD
officers in the use of force.

422.     The Supervisory Defendants' and Defendant Aurora's failure to create and
implement adequate use of force policies and/or to adequately train and/or supervise APD
officers in the use of force was substantially certain to cause APD officers to violate the
constitutional rights of individuals like Mr. McClain to be free from excessive force, and these
Defendants consciously or deliberately chose to disregard this risk in failing to change the use of
force policies and/or adequately train and/or supervise APD officers in the use of force. These
acts and/or omissions constituted a deliberate choice by the Supervisory Defendants and
Defendant Aurora among several alternatives to pursue a course of action regarding creating and

implementing policies, training, and supervision in the area of use of force.

423.    Defendant Aurora and the Supervisory Defendants set in motion a series of events that they knew would cause Mr. McClain, or an individual in a similar situation as Mr. McClain, to be deprived of his constitutional right to be free from excessive force.

424.    But for the above acts or omissions of Aurora and the Supervisory Defendants, the APD Defendants would not have violated Mr. McClain's constitutional rights, and such a deprivation was a natural and foreseeable consequence of the Aurora and Supervisory Defendants' acts and omissions.

425.    The herein described acts or omissions of Defendant Aurora, and each individual APD Defendant were the moving force behind the violation of Mr. McClain's constitutional right to be free from excessive force and proximate cause of Plaintiff Estate's significant injuries, damages, and losses, including Mr. McClain's death.

426.    The herein described acts or omissions of the Defendant Aurora and the individual APD Defendants were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. McClain's death, the physical and mental pain and anguish Mr. McClain suffered before and during his death (including but not limited to the extended time period between Defendants' seizure of Mr. McClain and his death), the loss of Mr. McClain's relationship and companionship with his family and friends, the loss of Mr. McClain's constitutional rights, his loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. McClain's permanent lost earnings and earnings capacity, medical bills, and funeral expenses.

427.    APD Defendants' and Aurora's intentional actions or inactions as described herein intentionally deprived Mr. McClain of due process and of rights, privileges, liberties, and

immunities secured by the Constitution of the United States of America.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment
### Denial of Equal Protection
**(Estate of Elijah Javon McClain against Defendants City of Aurora, Officer Nathan Woodyard, Officer Randy Roedema, Officer Jason Rosenblatt, Officer Matthew Green, Sergeant Dale Leonard, Officer Alicia Ward, Officer Kyle Dittrich, Officer Erica Marrero, Officer James Root, Officer Jordan Mullins-Orcutt, Officer Darren Dunson, and Sergeant Rachel Nunez)**

428.    Plaintiffs incorporate all other paragraphs of this Complaint as if set forth herein.

429.    APD Defendants were acting under color of state law and within the course and scope of their employment in their actions and inactions at all times relevant to this action.

430.    At the time of the complained of events, Mr. McClain had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

431.    Mr. McClain's race was a motivating factor in APD Defendants' decision to seize him, use excessive force against him, and/or fail to intervene in the seizure and the use of such excessive force. APD Defendants acted with the intent or purpose of depriving Mr. McClain of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment.

432.    APD Defendants treated Mr. McClain less favorably—and with much more unreasonable force—than his similarly situated White counterparts, wholly or in part because he was Black.

433.    APD Defendants acted or intentionally failed to act with an intent or purpose to discriminate against Mr. McClain based upon his race.

434.    There was no rational basis for APD Defendants' discriminatory actions and inactions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

435.     APD Defendants seized and used excessive force against Mr. McClain without reasonable suspicion or probable cause to believe that Mr. McClain had committed a crime, posed a threat of harm to any other person, or was a flight risk that would legally justify the force used. The lack of any such reasonable suspicion or probable cause, along with APD's long history of racially biased policing, are evidence that the seizure of Mr. McClain by APD Defendants' use of force against him was motivated in whole or in part because of Mr. McClain's race.

436.     APD officers' history and disproportionate use of excessive force against Black people provide evidence of discriminatory intent. APD's clear pattern of disproportionate use of excessive force against Black people is unexplainable on grounds other than race.

437.     APD Defendants intentionally, willfully, unreasonably, and wantonly seized Mr. McClain by using excessive force against him, and/or failing to intervene in the use of excessive force against him, wholly or in part because of his race.

438.     APD Defendants' actions were objectively unreasonable considering the facts and circumstances confronting them.

439.     APD Defendants engaged in these actions or inactions intentionally, willfully, maliciously, and wantonly, showing deliberate indifference to and reckless disregard of Mr. McClain's federally protected constitutional rights.

440.     Defendant Aurora failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to engage in racially biased policing, resulting in the APD Defendants' unlawful seizure via the use of excessive force against Mr. McClain or failure to intervene therein. Defendant Aurora particularly failed to properly train, supervise, and/or discipline its employees regarding the use of excessive force against Black

people, and the prohibition on using race as a motivating factor in taking police actions, including the use of force.

441.     Aurora's inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Aurora.

442.     Considering the duties and responsibilities of personnel of Defendant Aurora—who must police and interact with Black people regularly—and the frequency with which such law enforcement personnel will confront Black people while discharging their duties as law enforcement officers as described herein, the need for specialized training, supervision, and discipline regarding such decisions was so obvious, and the inadequacy of training and/or supervision was so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Aurora is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

443.     Such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of APD Defendants' racially biased treatment of Mr. McClain, and makes up an unconstitutional policy, procedure, custom, and/or practice.

444.     Aurora exonerated APD Defendants for their racially biased conduct under Aurora's municipal customs, policies and/or actual practices described herein. Such decision to exonerate racially discriminatory conduct was made deliberately and pursuant to Aurora's longstanding customs and practices. The decision sends a clear message that APD Defendants acted pursuant to the customs, practices, and policies of Defendant Aurora.

445.     Defendant Aurora's failure to adequately train and/or supervise, as well as the failure to take appropriate disciplinary or remedial action on past instances of similar

unconstitutional conduct, as described herein, was a legal and proximate cause of Mr. McClain's death.

446.    As a direct and proximate result of Aurora and APD Defendants' actions, Mr. McClain lost his life and Plaintiff Estate has been and continues to be damaged by APD Defendants' racially motivated seizure via unreasonable use of excessive force. Mr. McClain endured physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, loss of consortium with his family and friends, and sense of security and individual dignity, and tragically the loss of his life at the age of 23.

447.    The herein described acts or omissions of Defendant Aurora and the individual APD Defendants were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. McClain's death, the physical and mental pain and anguish Mr. McClain suffered before and during his death (including but not limited to the extended time period between Defendants' seizure of Mr. McClain and his death), the loss of Mr. McClain's relationship and companionship with his family and friends, the loss of Mr. McClain's constitutional rights, his loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. McClain's permanent lost earnings and earnings capacity, medical bills, and funeral expenses.

448.    APD Defendants' and Aurora's intentional actions or inactions as described herein intentionally deprived Mr. McClain of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Failure to Ensure Basic Safety and Provide Adequate Medical Care and Treatment**
**(Estate of Elijah Javon McClain against Defendants City of Aurora, Lieutenant Peter Cichuniec, Paramedic Jeremy Cooper, and Dr. Eric Hill)**

449.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

450.    At all times relevant to the allegations in this Complaint, AFR Defendants acted (or failed to act) under color of state law and within the course and scope of their employment.

451.    At the time of AFR's contact with Mr. McClain, Mr. McClain was in the custody of APD officers on behalf of the City of Aurora.

452.    Because Mr. McClain was in custody of APD, and Aurora had restrained Mr. McClain's freedom to act on his own behalf at the time of AFR Defendants' contact with him, AFR Defendants had a constitutional duty to protect Mr. McClain, to provide him adequate aid, and to provide for his safety and general well-being, including his basic needs to be kept reasonably safe and receive adequate medical care.

453.    Mr. McClain had a clearly established due process right under the Fourteenth Amendment to be kept reasonably safe and to receive adequate medical care while in the custody of APD.

454.    Under the Fourteenth Amendment, Mr. McClain was protected from conduct that was not rationally related to a legitimate nonpunitive governmental purpose or actions that appear excessive in relation to that purpose.

455.    Each AFR Defendant and Defendant Dr. Hill knew or should have known of these clearly established rights at the time of their contact with Mr. McClain.

456.    Under the application of the specific facts and totality of circumstances as described fulsomely herein, AFR Defendants and Defendant Dr. Hill violated Mr. McClain's clearly established constitutional rights.

457.    At most, an objective reasonableness standard applies to Mr. McClain's claims

against the AFR Defendants. He had not been arraigned for any criminal offense and was not in APD custody because of an adjudication of guilt within a criminal context. However, for the reasons amply described above and herein, AFR Defendants also had the subjective mental state of deliberate indifference to Mr. McClain serious and obvious medical needs.[9]

458.    Mr. McClain was in obvious and serious need of aid and medical care and treatment during his contact with AFR Defendants.

459.    Rather than provide adequate medical care, AFR Defendants compromised Mr. McClain's basic safety by injecting Mr. McClain with an overdose of a drug that AFR Defendants knew or should have known put him at substantial risk of suffering serious harm.

460.    AFR Defendants then failed to immediately monitor Mr. McClain and provide needed medical assistance after the injection of the ketamine, despite knowing or constructively knowing that their failure to do so exacerbated the risk of his suffering serious harm and despite his obvious medical distress.

461.    AFR Defendants' conduct was objectively unreasonable.

462.    AFR Defendants' special relationship with Mr. McClain—in that he was in Defendants' legal custody and detention against his will at the time of their tortious acts, and unable to provide for his own serious medical needs—triggered an affirmative duty on their part to protect Mr. McClain from harm; AFR Defendants' actions or inactions violated the duty in substantially departing from accepted professional judgment, practice, or standards, and from the

---

[9] Alternatively, a professional judgment standard applies because Defendants had taken Mr. McClain into their custody by restraining him against his will and therefore had a special relationship with Mr. McClain. This special relationship included a duty to provide adequate medical care to Mr. McClain, and the legal basis upon which their conduct is judged, a professional judgment standard, is a more lenient standard for plaintiffs than deliberate indifference. *See Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *Yvonne L. v. New Mexico Dep't of Human Services*, 959 F.2d 883, 894 (10th Cir. 1992); *T.M. ex rel. Cox v. Carson*, 93 F. Supp. 2d 1179, 1192 (D. Wyo. 2000).

duty to provide reasonable care under all the circumstances and created the conditions that

caused Mr. McClain's severe pain and suffering and, ultimately, his death.

463.     AFR Defendants' actions and inactions also constituted deliberate indifference to

Mr. McClain's obvious and serious medical needs. A reasonable official in the circumstances

would have appreciated the high degree of risk involved in AFR Defendants' actions and

inactions—making the consequences of the AFR Defendants' conduct obvious.

464.     At all times relevant to the allegations in this Complaint, each AFR Defendant

knew of and disregarded the excessive risks associated with their treatment of Mr. McClain.

465.     With deliberate indifference to Mr. McClain's constitutional right to be kept

reasonably safe and his right to receive adequate medical care for his known serious medical

needs, as provided by the Due Process Clause of the Fourteenth Amendment to the United States

Constitution, AFR Defendants knowingly failed to adequately and timely examine, treat,

monitor, supervise, and/or obtain medical care for Mr. McClain's obvious medical needs, or to

intervene to ameliorate the other Defendants' deliberate indifference to the obvious serious

medical needs of Mr. McClain (despite having the duty, requisite knowledge, and opportunity to

intervene). They did so despite their knowledge of Mr. McClain's serious medical needs, thereby

placing him at risk of serious physical harm, including death. Therefore, the AFR Defendants

knew or were aware that Mr. McClain faced a substantial risk of harm and disregarded this

excessive risk by injecting him with an overdose of ketamine and then failing to take measures to

reduce the risks caused by such action.

466.     By committing these actions and inactions, AFR Defendants caused Mr.

McClain's injuries and death and Plaintiffs' damages.

467.     Defendants Aurora and Dr. Hill are liable for AFR's deliberately indifferent

policies, practices, customs, widespread usages, and failures to adequately train and supervise their employees and contractors regarding, among other things, when to reasonably administer ketamine to a patient, the dosage to administer, and procedures surrounding the use of ketamine.

468.     Defendants Aurora and Dr. Hill are directly liable for their own deliberately indifferent policies, customs, and practices that were moving forces in Mr. McClain's constitutional injury, as well as their deliberately indifferent training and supervision of AFR paramedics, and their own roles in setting policy or providing training to AFR paramedics regarding ketamine.

469.     Defendant Aurora is also liable under the nondelegable duty doctrine for the deliberately indifferent policies, customs, practices, training and supervision of any private company with which it contracted to provide policies and training regarding ketamine.

470.     As described in detail above, Defendants Aurora's and Dr. Hill's deliberately indifferent policies, customs, practices, and/or failures to adequately train and/or supervise were moving forces in the violation of Mr. McClain's constitutional rights.

471.     Defendants Aurora and Dr. Hill were on notice that its deliberate indifference would result in serious injury and death.

472.     Defendants Aurora's and Dr. Hill's failures in training and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public and a moving force in the complained of injuries and death of Mr. McClain.

473.     Defendants Aurora's and Dr. Hill's ratification of the conduct by AFR Defendants that was a substantial contributing factor or caused the death of Mr. McClain evidences that such conduct was engaged in pursuant to policy, custom, and practice of AFR; had it been outside of policy, disciplinary or remedial action would have been taken.

474.     Therefore, Defendants Aurora and Dr. Hill set in motion a series of events that they knew would cause an individual in a similar situation as Mr. McClain to be deprived of his constitutional right to adequate medical care. But for the above acts or omissions of Aurora, Mr. McClain would not have been subjected to a violation of his constitutional rights, and such a deprivation was a natural and foreseeable consequence of Defendants Aurora's and Dr. Hill's acts and omissions.

475.     Defendant's and Dr. Hill's policies, practices, habits, customs, widespread usages, and/or lack of adequate training and supervision that resulted in the failure to provide proper medical care to Mr. McClain were not rationally related to a legitimate nonpunitive governmental purpose, or were excessive in relation to that purpose.

476.     The herein described acts or omissions of each AFR Defendant, Defendant Aurora, and Defendant Dr. Hill were a moving force and legal and proximate cause of, and/or substantial contributing factor to, the violation of Mr. McClain's constitutional right to receive adequate medical care.

477.     The herein described acts or omissions of these Defendants were a moving force and a legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. McClain's death, the physical and mental pain Mr. McClain suffered before and during his death, the loss of Mr. McClain's constitutional rights, loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. McClain's medical bills, funeral expenses, and permanent lost earnings and earnings capacity.

478.     The herein described acts and inactions were taken by AFR Defendants and Defendant Dr. Hill in reckless and callous indifference to Mr. McClain's federally protected rights, and these Defendants engaged in these actions and omissions maliciously, intentionally,

willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. McClain's constitutionally-protected rights.

479.     The intentional actions or inactions of each Defendant as described herein intentionally deprived Mr. McClain of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused other damages.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Substantive Due Process – Deprivation of Liberty – Forcible Administration of Medication**
**(Estate of Elijah Javon McClain against Lieutenant Peter Cichuniec and Paramedic**
**Jeremy Cooper)**

480.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

481.     AFR Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

482.     Under the Fourteenth Amendment to the United States Constitution, Mr. McClain had a constitutionally protected interest in making his own decision whether to accept or reject the administration of potentially dangerous drugs (like ketamine) in non-emergent circumstances.

483.     Defendant Paramedic Cooper and Defendant Paramedic Cichuniec, acting in coordination and in concert with each other, violated Mr. McClain's clearly established Fourteenth Amendment right to refuse the forcible administration of medication by requesting that another paramedic draw 500 milligrams of ketamine to be administered to Mr. McClain.

484.     Defendant Paramedic Cooper also violated Mr. McClain's clearly established Fourteenth Amendment right to refuse the forcible administration of medication by intentionally

injecting him with the ketamine. In so doing, Defendant Cooper effectuated the illegal plan to forcibly administer ketamine to Mr. McClain that he and Defendant Cichuniec had agreed upon.

485.     There obviously was no medical or other emergency that justified the administration of *any* ketamine to Mr. McClain, much less the profoundly impactful and excessive dosage the AFR Defendants caused to be forcibly administered to him.

486.     At the time AFR Defendants, acting in coordination and in concert with each other, caused Mr. McClain to receive 500 milligrams of ketamine, AFR Defendants knew that he was already physically restrained, that he did not present a threat to himself or others, and that he was not resisting the police or anyone else.

487.     Moreover, Mr. McClain obviously was not displaying any medical symptoms—physical, psychological, or otherwise—that would have justified the forcible administration of ketamine to him. AFR Defendants also were aware of these facts at the time they administered the ketamine.

488.     There plainly was no legitimate law enforcement or medical purpose for injecting Mr. McClain with ketamine, as Mr. McClain presented absolutely no safety or security threat.

489.     AFR Defendants' administration of the ketamine to Mr. McClain clearly was not in his own medical interest based on the facts the Defendants knew at the time.

490.     AFR Defendants all knew that Mr. McClain had not consented to the administration of ketamine to him.

491.     AFR Defendants engaged in the aforementioned conduct intentionally, willfully, and wantonly.

492.     AFR Defendants engaged in the aforementioned conduct with reckless or callous disregard of, or indifference to, the rights and safety of Mr. McClain and others.

493.     AFR Defendants' conduct falls outside the standards of civilized decency and therefore shocks the conscience.

494.     The Estate has been and continues to be damaged by AFR Defendants' violation of Mr. McClain's clearly established Fourteenth Amendment right to refuse the forcible administration of medication because this foreseeably was a cause of Mr. McClain's unimaginable pain, suffering, and terror and, ultimately, his death.

495.     More specifically, the ketamine overdose foreseeably suppressed Mr. McClain's ability to adequately ventilate. In conjunction with the severe metabolic acidosis caused by the APD Defendants' prolonged (illegal) restraint of Mr. McClain and (illegal) use of force on Mr. McClain, the ketamine foreseeably caused Mr. McClain's cardiac arrest.

496.     The acts and/or omissions of each AFR Defendant were a legal and proximate cause of the Estate's damages.

497.     The herein described acts or omissions of each AFR Defendant were a moving force of, legal and proximate cause of, and/or substantial contributing factor to  the violation of Mr. McClain's constitutional right to refuse the administration of ketamine.

498.     The herein described acts or omissions of these Defendants were a moving force and a legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. McClain's death, the physical and mental pain Mr. McClain suffered before and during his death, the loss of Mr. McClain's constitutional rights, loss of enjoyment of life, and other compensatory and special damages including but not limited to medical bills, funeral expenses, and permanent lost earnings and earnings capacity.

499.     The herein described acts and inactions were taken by the AFR Defendants in reckless and callous indifference to Mr. McClain's federally protected rights, and these

Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. McClain's constitutionally-protected rights.

500.     The intentional actions or inactions of each AFR Defendant as described herein intentionally deprived Mr. McClain of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused other damages.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment**
**Excessive Force**
**(Estate of Elijah Javon McClain against Lieutenant Peter Cichuniec and Paramedic Jeremy Cooper)**

501.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

502.     At all times relevant to the allegations in this Complaint, the AFR Defendants acted under color of state law, and within the course and scope of their official duties and employment in their capacities as AFR paramedics.

503.     Under the Fourth Amendment, as incorporated against the states by the Fourteenth Amendment, Decedent Elijah McClain had a clearly established constitutional right to be secure in his person against unreasonable seizure and excessive force.

504.     Under the Fourth Amendment, Mr. McClain had a clearly established right as a competent adult not to be involuntarily seized without probable cause to believe that he presented a danger to himself or others, as well as a clearly established right not to be seized by emergency responders for purposes of enforcing the law, punishment, deterrence, or incarceration.

505. Under the application of the specific facts and totality of circumstances as described herein, AFR Defendants violated Mr. McClain's clearly established constitutional rights to be free from unreasonable seizure and excessive force.

506. Any reasonable paramedic knew or should have known of these clearly established rights at the time of Mr. McClain's death.

507. AFR Defendants' administration of ketamine to Mr. McClain constituted a seizure under the Fourth Amendment because the ketamine physically incapacitated Mr. McClain, thereby restraining his freedom of movement by means of physical force intentionally applied.

508. When AFR Defendants administered the ketamine to Mr. McClain, they were acting in a law enforcement capacity as opposed to an emergency medical response capacity. There was no actual or apparent medical need for the ketamine administration, and AFR Defendants instead administered the ketamine for the purpose of rendering Mr. McClain, a non-consenting, non-dangerous, competent adult, incapacitated and restrained for law enforcement purposes, to assist APD Defendants in unreasonably restraining or punishing Mr. McClain.

509. AFR Defendants did not have a valid legal basis to seize Mr. McClain via incapacitation due to ketamine administration. There was no reasonable suspicion or probable cause to believe that Mr. McClain had committed any crime, that he posed an immediate threat to the safety of himself or others, or that he was actively attempting to avoid being subdued or brought under control.

510. AFR Defendants did not have a valid legal basis to seize Mr. McClain in the manner and with the level of force used under the circumstances present.

511. AFR Defendants unlawfully seized Mr. McClain by means of objectively

unreasonable chemical restraint when they had no reasonable belief Mr. McClain had committed

or was going to commit a crime, possessed a weapon, or posed a threat to any officer or any

other person including himself.

512.     AFR Defendants' seizure of Mr. McClain and the manner of the seizure were

objectively unreasonable in light of the facts and circumstances surrounding them, violating Mr.

McClain's Fourth Amendment rights.

513.     Any reasonable paramedic in AFR Defendants' position would have known that it

was unreasonable to administer the ketamine under the circumstances at issue, and that to do so

would violate Mr. McClain's clearly established constitutional rights.

514.     AFR Defendants' conduct caused Mr. McClain to be unlawfully seized and was a

moving force of and/or substantially contributing factor to Mr. McClain's death.

515.     AFR Defendants' actions, as described herein, were motivated by malice and/or

involved reckless or callous indifference to Mr. McClain's federally protected rights, and they

engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating

deliberate indifference to, and a reckless disregard for, Mr. McClain's constitutionally protected

rights.

516.     The herein described acts or omissions of each AFR Defendant were a moving

force of and/or substantial contributing factor to the violation of Mr. McClain's constitutional

right to be free from unreasonable seizure and a proximate cause of Plaintiff Estate's significant

injuries, damages, and losses, including Mr. McClain's death.

517.     The herein described acts or omissions of the AFR Defendants were a moving

force and legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but

not limited to Mr. McClain's death, the loss of Mr. McClain's relationship and companionship

with his family and friends, the loss of Mr. McClain's constitutional rights, his loss of enjoyment

of life, and other compensatory and special damages including but not limited to Mr. McClain's

permanent lost earnings and earnings capacity, medical bills, and funeral expenses.

518.     AFR Defendants' intentional actions or inactions as described herein intentionally

deprived Mr. McClain of due process and of rights, privileges, liberties, and immunities secured

by the Constitution of the United States of America.

**SIXTH CLAIM FOR RELIEF**
**Colo. Rev. Stat. § 13-21-201 *et seq.***
**Battery Causing Wrongful Death**
**(Sheneen McClain and LaWayne Mosley against Defendants Officer Nathan Woodyard,**
**Officer Randy Roedema, Officer Jason Rosenblatt, Officer Matthew Green, Sergeant Dale**
**Leonard, and Officer Alicia Ward)**

519.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

520.     Pursuant to Colo. Rev. Stat. §§ 24-10-105(1) and 24-10-118(2)(a), public

employees like Direct Participation Defendants are not immune under the Colorado

Governmental Immunity Act ("CGIA") for acts or omissions that are willful and wanton.

521.     Pursuant to the CGIA, Plaintiffs provided Defendants with timely notice of claim

on February 19, 2020.

522.     Direct Participation Defendants intentionally used force against Mr. McClain with

the intent to inflict harmful contact on Mr. McClain, and which such contact caused injury to Mr.

McClain, namely his death.

523.     As described in detail in above, Direct Participation Defendants' use of force

against Mr. McClain did not constitute the use of reasonable force because the force was in

excess of the amount of force that an officer in their position would have reasonably believed

necessary to arrest Mr. McClain, protect themselves or others from any risk of harm posed by

Mr. McClain, and/or or prevent his escape.

524.    Direct Participation Defendants' intentional infliction of physical harm upon Mr. McClain, causing his death, was without legal authorization, privilege, or consent.

525.    In using excessive force against Mr. McClain, Direct Participation Defendants consciously disregarded a substantial and unjustifiable risk of danger of death or serious bodily injury to Mr. McClain.

526.    Direct Participation Defendants' willful and wanton conduct caused Mr. McClain's death and Plaintiffs' damages.

527.    Direct Participation Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which they must have realized was dangerous, and/or they acted heedlessly and recklessly, without regard to the consequences to Mr. McClain or his family, his safety and life, and their lives.

528.    Direct Participation Defendants' conduct constituted a felonious killing under C.R.S. §§ 13-21-203 and 15-11-803, in that their conduct caused the death of Mr. McClain and that they consciously disregarded a substantial and unjustifiable risk that their conduct would cause the death of Mr. McClain.

529.    Plaintiffs, as the parents of Mr. McClain, suffered and continue to suffer economic and non-economic damages due to these Defendants' tortious conduct, including but not limited to economic damages for medical and funeral expenses and financial losses due to the financial benefits they would have reasonably expected to receive from Mr. McClain had he lived, and non-economic damages for grief, loss of Mr. McClain's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

530.    As a result of these Defendants' negligence, Plaintiffs have suffered damages,

losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, upset, grief, loss of society and companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

**SEVENTH CLAIM FOR RELIEF**
**Colo. Rev. Stat. § 13-21-201 *et seq.***
**Negligence Causing Wrongful Death**
**(Sheneen McClain and LaWayne Mosley against Defendants Officer Nathan Woodyard, Officer Randy Roedema, Officer Jason Rosenblatt, Officer Matthew Green, Sergeant Dale Leonard, Officer Alicia Ward, Officer Kyle Dittrich, Officer Erica Marrero, Officer Jordan Mullins-Orcutt, Officer Darren Dunson, and Sergeant Rachel Nunez)**

531.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

532.     Pursuant to Colo. Rev. Stat. §§ 24-10-105(1) and 24-10-118(2)(a), public employees like APD Defendants are not immune under the Colorado Governmental Immunity Act ("CGIA") for acts or omissions that are willful and wanton.

533.     Pursuant to the CGIA, Plaintiffs provided Defendants with timely notice of claim on February 19, 2020.

534.     APD Defendants had a statutory, constitutional, and common law duty to detain Mr. McClain in a safe manner, and to protect him from harm while under the custody of APD.

535.     Because Mr. McClain was under the control of APD officers, APD Defendants had a duty to exercise reasonable care in protecting Mr. McClain's health and safety.

536.     APD Defendants breached their duty of care to Mr. McClain.

537.     All APD Defendants knew or should have known that Direct Participation Defendants were using excessive force against Mr. McClain and that such force was likely to cause him harm.

538.     By not acting to protect Mr. McClain from the use of excessive force and

reasonably foreseeable risk of unreasonable harm caused by Direct Participation Defendants' conduct, APD Defendants failed to act as a reasonably prudent person would have, thus breaching their duty of care to Mr. McClain.

539.    Each APD Defendant had a timely opportunity to intervene in Direct Participations' use of excessive force against Mr. McClain, yet each failed to do so.

540.    Because APD Defendants, including Direct Participation Defendants, each knew or should have known that the Direct Participation Defendants or other Direct Participation Defendants was causing Mr. McClain harm or the risk of harm, and they failed to take any action to prevent such harm or the risk of harm, they are each liable for the harm caused Mr. McClain and Plaintiffs, namely Mr. McClain's death.

541.    In failing to exercise reasonable care in protecting Mr. McClain from unreasonable harm by Direct Participation Defendants' use of excessive force, APD Defendants were negligent and proximately caused Mr. McClain's death.

542.    APD Defendants' negligent acts and omissions were a substantial and significant contributing factor and cause of Mr. McClain's death, and it was reasonably foreseeable that APD Defendants' negligence would cause the harm or a similar harm that Mr. McClain suffered, and Plaintiffs have suffered, are suffering, and will suffer.

543.    It was reasonably foreseeable to a reasonable person in each of the APD Defendants' positions that their failure to intervene in the use of excessive force against Mr. McClain would cause the harm or a similar harm that Mr. McClain suffered.

544.    As a direct and proximate result of APD Defendants' conduct, Mr. McClain suffered significant physical and mental pain and suffering and other damages, and ultimately died, causing Plaintiffs' damages.

545.    APD Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which APD Defendants must have realized was dangerous, or that their actions and inactions were taken recklessly, without regard to the consequences to Mr. McClain and Plaintiffs.

546.    In taking the above actions and inactions, APD Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause serious bodily injury or the death of another.

547.    Plaintiffs suffered and continue to suffer economic and non-economic damages due to APD Defendants' negligent conduct, including but not limited to economic damages for funeral and medical expenses and financial losses due to the financial benefits they would have reasonably expected to receive from Mr. McClain had he lived, and non-economic damages for grief, loss of Mr. McClain's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

548.    As a result of these Defendants' negligence, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, upset, grief, loss of society and companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

### EIGHTH CLAIM FOR RELIEF
### Colo. Rev. Stat. § 13-21-201 *et seq.*
### Negligence Causing Wrongful Death
### (Sheneen McClain and LaWayne Mosley against Defendants Lieutenant Peter Cichuniec, Paramedic Jeremy Cooper, and Dr. Hill)

549.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

550.    Pursuant to Colo. Rev. Stat. §§ 24-10-105(1) and 24-10-118(2)(a), public

employees like AFR Defendants and Defendant Dr. Hill are not immune under the Colorado

Governmental Immunity Act ("CGIA") for acts or omissions that are willful and wanton.

551.    Pursuant to the CGIA, Plaintiffs provided Defendants with timely notice of claim

on February 19, 2020.

552.    At all times relevant, Mr. McClain was in the involuntary custody of APD on

behalf of Aurora, and under the medical responsibility, care, and treatment of AFR Defendants.

553.    AFR Defendants had a duty to exercise reasonable care to ensure the safety of

individuals under custody of Aurora and to provide reasonable medical care and treatment to

such individuals.

554.    AFR Defendants had a paramedic-patient relationship with Mr. McClain at all

relevant times.

555.    With respect to their care and treatment of Mr. McClain, AFR Defendants owed

him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and

expected of medical personnel in similar situations.

556.    In addition to common law, these duties of care are also informed by state law.

For example, under Colo. Rev. Stat. § 16-3-401, individuals in custody shall be treated humanely

and provided with adequate food, shelter, and, if required, medical treatment. The provision of

adequate medical treatment and humane care is a statutory (as well as constitutional) obligation.

557.    AFR Defendants breached their duty of care to Mr. McClain and deviated from

the standard of care they owed him when they failed to exercise reasonable care in protecting

him by harm by unreasonably injecting Mr. McClain with an unnecessary medication.

558.    AFR Defendants breached their duty of care to Mr. McClain and deviated from

the standard of care they owed him when they failed to exercise reasonable care in protecting

him by harm by giving him a significant overdose of such medication.

559.     AFR Defendants breached their duty of care to Mr. McClain and deviated from the standard of care they owed him when they failed to provide Mr. McClain with reasonable and necessary medical care by failing to immediately monitor his condition after the ketamine was administered and provide immediate medical assistance once they knew or should have known he was in medical distress.

560.     Per his duties as AFR medical director, Defendant Dr. Hill had a duty to exercise reasonable care in the training and supervision of AFR paramedics providing ketamine to patients, and owed Mr. McClain a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.

561.     Defendant Dr. Hill is liable for negligent supervision and negligent training of AFR paramedics, and for failing to ensure the provision of appropriate care in the treatment of Mr. McClain. Defendant Dr. Hill is directly liable for breaching his duty to exercise reasonable care and deviating from the standard of care owed Mr. McClain in his failure to provide training and supervision of AFR paramedics in a manner that provided patients with reasonable medical care and treatment.

562.     Defendant Dr. Hill or should have known that the lack of adequate supervision and training of AFR paramedics was likely to harm patients to whom AFR paramedics administered ketamine, like Mr. McClain.

563.     In failing to exercise reasonable care in the training and supervision of AFR paramedics as it relates to the administration of ketamine, Defendant Dr. Hill was negligent and proximately caused Mr. McClain's death

564.     As a direct and proximate result of AFR Defendants' and Defendant Dr. Hill's

breach of their duty to protect Mr. McClain from harm and to provide reasonable care and treatment to Mr. McClain, he suffered significant physical and mental pain and distress and other damages, including death.

565.    The negligent acts and omissions by AFR Defendants and Defendant Dr. Hill were a substantial and significant contributing cause of Mr. McClain's death, and it was reasonably foreseeable that these Defendants' negligence would cause the harm or a similar harm that Mr. McClain and Plaintiffs have suffered, are suffering, and will suffer.

566.    AFR Defendants' and Defendant Dr. Hill's conduct was attended by circumstances of malice, or willful and wanton conduct, which AFR Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Mr. McClain and Plaintiffs.

567.    AFR Defendants and Defendant Dr Hill consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause serious bodily injury or the death of another.

568.    AFR Defendants' and Defendant Dr. Hill's conduct constituted a felonious killing under C.R.S. §§ 13-21-203 and 15-11-803, in that their conduct caused the death of Mr. McClain and that they consciously disregarded a substantial and unjustifiable risk that their conduct would cause the death of Mr. McClain.

569.    Plaintiffs suffered and continue to suffer economic and non-economic damages due to AFR Defendants' and Defendant Dr Hill's negligent conduct, including but not limited to economic damages for funeral and medical expenses and financial losses due to the financial benefits they would have reasonably expected to receive from Mr. McClain had he lived, and non-economic damages for grief, loss of Mr. McClain's companionship, impairment in the

quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

570.     As a result of these Defendants' negligence, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, upset, grief, loss of society and companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

**NINTH CLAIM FOR RELIEF**
**Colo. Rev. Stat. § 13-21-201 *et seq.***
**Battery Causing Wrongful Death**
**(Sheneen McClain and LaWayne Mosley against Defendants Lieutenant Peter Cichuniec and Paramedic Jeremy Cooper)**

571.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

572.     Pursuant to Colo. Rev. Stat. §§ 24-10-105(1) and 24-10-118(2)(a), public employees like the AFR Defendants are not immune under the Colorado Governmental Immunity Act ("CGIA") for acts or omissions that are willful and wanton.

573.     Pursuant to the CGIA, Plaintiffs provided Defendants with timely notice of claim on February 19, 2020.

574.     Mr. McClain never consented to any Defendant injecting him with ketamine.

575.     Nevertheless, Defendants Cichuniec and Cooper, acting in concert, knowingly forcibly administered ketamine to Mr. McClain against his obvious wishes to not be injected with the drug.

576.     Thus, Defendants Cichuniec and Cooper not only intentionally and knowingly administered ketamine to Mr. McClain without his consent, they administered the drug to him despite being aware that he did not consent to it. Such conduct constitutes unlawful battery.

577.     No appropriate skill was used in these Defendants' decisions to administer

ketamine to Mr. McClain.

578.    Moreover, at no relevant time did the AFR Defendants reasonably believe that Mr. McClain's life or health was in such danger that to delay treatment would further endanger his life or health.

579.    At no relevant time, under the same or similar circumstances, would a reasonably careful medical provider have believed the same thing as the AFR Defendants claimed to here. A reasonably careful medical provider would not have injected Mr. McClain with any ketamine, much less the excessive quantity the AFR Defendants intentionally used, because there was no medical or other justification for the use of ketamine at the time.

580.    At no relevant time was Mr. McClain in a mental or physical condition that prevented him from being able to indicate his consent or lack of consent.

581.    The AFR Defendants' willful and wanton conduct caused Mr. McClain's death and Plaintiffs' damages.

582.    The AFR Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which they must have realized was dangerous, and/or they acted heedlessly and recklessly, without regard to the consequences to Mr. McClain or his family, his safety and life, and their lives.

583.    The AFR Defendants' conduct constituted a felonious killing under C.R.S. §§ 13-21-203 and 15-11-803, in that their conduct caused the death of Mr. McClain and that they consciously disregarded a substantial and unjustifiable risk that their conduct would cause the death of Mr. McClain.

584.    Plaintiffs, as the parents of Mr. McClain, suffered and continue to suffer economic and non-economic damages due to these Defendants' tortious conduct, including but

not limited to economic damages for medical and funeral expenses and financial losses due to the financial benefits they would have reasonably expected to receive from Mr. McClain had he lived, and non-economic damages for grief, loss of Mr. McClain's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

585.    As a result of these Defendants' unlawful conduct, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, upset, grief, loss of society and companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against each of the Defendants, and grant them all relief as allowed by law and equity, including, but not limited to:

(a)    Declaratory and injunctive relief, as appropriate;

(b)    Past and future economic losses on all claims allowed by law, including but not limited to lost earnings and funeral and medical related expenses, in an amount to be determined at trial;

(c)    Compensatory and consequential damages, including, but not limited to, damages for emotional distress, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)    Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(f)    Pre- and post-judgment interest at the lawful rate;

(g)    Any further relief that this court deems just and proper, and any other relief as

allowed by law.

**PLAINTIFFS DEMAND A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 11th day of August 2020.

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*
Mari Newman
Michael Fairhurst
Liana Gerstle Orshan
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
mnewman@kln-law.com
mfairhurst@kln-law.com
lorshan@kln-law.com

ATTORNEYS FOR PLAINTIFFS