# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-2389-DDD-NRN

ESTATE OF ELIJAH JAVON MCCLAIN, by and through its personal representatives Sheneen McClain and Lawayne Mosley;
SHENEEN MCCLAIN, individually;
LAWAYNE MOSLEY, individually;

     Plaintiffs,

v.

CITY OF AURORA, COLORADO, a municipality;
OFFICER NATHAN WOODYARD, in his individual and official capacity;
OFFICER RANDY ROEDEMA, in his individual and official capacity;
OFFICER JASON ROSENBLATT, in his individual and official capacity;
OFFICER MATTHEW GREEN, in his individual and official capacity;
SERGEANT DALE LEONARD, in his individual and official capacity;
OFFICER ALICIA WARD, in her individual and official capacity;
OFFICER KYLE DITTRICH, in his individual and official capacity;
OFFICER ERICA MARRERO, in her individual and official capacity;
OFFICER JAMES ROOT, in his individual and official capacity;
OFFICER JORDAN MULLINS-ORCUTT, in his individual and official capacity;
OFFICER DARREN DUNSON, in his individual and official capacity;
SERGEANT RACHEL NUNEZ, in her individual and official capacity;
LIEUTENANT PETER CICHUNIEC, in his individual and official capacity;
PARAMEDIC JEREMY COOPER, in his individual and official capacity;
DR. ERIC HILL, in his individual capacity;

     Defendants.

---

## SCHEDULING ORDER

---

## 1.     DATE OF CONFERENCE

The Scheduling/Planning Conference pursuant to Fed. R. Civ. P. 16(b) is scheduled for

**October 22, 2020**, at 10:00 a.m. in Courtroom C-203 before Magistrate Judge N. Reid

Neureiter.[1] Appearing for the parties are:

Mari Newman
Michael P. Fairhurst
Liana Orshan
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
mnew@kln-law.com
mfairhurst@kln-law.com
lorshan@kln-law.com
*Attorneys for Plaintiff*

Stephen J. Hensen
Hensen | DuWaldt
1001 Bannock St., Suite 39
Denver, CO 80204
303-223-0773 p
Mobile: 303-895-4199 c
steve@hendulaw.com
*Attorney for Defendant Dr. Eric Hill*

Michael Lowe
David Goddard
Bruno, Colin & Lowe, P.C.
1999 Broadway, Suite 4300
Denver, Colorado 80202
P: 303.831.1099
F: 303.831.1088
mlowe@brunolawyers.com
dgoddard@brunolawyers.com
*Attorneys for Defendants Cichuniec and Cooper in their individual capacities ("AFR Defendants")*

Peter Morales
Isabelle Evans
Aurora City Attorney's Office
15151 E. Alameda Parkway, Suite 5300
Aurora, CO 80012
Telephone: (303) 739-7030
Facsimile: (303) 739-7042
pmorales@auroragov.org
ievans@auroragov.org
*Attorneys for Defendant City of Aurora, and Defendants Woodyard, Roedema, Rosenblatt, Green, Leonard, Ward, Dittrich, Marrero, Root, Mullins-Orcutt, Dunson, Nunez, Cichuniec, and Cooper in their official capacities ("Aurora Defendants")*

Jonathan M. Abramson
Yulia Nikolaevskaya
Kissinger & Fellman, P.C.
3773 Cherry Creek N. Dr., #900
Denver, CO 80209
Telephone: 303-320-6100
Facsimile: 303-327-8601
jonathan@kandf.com
julie@kandf.com
*Attorneys for Defendants Dittrich, Dunson, Green, Leonard, Marrero, Mullins-Orcutt, Nunez, Roedema, Root, Rosenblatt, Ward, and Woodyard in their individual capacities ("APD Defendants")*

---

[1] The Scheduling Conference will be conducted via telephone. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time.

## 2.     STATEMENT OF JURISDICTION

This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.  Jurisdiction for Plaintiffs' supplemental state law claims is conferred by 28 U.S.C. § 1367.

Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the State of Colorado.

## 3.     STATEMENT OF CLAIMS AND DEFENSES

### a.  **Plaintiffs' statement:**[2]

At approximately 10:30 p.m. on the evening of August 24, 2019, Elijah McClain had just purchased some iced tea from a convenience store a few blocks away from his home in Aurora, Colorado, and was walking home. Unbeknownst to Elijah, a passing motorist had called 911 to report what the caller viewed as unusual behavior on Elijah's part: wearing a face mask and making arm motions as he walked down the street. The caller made clear that Elijah posed no danger to him or anyone else, he was not reporting a crime, and he did not believe Elijah was armed – information that was relayed to from dispatch to members of the Aurora Police Department ("APD"). Elijah had committed no crime, and he had no weapons.

Though there was obviously no need for police contact *at all*, APD dispatched three officers to find Elijah. Defendant APD Officer Nathan Woodyard drove one police vehicle,

---

[2] The facts section of Plaintiff's Complaint and Jury Demand is hereby incorporated as if set forth fully herein.

while Defendant Officers Jason Rosenblatt and Randy Roedema arrived in another.

Defendant Woodyard quickly located Elijah, who was walking down the sidewalk normally, minding his own business as he walked the few blocks to his home. Defendant Woodyard performed a U-turn so that he could park his car in front of Elijah; Defendants Rosenblatt and Roedema parked behind Elijah. Defendant Woodyard exited his vehicle and demanded that Elijah stop.

Elijah continued to walk peacefully down the sidewalk, calmly informing Defendant Woodyard that he had a right to walk to his destination. Elijah was correct; he had no legal obligation to stop to speak with Defendant Woodyard, and Defendant Woodyard had no legal authority to stop him. No circumstances existed that could have reasonably caused any of the three officers to believe that (1) Elijah had committed or was about to commit any crime, (2) had any weapons, or (3) posed any danger to them, himself, or anyone else.

Despite this, all three officers almost immediately began to use force against Elijah, grabbing him and further escalating the situation. In order to create some justification for the use of force, Defendant Roedema told Defendants Woodyard and Rosenblatt—in a notably non-urgent tone—that Elijah attempted to grab Defendant Rosenblatt's holstered gun, a statement that is contradicted by both video evidence and the statements provided to investigators after the extended use of force.

Without any justification, Defendant Rosenblatt placed Elijah in a carotid control hold, using his forearm and bicep to place pressure on either side of Elijah's neck and drastically reduce the flow of blood to his brain, a notoriously dangerous technique that had already been banned by law enforcement across Colorado and the United States, and is now banned in Aurora.

Elijah was unarmed, weighed approximately 143 pounds (65 kilograms), and was restrained by three armed police officers. With Elijah in an entirely helpless and controlled position in Defendant Rosenblatt's grasp, Defendant Woodyard proceeded to tackle Elijah. Defendant Woodyard later told investigators that he tackled Elijah to the ground as hard as he could. Seconds after Defendant Rosenblatt released his carotid hold, Defendant Woodyard applied a second carotid hold to Elijah. Whether or not he was rendered fully unconscious, Elijah was plainly left in a vulnerable state that only heightened his terror, confusion, and physical peril. Elijah began to vomit.

The three officers used their full combined weight (approximately 700 pounds) to pin Elijah to the ground by putting their body weight on top of his back, legs, and shoulders. Even after they handcuffed Elijah behind his back and he was completely under their control, they continued to apply force, including pinning him to the ground with their body weight on top of him.

When Defendant APD Sergeant Dale Leonard arrived on scene, he found Elijah on the ground, handcuffed, and entirely under the control of Defendants Woodyard, Rosenblatt, and Roedema. Sgt. Leonard, without any evidence whatsoever, asserted that Elijah had been using drugs; at least one of the other three officers agreed. A toxicology screen later revealed that Elijah had no drugs or alcohol in his system beyond legal marijuana.

Numerous other APD officers filtered into the crime following Defendant Leonard's arrival, including at least Defendants Officer Matthew Green, Officer Alicia Ward, Sergeant Rachel Nunez, Officer Jordan Mullins-Orcutt, Officer James Root, Officer Darren Dunson, Officer Kyle Dittrich, and Officer Erica Marrero. None of these additional officers took any

action to prevent the ongoing application of what was obviously excessive force to Elijah, who was fully restrained, begging for his life, and in clear peril. Some jumped in and used additional force themselves.

Without any justification, and while Elijah was handcuffed, Defendant Roedema repeatedly drove his knee into Elijah's left arm between the bicep and triceps, inflicting tremendous pain on Elijah throughout the APD interaction—sometimes for minutes on end. When Elijah made involuntary motions in response to Defendant Roedema's repeated applications of the pain compliance technique, Defendant Roedema shouted at Elijah and intentionally inflicted further pain on him. Defendant Roedema repeatedly commanded Elijah to stop, roughly jerked Elijah around on the ground, and continued to inflict the muscle-separating pain compliance technique to Elijah's left arm.

Defendant Leonard later reported that he grew increasingly concerned that Elijah was in need of emergency medical attention as the officers awaited the arrival of Aurora Fire Rescue ("AFR"); yet, Defendant Leonard took no action to prevent his subordinate officers from continuing to inflict excessive and unnecessary force on Elijah. Elijah informed APD Defendants on several occasions that his slight movements were involuntary, that the officers' application of force was causing him significant pain, and that he was having difficulty breathing. In one instance, he pleaded, "Oh yeah, I'm sorry, I wasn't trying to do that. It's just, *I can't breathe correctly*."

Defendant Green, a K-9 officer, took the opportunity to further terrify Elijah in the finest tradition of racist American policing, enthusiastically threatening, despite Elijah's total compliance, to sic his dog on the handcuffed, helpless man.

Defendant Roedema directed another APD Defendant to place pressure on Elijah's ankle as Defendant Roedema continued to apply the pain compliance technique to Elijah's left arm. Despite his professed concern for Elijah's health, Defendant Leonard also personally participated in the excessive force, stepping on Elijah's lower legs and leaning on them with the bulk of his body weight as Defendant Roedema persisted in torturing Elijah.

Shortly thereafter, Defendant Green replaced Defendant Rosenblatt in holding Elijah's legs. In total, APD Defendants subjected Elijah to at least the above-described force over the course of approximately 18 minutes.

Elijah had committed no crime nor was he suspected of committing any crime, and at no point attempted to strike or otherwise harm any APD officer or anyone else. Yet, the APD Defendants unlawfully seized Elijah; tackled him to the ground; inflicted a variety of painful and dangerous control holds and the crushing force of their collective body weight; tortured him with plainly unnecessary pain compliance techniques—even during the approximately fifteen minutes after has was handcuffed and completely under their control—and Defendant Rosenblatt threatened him with electrocution and the bite of a police dog, among other forceful and terrorizing actions.

Aurora Fire Rescue personnel arrived at the scene approximately nine minutes after Defendant Woodyard initially seized Elijah. Defendants Cooper and Cichuniec intentionally and recklessly reported false observations in order to claim that Elijah suffered from excited delirium, even though Elijah did not display the symptoms of that condition sufficient to diagnose it; he did not exhibit paranoia, hallucinations, incoherent speech or shouting, hyper-aggression, increased strength, or extreme agitation. AFR's protocol for patients suffering from

excited delirium specifies that they may be treated with ketamine. As Defendant Cooper continued to observe Elijah, Defendant Cichuniec asked Defendant Cooper if he needed narcotics to administer to Elijah. Defendant Cooper requested Ketamine, which Defendants Rosenblatt and Roedema enthusiastically agreed with.

By this time, as a result of the various forms of excessive force detailed above, Elijah was suffering from a condition known as metabolic acidosis, which occurs when panic and strenuous physical activity (including the struggle to survive and the carotid holds) cause a dramatic increase in lactic acid in the blood, leading to a significant drop of the blood's pH. Despite this, and the fact that Elijah was already handcuffed and restrained—and totally compliant— Defendants Cichuniec and Cooper decided to further restrain Elijah via chemical restraint. They administered 500 milligrams of ketamine to Elijah by syringe—a dose at least 175 milligrams higher than Elijah should have received based on his weight. At the time of this incident, AFR EMTs, under the purported supervision of AFR EMS medical director Dr. Eric Hill, had a *de facto* custom, policy and/or practice of administering a dose of 500 milligrams in cases in which the paramedic could not or simply failed to estimate a patient's weight – a practice that foreseeably would lead to overdoses of the medication, injury, and in Elijah's case, death.

No APD or AFR Defendant made any attempt to assess Elijah's breathing or vital signs as they waited for the ketamine to take effect, even though Defendant Cooper later told investigators that he was aware that respiratory depression was a potential effect of ketamine. The officers and paramedics moved Elijah's limp body to the gurney approximately three minutes after the ketamine injection. Approximately 40 seconds later, Elijah began to take labored, abdominal-breathing, agonal breaths, a sign that he was struggling to breathe *at all* in a

moment when his body desperately needed to hyperventilate to relieve the deadly effects of the acidosis. Approximately one minute after Elijah was moved to the ambulance, the paramedics noticed he was in respiratory arrest. The medical personnel attempted life-saving measures and rushed Elijah to the hospital.

Elijah never regained consciousness. He could not overcome the massive damage to his body caused by the acidosis from the excessive force inflicted on him, combined with and exacerbated by the respiratory depression from the ketamine. Elijah was pronounced brain dead on August 27, 2019, after several days on life support. He was taken off life support on August 30, 2019, and his organs were donated for the benefit of others.

Aurora's unconstitutional conduct on the night of August 24, 2019 is part of a larger custom, policy, and practice of racism and brutality, as reflected by its conduct both before and after its murder of Elijah McClain, a young Black man. For decades, Aurora police have persistently brutalized Black people at a rate significantly greater than Caucasians and greater than the proportion of Black people in the Aurora community. Many instances of Defendant Aurora's use of excessive force by APD officers, especially against Black people, show that such unconstitutional actions are customary and the standard operating procedure in the City of Aurora Police Department. Some—but by no means all—examples of cases brought by victims of Aurora's brutality and racist policing are set forth in Plaintiff's Complaint at ¶¶ 266-354.

APD Defendants' treatment of Elijah was engaged in pursuant to Aurora's custom, policy and/or practice of unlawful conduct, including but not limited to: racially-biased policing; aggression and violence when policing Black people; using excessive force in its law enforcement practices, particularly against Black people; unlawfully detaining, arresting, or

charging people, particularly Black people, in order to cover up and justify unconstitutional uses of excessive force; failing to discipline officers, or even find the officers engaged in wrongdoing, in the face of obvious constitutional violations; and failing to adequately train and supervise APD officers. Aurora's longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying use of excessive force, particularly against Black people, have caused Aurora police officers to use unjustified and excessive force, particularly against Black people, because Aurora has communicated to APD officers that such force is authorized and, indeed, expected, and when used will be defended or covered up by the supervisory and municipal apparatus of the City.

Defendants' actions, as described herein, deprived Plaintiffs of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused other damages. As a result of Defendants' conduct, Plaintiffs bring the following legal claims:[3]

1. Excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 (Estate of Elijah Javon McClain against Defendants City of Aurora, Officer Nathan Woodyard, Officer Randy Roedema, Officer Jason Rosenblatt, Officer Matthew Green, Sergeant Dale Leonard, Officer Alicia Ward, Officer Kyle Dittrich, Officer Erica Marrero, Officer James Root, Officer Jordan Mullins-Orcutt, Officer Darren Dunson, and Sergeant Rachel Nunez);

2. Denial of equal protection in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (Estate of Elijah Javon McClain against Defendants City of Aurora,

---

[3] No Defendant is entitled to qualified immunity, and Plaintiffs object to any discovery stay sought by Defendants.

Officer Nathan Woodyard, Officer Randy Roedema, Officer Jason Rosenblatt, Officer Matthew Green, Sergeant Dale Leonard, Officer Alicia Ward, Officer Kyle Dittrich, Officer Erica Marrero, Officer James Root, Officer Jordan Mullins-Orcutt, Officer Darren Dunson, and Sergeant Rachel Nunez);

3. Failure to Ensure Basic Safety and Provide Adequate Medical Care and Treatment in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (Estate of Elijah Javon McClain against Defendants City of Aurora, Lieutenant Peter Cichuniec, Paramedic Jeremy Cooper, and Dr. Eric Hill);

4. Substantive Due Process – Deprivation of Liberty – Forcible Administration of Medication in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (Estate of Elijah Javon McClain against Lieutenant Peter Cichuniec and Paramedic Jeremy Cooper);

5. Excessive force in violation of the Fourth Amendment and pursuant to 42 U.S.C. § 1983 (Estate of Elijah Javon McClain against Lieutenant Peter Cichuniec and Paramedic Jeremy Cooper);

6. Battery Causing Wrongful Death pursuant to Colo. Rev. Stat. § 13-21-201 *et seq.* (Sheneen McClain and LaWayne Mosley against Defendants Officer Nathan Woodyard, Officer Randy Roedema, Officer Jason Rosenblatt, Officer Matthew Green, Sergeant Dale Leonard, and Officer Alicia Ward);

7. Negligence Causing Wrongful Death pursuant to Colo. Rev. Stat. § 13-21-201 *et seq.* (Sheneen McClain and LaWayne Mosley against Defendants Officer Nathan Woodyard, Officer Randy Roedema, Officer Jason Rosenblatt, Officer Matthew

Green, Sergeant Dale Leonard, Officer Alicia Ward, Officer Kyle Dittrich, Officer Erica Marrero, Officer Jordan Mullins-Orcutt, Officer Darren Dunson, and Sergeant Rachel Nunez);

8. Negligence Causing Wrongful Death pursuant to Colo. Rev. Stat. § 13-21-201 *et seq.* (Sheneen McClain and LaWayne Mosley against Defendants Lieutenant Peter Cichuniec, Paramedic Jeremy Cooper, and Dr. Hill); and

9. Battery Causing Wrongful Death pursuant to Colo. Rev. Stat. § 13-21-201 *et seq.* (Sheneen McClain and LaWayne Mosley against Defendants Lieutenant Peter Cichuniec and Paramedic Jeremy Cooper).

b. **Defendants' statements:**

**APD Defendants:**      The death of Elijah McClain **is** a tragedy; however, this tragedy was not caused by any acts or omissions of the APD Defendants. APD Defendants deny that they used excessive force on Mr. McClain in violation of the Fourth Amendment, that they denied him equal protection of the law under the Fourteenth Amendment and that they caused his death by battery or neglect.

On the day in question, Aurora Police Department dispatch received a 911 call. The caller, J.V, who provided his name and a phone number, reported seeing Mr. McClain walking down the street, wearing a "full-on" ski mask, "acting weird", "waving his arms around" and that Mr. McClain looks "sketchy". Pursuant to this 911 call of a suspicious person, APD Defendants Woodyard, Roedema and Rosenblatt were dispatched to Mr. McClain's possible location. None of the APD Defendants have ever met Mr. McClain before. Defendant Woodyard was first to arrive on scene and make contact with Mr. McClain. Defendant Woodyard asked Mr. McClain to

stop at least 3 times, but Mr. McClain continued to walk away. Defendant Woodyard then approached Mr. McClain on foot and asked him to stop again. Mr. McClain stated, "I have a right to go where I'm going" and Defendant Woodyard stated "I have a right to stop you because you are being suspicious." Defendant Woodyard was performing an investigative stop and wanted to pat Mr. McClain down for weapons. Mr. McClain was walking through a high crime area, he was reported being suspicious by a 911 caller, he was wearing a ski mask on a warm summer evening and would not stop when asked multiple times. Mr. McClain would not allow himself to be searched.

At that point, Defendant Rosenblatt also arrived on the scene. Defendant Woodyard grabbed Mr. McClain's left arm. Mr. McClain tightened up his arms and pulled them to his chest. At that time, Defendant Rosenblatt grabbed Mr. McClain's right arm, and Defendant Woodyard grabbed Mr. McClain's left arm. Defendant Roedema then arrived on the scene. Defendant Woodyard asked Mr. McClain to calm down.

At that point, Mr. McClain was asked to stop tensing up but he replied, "let me go, no let me go, I am an introvert, please respect my boundaries that I'm speaking." Mr. McClain was asked to relax again, and Mr. McClain responded, "I'm going home." Mr. McClain was once again asked to relax or that the officers were going to have to change the situation. Mr. McClain replied, "leave me alone." Officer Roedema stated "stop sir, can you please cooperate, we are going to talk to you." Mr. McClain responded, "can you leave me alone, you guys started to arrest me and I was stopping my music to listen, now let me go." Defendants Woodyard, Roedema and Rosenblatt decided to move Mr. McClain to the grassy area nearby. In response to being moved, Mr. McClain stated, "I intend to take my power back, I intend to be censored, I intend to be censored." At that

time, Defendant Roedema observed Mr. McClain reach out and grab the grip of Defendant Rosenblatt's gun and exclaimed. "he just grabbed your gun" and "he is going for your gun!". Defendants Woodyard and Rosenblatt were not sure whose gun was referenced. Mr. McClain was quickly taken down to the ground by all Defendants: Woodyard, Roedema and Rosenblatt.

Based on the circumstances, Defendant Rosenblatt attempted to use a carotid control hold on Mr. McClain but was unsuccessful due to his position. Defendant Woodyard, who was in the better position, performed and released the second carotid hold. Aurora Fire Department was called to the scene per policy.

Mr. McClain was handcuffed, but he continued to tense up his body and move around. Mr. McClain was conscious and was able to communicate with APD Defendants: McClain told Defendant Leonard that he used "mary" (street slang for marijuana), that he was a vegetarian, and that he had no gun.  Other APD Defendants began arriving at the scene with Defendant Leonard first to arrive. Defendants Green, Ward, Dittrich, Marrero, Root, Mullins-Orcutt, Dunson and Nunez followed. While paramedics were in route, Mr. McClain remained on the ground. Because he continued to move around, he was secured by Defendant Roedema, who was holding his arm, and Defendant Rosenblatt, who was holding his legs down. During the struggle, Defendant Woodyard lost his glasses and he walked around the scene attempting to find them.

While on the ground waiting for the ambulance, Defendants Green and Leonard assisted in holding Mr. McClain's legs. Defendant Ward helped secure Mr. McClain's arm. Mr. McClain's position was alternated through the entire incident, some time he was facing down so he could vomit on the ground, and other times, he was on his side in the "recovery position". No other APD Defendants had any physical contact with Mr. McClain.

Once paramedics and Falck Ambulance arrived at the scene, the paramedics diagnosed Mr. McClain with excited delirium.  Based upon this diagnosis, Mr. McClain was administered a dose of ketamine. Mr. McClain was placed in the ambulance. Shortly after, the paramedics noticed that Mr. McClain's chest was not rising, and he did not have a pulse. Cardiopulmonary resuscitation and medication were administered. Mr. McClain was taken to the University of Colorado Hospital for treatment, where he later passed away.

Mr. McClain's blood toxicology was positive for marijuana and ketamine. The pathological finding of the blood ketamine concentration was noted to be within a therapeutic level. The autopsy revealed that Mr. McClain had a narrow left anterior descending coronary artery. The autopsy found no signs of traumatic asphyxiation, no injuries to the muscle of the neck, larynx, or a hyoid bone that would suggest injury to the neck.

APD Defendants generally deny all allegations in the Complaint. Defendants Woodyard, Roedema and Rosenblatt were justified in the performance of the investigatory stop and based on observations by Defendant Roedema, of the carotid hold. A variety of APD Defendants, in their individual capacities, are entitled to the defense of qualified immunity based on various claims asserted in the Complaint and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6)[4]. The Complaint failed to state a viable claim as to failure to intervene allegation against APD Defendants Dittrich, Marrero, Root, Mullins-Orcutt, Dunson and Nunez. The Complaint failed to state a claim for excessive force against Defendants Leonard, Green and Ward. The Complaint failed to state a viable claim of equal protection against any and all APD Defendants. Moreover,

---

[4] Defendants may seek a discovery stay after filing of a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

the Complaint failed to state claims of battery and negligence causing wrongful death against APD

Defendants Green, Leonard, Ward, Dittrich, Marrero, Root, Mullins-Orcutt, Dunson and Nunez.

All APD Defendants reserve the right to assert any and all additional claims and defenses.

The state-law claims brought by Plaintiffs are further barred by provisions of the Colorado

Governmental Immunity Act, C.R.S. § 24-10-101, *et seq.*, as well as the fact that these Defendants'

actions were not willful, wanton, or malicious. Plaintiffs' recovery, if any, is also limited and/or

barred by the provisions of the Colorado Governmental Immunity Act. C.R.S. § 24-10-114.

**AFR Defendants:**    On August 24, 2019, City of Aurora Firefighter Paramedics Peter

Cichuniec and Jeremy Cooper were dispatched to a scene where Aurora Police Officers had

detained Plaintiff McClain. Upon the arrival of Defendants Cichuniec and Cooper, Plaintiff

McClain was exhibiting symptoms consistent with a diagnosis of excited delirium. Consistent with

established protocols for treatment of agitated and/or combative patients, Defendants Cooper and

Cichuniec requested that responding paramedics from Falck Ambulance Service draw up 500

milligrams of the sedative ketamine. Paramedic Cooper then administered the 500 milligram

ketamine dose intramuscularly into Plaintiff McClain's deltoid muscle. Once the ketamine took

effect, Plaintiff McClain was placed onto a pram and into a waiting ambulance. As Plaintiff

McClain was being treated inside the ambulance and prepared for transport to the hospital, it was

noticed Plaintiff McClain was not breathing. Defendant Cichuniec immediately checked for a

pulse, found none, and so lifesaving protocols including CPR were immediately initiated. These

lifesaving efforts were continued for the duration of transport to the hospital, where Plaintiff

McClain was transferred to the care of hospital medical providers.

Defendants Cichuniec and Cooper deny any negligent, intentionally tortious, or otherwise

unlawful conduct in connection with their treatment of Plaintiff McClain on August 24, 2019. At all times relevant to the allegations contained in Plaintiff's Complaint, all actions by Defendants Cooper and Cichuniec were conducted in good faith and with the belief that their actions were lawful, reasonable, and consistent with their duties and obligations as Firefighter Paramedics for the City of Aurora under local, state and federal law and regulations. Neither did these Defendants engage in any conduct violative of Plaintiff's constitutional rights or violative of law which was clearly established at the time of the actions complained of, and their actions were at all times objectively reasonable under the circumstances they confronted. Subject matter jurisdiction is therefore lacking, and these Defendants are entitled to qualified immunity with respect to the federal claims brought in Plaintiff's Complaint. Furthermore, Plaintiffs' Complaint and each and every claim for relief set forth therein fails to state a valid claim upon which the relief prayed for may be granted. The state-law claims brought by Plaintiffs are further barred by provisions of the Colorado Governmental Immunity Act, C.R.S. § 24-10-101, *et seq.*, as well as the fact that these Defendants' actions were not willful, wanton, or malicious. Plaintiffs' recovery, if any, is also limited and/or barred by the provisions of the Colorado Governmental Immunity Act. C.R.S. § 24-10-114.

At all times relevant, Defendants Cooper and Cichuniec were exercising their public duties pursuant to C.R.S. §§ 18-1-701 and 703.

Plaintiffs have not sufficiently alleged causation and cannot establish that that their injuries, if any, were attributable to any actions or omissions on the part of Defendants Cooper or Cichuniec. Plaintiff McClain may have had a pre-existing medical condition amounting to a superseding cause mitigating or eliminating these Defendants' liability, if any.

Plaintiffs' injuries and damages, if any, were the result of Plaintiffs' own negligent or unlawful conduct, or the negligent or unlawful conduct of a third party, which negligence and/or unlawful conduct operates to bar or reduce the negligence of these Defendants, if any. Plaintiffs have failed to mitigate their damages, if any, as required by law.

Plaintiffs' injuries and damages, if any, were the result of the negligence or unlawful actions or omissions of a third party or parties over whom these Defendants had no control nor exercised any right of control.

At all times material, Plaintiff was accorded all rights, privileges and immunities guaranteed to him by the Constitution and laws of the United States and the State of Colorado.

These Defendants' acts were not motivated by any racial or otherwise discriminatory animus.

These Defendants reserve the right to amend their answer and this scheduling order to add such other affirmative defenses as may become known through discovery or are supported by the evidence.

**Dr. Eric Hill:**  Dr. Hill is an emergency medicine physician who was not involved in any way in the events involving the tragic death of Elijah McClain.  Dr. Hill's only involvement related to the events set forth in  Plaintiffs' complaint relates to when, in 2018, at the request of Aurora Fire Rescue, he helped Aurora Fire Rescue apply to join the other almost 100 pre-hospital services who had obtained the State of Colorado waiver for use of Ketamine as a medication available for use by paramedics under certain circumstances.  Dr. Hill did not violate anyone's civil rights and was not in any way negligent.  Dr. Hill incorporates by this reference the answer and affirmative defenses he will file in this case.

**Aurora Defendants:** Aurora Defendants generally deny all allegations in Plaintiffs' Complaint. Plaintiff has failed to state a *Monell* claim against Defendant Aurora. Furthermore, Defendant Aurora is not liable under a theory of *respondeat superior* pursuant to 42 U.S.C. § 1983. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). Defendant Aurora has provided sufficient training and supervision to its employees. To the extent that Plaintiff has failed to allege facts sufficient to support an underlying constitutional violation by any individual defendant, Plaintiffs' claims against Defendant Aurora should be dismissed. Aurora Defendants reserve the right to assert any and all additional claims and defenses.

### 4.      UNDISPUTED FACTS

The following facts are undisputed:

1.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

2.      Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

3.      Jurisdiction for Plaintiffs' supplemental state law claims is conferred by 28 U.S.C. § 1367.

4.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).

5.      All of the events alleged herein occurred within the State of Colorado.

6.      At all times relevant to the subject matter of this Complaint, the decedent Elijah McClain was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

7.      At all relevant times, the decedent's parents, Sheneen McClain and Lawayne Mosley, were and are the co-personal representatives of the Estate of Elijah McClain.

8.      Plaintiff Sheneen McClain is Elijah McClain's biological mother.

9.      At all times relevant to the subject matter of this Complaint, Ms. McClain was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

10.      Plaintiff Lawayne Mosley is Elijah McClain's biological father.

11.      At all times relevant to the subject matter of this Complaint, Mr. Mosley was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

12.      Defendant City of Aurora, Colorado ("Aurora") is a municipality organized under the laws of the State of Colorado and is a "person" subject to suit under 42 U.S.C. § 1983.

13.      The Aurora Police Department ("APD") is a law enforcement agency that is part of the City of Aurora.

14.      Aurora Fire Rescue ("AFR") is a fire department that is part of the City of Aurora.

15.      At all times relevant to the subject matter of this Complaint, Defendant City of Aurora was responsible for the oversight, supervision, discipline, and training of APD and AFR and their personnel.

16.      At all times relevant to the subject matter of this Complaint, Defendant Nathan Woodyard was a citizen of the United States and a resident of and domiciled in Colorado.

17.      At all relevant times, Defendant Woodyard was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

18.      At all times relevant to the subject matter of this Complaint, Defendant Randy Roedema was a citizen of the United States and a resident of and domiciled in Colorado.

19.      At all relevant times, Defendant Roedema was acting within the scope of his

official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

20.     At all times relevant to the subject matter of this Complaint, Defendant Jason Rosenblatt was a citizen of the United States and a resident of and domiciled in Colorado.

21.     At all relevant times, Defendant Rosenblatt was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

22.     At all times relevant to the subject matter of this Complaint, Defendant Matthew Green was a citizen of the United States and a resident of and domiciled in Colorado.

23.     At all relevant times, Defendant Green was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

24.     At all times relevant to the subject matter of this Complaint, Defendant Dale Leonard was a citizen of the United States and a resident of and domiciled in Colorado.

25.     At all relevant times, Defendant Leonard was acting within the scope of his official duties and employment and under color of state law in his capacity as a Sergeant employed by the Aurora Police Department.

26.     At all times relevant to the subject matter of this Complaint, Defendant Alicia Ward was a citizen of the United States and a resident of and domiciled in Colorado.

27.     At all times, Defendant Ward was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed by the Aurora Police Department.

28.     At all times relevant to the subject matter of this Complaint, Defendant Kyle Dittrich was a citizen of the United States and a resident of and domiciled in Colorado.

29.     At all relevant times, Defendant Dittrich was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

30.     At all times relevant to the subject matter of this Complaint, Defendant Erica Marrero was a citizen of the United States and a resident of and domiciled in Colorado.

31.     At all relevant times, Defendant Marrero was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed by the Aurora Police Department.

32.     At all times relevant to the subject matter of this Complaint, Defendant James Root was a citizen of the United States and a resident of and domiciled in Colorado.

33.     At all relevant times, Defendant James Root was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

34.     At all times relevant to the subject matter of this Complaint, Defendant Jordan Mullins-Orcutt was a citizen of the United States and a resident of and domiciled in Colorado.

35.     At all relevant times, Defendant Mullins-Orcutt was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

36.     At all times relevant to the subject matter of this Complaint, Defendant Darren Dunson was a citizen of the United States and a resident of and domiciled in Colorado.

37.     At all relevant times, Defendant Dunson was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Aurora Police Department.

38.     At all times relevant to the subject matter of this Complaint, Defendant Rachel Nunez was a citizen of the United States and a resident of and domiciled in Colorado.

39.     At all relevant times, Defendant Nunez was acting within the scope of her official duties and employment and under color of state law in her capacity as a Sergeant employed by the Aurora Police Department.

40.     At all times relevant to the subject matter of this Complaint, Defendant Peter Cichuniec was a citizen of the United States and a resident of and domiciled in Colorado.

41.     At all relevant times, Defendant Cichuniec was acting within the scope of his official duties and employment and under color of state law in his capacity as a Lieutenant and paramedic employed by Aurora Fire Rescue.

42.     At all times relevant to the subject matter of this Complaint, Defendant Jeremy Cooper was a citizen of the United States and a resident of and domiciled in Colorado.

43.     At all relevant times, Defendant Cooper was acting within the scope of his official duties and employment and under color of state law in his capacity as a paramedic employed by Aurora Fire Rescue.

44.     At all times relevant to the subject matter of this Complaint, Defendant Eric Hill was a citizen of the United States and a resident of and domiciled in Colorado.

### 5.     COMPUTATION OF DAMAGES

**Plaintiffs:** Plaintiffs claim declaratory and injunctive relief, as appropriate; economic

losses on all claims allowed by law, including but not limited to lost earnings, funeral/cremation expenses, and medical related expenses, in an amount to be determined at trial; compensatory and consequential damages, including, but not limited to, damages for emotional distress, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial; punitive damages on all claims allowed by law and in an amount to be determined at trial; attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law; pre- and post-judgment interest at the lawful rate; any further relief that this court deems just and proper, and any other relief as allowed by law.

Plaintiff Estate has suffered injuries and losses, including the death of Mr. McClain, entitling it to recover his compensatory and special damages, including, but not limited to, for loss of constitutional rights, loss of life, loss of relationships, loss of enjoyment of life, medical expenses, and his herein described horrific and terrifying pain and suffering during and leading up this fatal event, permanent lost earnings and earnings capacity for the expected productive working lifetime of Mr. McClain, who worked as a massage therapist, under the mortality tables and other special damages, all in amounts to be proven at trial.

Plaintiffs Sheneen McClain and Lawayne Mosley have suffered and continue to suffer economic and non-economic damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, funeral/cremation expenses and financial losses due to the financial benefits they would have reasonably been expected to receive from their son had he lived, pain and suffering, upset, grief, loss of society and companionship, impairment in the quality of their lives, inconvenience, anger, depression, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Statute.

These Plaintiffs are therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages.

Other than economic damages, Plaintiffs' damages are not of the type that can be tallied here.  Plaintiffs have claims for their upset and feelings.  Plaintiff Estate has claims for the loss of life of Mr. McClain. Plaintiffs have claims for punitive damages. These are not quantifiable other than by a jury. Damages for emotional distress, in particular, are not susceptible to the type of calculation contemplated by Rule 26(a)(1). "[C]ompensatory damages for emotional distress are necessarily vague and are generally considered a fact issue for the jury." *Williams v. Trader Pub. Co.*, 218 F.3d 481, 487 n.3 (5th Cir. 2000).

Undersigned counsel will provide Defendants in this matter with whatever quantifiable evidence is obtained to show measurement of damages, but civil rights violations like this are not given to easy description of losses and instead require that the jury announce their value.

A preliminary[5] estimate of those categories of Plaintiffs' damages that are readily calculable include the following:

**$214,180.46** in medical bills – UCHealth University of Colorado Hospital

**$29,307.00** in medical bills – University of Colorado Physicians

**$1,767.00** ambulance bill – Falck Rocky Mountain

**$1,814,900 - $3,508,900** in lost future earnings

A more precise computation of Plaintiffs' damages, to the extent Plaintiffs' damages are subject to such computation, will be provided during the normal course of discovery, and will be

---

[5] These estimates are preliminary only and will be supplemented as necessary as additional information becomes available.

determined by a jury in its sound discretion following a presentation of the evidence at trial in this matter.

Punitive damages are sought against the individual Defendants based upon the egregious nature of Defendants' conduct as set forth in the Complaint and to be proven at trial. Calculation of these damages and entitlements is premature and not susceptible to the type of calculation contemplated by Rule 26(a)(1).

**Aurora Defendants:** Aurora Defendants are incurring damages in the form of attorneys' fees, expenses and court costs. Aurora Defendants' damages are ongoing, continuing and, therefore, are not readily determined.

**APD Defendants:** APD Defendants are incurring damages in the form of attorneys' fees, expenses and court costs. APD Defendants' damages are ongoing, continuing and, therefore, are not readily determined.

**AFR Defendants:** These Defendants are not currently accruing damages but reserve the right to pursue such damages as may accrue through the development of evidence and discovery, including but not limited to reasonable attorney's fees.

**Dr. Eric Hill:** Dr. Hill reserves the right to pursue attorney's fees and costs as permitted by law.

### 6.      REPORT OF PRE-CONFERENCE DISCOVERY & MEETING UNDER FED. R. CIV. P.  26(F)

a.      Date of Rule 26(f) meeting: **October 5, 2020.**

b.      Names of each participant and each party represented:

      i.      Mari Newman, Michael P. Fairhurst, and Liana Orshan – Attorneys for Plaintiffs

ii.    Peter Morales and Isabelle Evans – Attorneys for Aurora Defendants

iii.    Jonathan M. Abramson and Yulia Nikolaevskaya – Attorneys for APD Defendants

iv.    Michael Lowe and David Goddard – Attorneys for AFD Defendants

v.    Stephen J. Hensen – Attorney for Defendant Dr. Eric Hill

c.    Proposed changes, if any, in timing or requirement of disclosures  under Fed.R.Civ.P. 26(a)(1): None.

d.    Statement as to when Rule 26(a)(1) disclosures were made or will be made: Rule 26(a)(1) disclosures were made on or before **November 18, 2020**.

e.    The parties have not agreed to conduct informal discovery but will attempt to cooperate with informal requests for discrete documents to the extent feasible as the case unfolds.

f.    The parties agree to take all reasonable steps to reduce discovery and reduce costs.

g.    The parties do not anticipate that this case will involve extensive amounts of electronically stored information.  The parties have taken steps to preserve any emails and other electronically stored information which may exist regarding this matter through the issuance of litigation hold letters.  The parties agree that all electronically stored information may be produced in paper form.  A party will only be required to produce electronically stored information in an electronic form if specifically requested with the form specified (i.e. with or without metadata, PDF or native form).  The parties further agree to work cooperatively to avoid discovery disputes related to electronically stored information and to be guided by the Sedona Principles to resolve any disputes which may arise.

h.    Statement summarizing the parties' discussions regarding the possibilities for promptly settling or resolving the case.  Pursuant to Fed. R. Civ. P. 26(f), the parties have discussed the possibility for a prompt settlement of the case. The parties will report the result of any future settlement discussions to the Court as they deem necessary or useful.

## 7.    CONSENT

All parties have not consented to the exercise of jurisdiction of a magistrate judge.

## 8.    DISCOVERY LIMITATIONS

a.    Plaintiffs position: The parties agree to limit the number of depositions to 10 per side (or 10 for Plaintiffs and 3 per Defendant group[6]), exclusive of parties and experts.

Defendants position: The parties agree to limit the number of depositions to 10 per group (Plaintiff, APD Defendants, AFR Defendants, Aurora Defendants and Dr. Hill), exclusive of parties and experts.

Plaintiff shall be limited to 10 non-expert/non-party depositions.
Defendants, collectively, shall be limited to 10 non-expert/non-party depositions.

Both: The parties agree to limit the length of depositions to 7 hours unless a longer deposition is agreed to by the parties or ordered by the court.

b.    Plaintiffs: Plaintiffs collectively shall be limited to fifteen (15) interrogatories to Defendants Woodyard, Roedema, Rosenblatt, Cooper, Cichuniec, and Hill; ten (10) interrogatories to each remaining APD Defendant, and twenty-five (25) interrogatories to Defendant City of Aurora. Each Defendant group (Aurora Defendants, APD Defendants, AFR Defendants, and Dr. Hill) may serve a total of ten (10) interrogatories to the Plaintiffs. Plaintiffs

_____

[6] Defendant groups are: APD Defendants, AFR Defendants, Aurora Defendants and Dr. Hill.

collectively shall be limited to ten (10) requests for production for each individual Defendant and forty (40) requests for production to Aurora. Plaintiffs shall be limited to fifteen (15) requests for admission to Woodyard, Roedema, Rosenblatt, Cooper, Cichuniec, and Hill; ten (10) requests for admission to the remaining individual Defendants; and thirty (30) requests for admission to Defendant City of Aurora.

c.a.    Defendants: Plaintiffs collectively shall be limited to ten (10) fifteen (15) interrogatories to Defendants Woodyard, Roedema, Rosenblatt, Cooper, Cichuniec, and Hill; five (5) interrogatories to each remaining APD Defendant, and twenty-five (25) interrogatories to Defendant City of Aurora. Each Defendant group (Aurora Defendants, APD Defendants, AFR Defendants, and Dr. Hill) may serve a total of ten (10) interrogatories to the Plaintiffs. Plaintiffs collectively shall be limited to ten (10) fifteen (15) requests for production for each individual Defendant and thirty (30) thirty-five (35) requests for production to Aurora. Plaintiffs shall be limited to ten (10) fifteen (15) requests for admission to Woodyard, Roedema, Rosenblatt, Cooper, Cichuniec, and Hill; five (5) seven (7) requests for admission to the remaining individual Defendants; and twenty (20) twenty-five (25) requests for admission to Defendant City of Aurora. Each Defendant group (Aurora Defendants, APD Defendants, AFR Defendants, and Dr. Hill) may serve a total of ten (10) requests for production and ten (10) requests for admission to Plaintiffs.

d.b.    Other Planning or Discovery Orders:  The parties anticipate their submission to the Court of a proposed protective order for its review and approval to accommodate the exchange of confidential documents and other information during the discovery process.

~~e.~~c.     **Plaintiff's position:** No one shall be permitted to carry any firearms during depositions at Plaintiffs' counsel's office. In the event that a deponent brings a firearm to a deposition, the firearm will be placed in a locked box or other secure location until the conclusion of the deposition.

   **Aurora and APD Defendants' position**: Per Aurora Police Department Policy, the Aurora and APD Defendants will not agree to APD officers disarming at depositions conducted in non-secure locations. The Aurora and APD Defendants will agree to officers disarming for depositions that take place at the Federal Courthouse.

~~f.~~d.     The parties anticipate that until such time as the COVID-19 Pandemic is no longer an issue, any witness or party whose deposition is being taken has the right to appear remotely (via Zoom, WebEx, Teams or other similar forum).

## 9.     CASE PLAN AND SCHEDULE

The plan and schedule must include the following items:

  a.     Deadline for Joinder of Parties and Amendment of Pleadings**: January 6, ~~2020~~ 2021.**

  b.     Discovery Cut-off:  **August 23, 2021.**

  c.     Dispositive Motion Deadline: **September 22, 2021.**

  d.     Expert Witness Disclosure

   (1)     Statement regarding anticipated fields of expert testimony, if any:

    a)     <u>Plaintiff</u>: Plaintiff anticipates calling retained experts in the following possible fields: police practices, emergency medicine, toxicology, forensic pathology, emergency medical services practices, economic damages, hedonic/enjoyment of life damages, psychological damages, and any

expert necessary for rebuttal and/or impeachment purposes. Plaintiffs may call experts in other areas as well.

    b)  <u>Defendants</u>: Defendants anticipate calling retained experts in the following possible fields: police practices, emergency medicine, toxicology, pharmacology (including but not limited to pharmacokinetics and pharmacodynamics), forensic pathology, emergency medical services, economic damages, psychological damages, enjoyment of life damages, and any expert necessary for rebuttal and/or impeachment purposes. Defendants may call experts in other areas as well.

(2)    Each side shall be limited to a total of seven (7) retained expert witnesses.

(3)    The parties shall designate all affirmative experts and provide opposing counsel with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **May 17, 2021.**

(4)    The parties shall designate all rebuttal experts and provide opposing counsel and any *pro se* party with all information specified in Fed. R. Civ. P. 26(a)(2) on or before ~~June 28, 2021.~~ **July 12, 2021**

e.    Deposition Schedule:

| Name of Deponent* | Date of Deposition | Time of Deposition | Expected Length of Deposition |
|---|---|---|---|
| Sheneen McClain | TBD | TBD | 7 hours |
| LaWayne Mosley | TBD | TBD | 7 hours |

| | | | |
|---|---|---|---|
| Nathan Woodyard | TBD | TBD | 7 hours |
| Randy Roedema | TBD | TBD | 7 hours |
| Jason Rosenblatt | TBD | TBD | 7 hours |
| Matthew Green | TBD | TBD | 7 hours |
| Dale Leonard | TBD | TBD | 7 hours |
| Alicia Ward | TBD | TBD | 7 hours |
| Kyle Dittrich | TBD | TBD | 7 hours |
| Erica Marrero | TBD | TBD | 7 hours |
| James Root | TBD | TBD | 7 hours |
| Jordan Mullins-Orcutt | TBD | TBD | 7 hours |
| Darren Dunson | TBD | TBD | 7 hours |
| Rachel Nunez | TBD | TBD | 7 hours |
| Vanessa Wilson | TBD | TBD | 7 hours |
| Peter Cichuniec | TBD | TBD | 7 hours |
| Jeremy Cooper | TBD | TBD | 7 hours |
| Eric Hill | TBD | TBD | 7 hours |
| 30(b)(6) representative(s) of Defendant City of Aurora, CO | TBD | TBD | TBD |
| Other individuals disclosed by the parties in their disclosures and discovery responses | TBD | TBD | TBD |

\* The Parties reserve the right to take additional depositions of persons identified in the Parties' disclosures and through the course of discovery.

     f.       Deadline for Interrogatories: All interrogatories must be served at least 30 45 days prior to the discovery cut-off.

     g.       Deadline for Requests for Production and Admission: All requests for production and requests for admission must be served at least 30 45 days prior to the discovery cut-off.

## 10.  DATES FOR FURTHER CONFERENCES

     a.       Telephonic Status conferences will be held in this case at the following dates and times:

 January 6, 2021 at 2:00 PM

_____.

     b.       A final pretrial conference will be held in this case on  to be set before Judge Domenico_____at o'clock ___m.  A Final Pretrial Order shall be prepared by the parties and submitted to the court no later than seven (7) days before the final pretrial conference.

## 11. OTHER SCHEDULING ISSUES

     a.       Statement of those discovery or scheduling issues, if any, on which counsel, after a good faith effort, were unable to reach an agreement:

          (1)     As set out in section 8.e, above, Aurora and APD Defendants object to Plaintiff's proposal to include the language in the Scheduling Order that prohibits attendants from having firearms on the premises during any deposition at Plaintiffs' counsel's office.

     b.       Statement of anticipated length of trial to the jury: **Fifteen (15) days.**

     c.       The Parties do not anticipate conducting any pretrial proceedings at the District Court's facilities in Colorado Springs, Grand Junction or Durango.

## 12. NOTICE TO COUNSEL AND PRO SE PARTIES

The parties filing motions for extension of time or continuances must comply with D.C.Colo.LCivR 6.1(c) by submitting proof that a copy of the motion has been served upon the moving attorney's client, all attorneys of record, and all *pro se* parties.

Counsel will be expected to be familiar and to comply with the Pretrial and Trial Procedures or Practice Standards established by the judicial officer presiding over the trial of this case.

With respect to discovery disputes, parties must comply with D.C.Colo.LCivR 7.1(a).

Counsel and unrepresented parties are reminded that any change of contact information must be reported and filed with the Court pursuant to the applicable local rule.

## 13. AMENDMENTS TO DISCOVERY AND SCHEDULING ORDER

The Scheduling Order may be altered or amended only upon a showing of good cause.

DATED this _____22nd_____ day of ___October_____ 2020.

BY THE COURT:

_N. Reid Neureiter_____

N. Reid Neureiter
United States Magistrate Judge

APPROVED:

*s/ Mari Newman*

_____

 Mari Newman
 Michael P. Fairhurst
 Liana Orshan
 KILLMER, LANE & NEWMAN, LLP

*s/ Isabelle Evans*

_____

 Peter Morales
 Isabelle Evans
 Aurora City Attorney's Office
 15151 E. Alameda Parkway, Suite 5300

1543 Champa Street, Suite 400
Denver, CO 80202
mnew@kln-law.com
mfairhurst@kln-law.com
lorshan@kln-law.com
*Attorneys for Plaintiff*


s/ Stephen J. Hensen
_____
Stephen J. Hensen
Hensen | DuWaldt
1001 Bannock St., Suite 39
Denver, CO 80204
303-223-0773 p
Mobile: 303-895-4199 c
steve@hendulaw.com
*Attorney for Defendant Dr. Eric Hill*


s/ Michael Lowe
_____
Michael Lowe
David Goddard
Bruno, Colin & Lowe, P.C.
1999 Broadway, Suite 4300
Denver, Colorado 80202
P: 303.831.1099
F: 303.831.1088
MLowe@brunolawyers.com
dgoddard@brunolawyers.com
*Attorneys for Defendants Cichuniec and Cooper in their individual capacities ("AFR Defendants")*

Aurora, CO 80012
Telephone: (303) 739-7030
Facsimile: (303) 739-7042
pmorales@auroragov.org
ievans@auroragov.org
*Attorneys for Defendant City of Aurora, and Defendants Woodyard, Roedema, Rosenblatt, Green, Leonard, Ward, Dittrich, Marrero, Root, Mullins-Orcutt, Dunson, Nunez, Cichuniec, and Cooper in their official capacities ("Aurora Defendants")*


s/ Jonathan M. Abramson
_____
Jonathan M. Abramson
Yulia Nikolaevskaya
Kissinger & Fellman, P.C.
3773 Cherry Creek N. Dr., #900
Denver, CO 80209
Telephone: 303-320-6100
Facsimile: 303-327-8601
jonathan@kandf.com
julie@kandf.com
*Attorneys for Defendants Dittrich, Dunson, Green, Leonard, Marrero, Mullins-Orcutt, Nunez, Roedema, Root, Rosenblatt, Ward, and Woodyard in their individual capacities ("APD Defendants")*