1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
    Case No. 20-cv-02389-DDD-NRN
 3  _____

 4  ESTATE OF ELIJAH JAVON McCLAIN, by and through its personal
    representatives Sheneen McClain and Lawayne Mosley, SHENEEN
 5  McCLAIN, individually, LAWAYNE MOSLEY, individually,

 6      Plaintiffs,

 7  vs.

 8  CITY OF AURORA, COLORADO, a municipality, et al.,

 9      Defendants.
    _____
10

11          Proceedings before N. REID NEUREITER, United States

12  Magistrate Judge, United States District Court for the

13  District of Colorado, commencing at 2:00 p.m., January 6,

14  2021, in the United States Courthouse, Denver, Colorado.

15  _____

16          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

18  _____

19                    APPEARANCES

20          LIANA ORSHAN, MICHAEL FAIRHURST and MARI NEWMAN,
    Attorneys at Law, appearing for the Plaintiffs.
21
            ISABELLE EVANS, PETER MORALES, JONATHAN ABRAMSON,
22  YULIA NIKOAEVSKAYA, STEPHEN HENSEN, MICHAEL LOWE and DAVID
    GODDARD, Attorneys at Law, appearing for the Defendants.
23  _____

24                TELEPHONIC MOTION HEARING

25
```

2

```
 1              P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              THE COURT:  Okay.  I'm calling the case,

 6    20-cv-02389, the Estate of Elijah Javon McClain vs. City of

 7    Aurora, Colorado.  Appearances for the plaintiff, please.

 8              MS. NEWMAN:  Good afternoon, Your Honor.  On behalf

 9    of plaintiff, Mari Newman, Michael Fairhurst, and Liana

10    Orshan of Cumberland & Newman.

11              THE COURT:  All right, thank you.  And I'm going to

12    -- other than having people say things, I'm going to read out

13    the names of the defendants and you tell me if you're

14    appearing on behalf of that defendant and any other

15    defendants.  So on behalf of defendant City of Aurora?

16              MR. MORALES:  Yeah, good afternoon, Your Honor --

17              MS. EVANS:  Good afternoon, Your Honor.  Isabella

18    Evans and Peter Morales here for the City of Aurora and all

19    of the individual defendants in their official capacity.

20              THE COURT:  Okay.  And defendant Nathan Woodyard in

21    his individual capacity?

22              MR. ABRAMSON:  Good afternoon, Your Honor.

23    Jonathan Abramson and Julie Nikolaevskaya on behalf of

24    Officer Nathan Woodyard.  In addition, we are representing

25    Officer Randy Roedema, Officer Jason Rosenblatt, Officer
```

```
 1   Matthew Green, Sergeant Dale Leonard, Officer Alicia Ward,
 2   Officer Kyle Dittrich, Officer Erica Marrero, Officer James
 3   Root, Officer Jordan Mullins-Skordesky (ph), and Officer
 4   Darren Dunson, and Sergeant Rachel Nunez in their official --
 5   individual capacities.
 6             THE COURT:  Okay.  And for defendant Peter
 7   Cichuniec?
 8             MR. LOWE:  Good afternoon, Your Honor.  Mike Lowe
 9   and David Goddard on behalf of the defendants Cichuniec and
10   Cooper in their individual capacities.
11             THE COURT:  Okay.  And then last one is Dr. Eric
12   Hill?
13             MR. HENSEN:  Good afternoon, Your Honor.  Steve
14   Hensen on behalf of Dr. Hill.
15             THE COURT:  All right.  Are there any other
16   attorneys on the line that have not entered their appearance?
17             Okay.  So we had originally set this -- I think
18   it's just a check-in status conference, but in the interim --
19   that's my recollection anyway.  Ms. Newman, was there any
20   other particular reason why we've set this as a status
21   conference?
22             MS. NEWMAN:  No, Your Honor.  I think it was just a
23   status conference.
24             THE COURT:  Okay.  So in the interim course, the
25   defendants filed a motion to bifurcate the individual Monell
```

4

1    claims and simultaneously asked for stay of discovery for the

2    Monell claims and then the -- there was a joint motion to

3    stay discovery that was also filed.

4            Just last night, Judge Domenico said he was going

5    to address the issue of bifurcating the trials, but referred

6    to me the issue of bifurcating discovery and the motion for

7    stay, and then I issued an order this morning asking the

8    parties to be prepared to argue that.

9            Sort of short notice, I agree, and if somebody

10   really feels that they're being treated unfairly in having to

11   argue this today, I can talk about rescheduling it, but quite

12   frankly, the briefs are pretty comprehensive.  I've read

13   them, I've read the Boyd decision, I've read the decision by

14   Judge Arguello that was just issued that was submitted as

15   supplemental authority, and most of the time, people in this

16   district don't give oral arguments.  So I'm inclined to go

17   ahead with it, if you all are -- if there's no serious

18   objection to that.

19           Plaintiffs' counsel, are you ready to argue the

20   issue?  I mean, it's not your motion, but are you -- feel

21   like you can --

22           MS. NEWMAN:  I think we should be -- I think we

23   should be fine on both, and I'm glad to hear that the Court

24   has already read Judge Arguello's order from this morning.

25           THE COURT:  Yeah.  Plaintiffs' counsel, I'll -- if

1   there could be -- or defense counsel, if there's going to be

2   -- and I know there are a bunch of groups of defendants, but

3   if there is somebody who could take the primary load on the

4   issue.  Are you all ready to argue this?

5           MS. EVANS:  Your Honor, this is Isabella Evans for

6   the City.  I think as to the arguments for bifurcation, I'll

7   be handling those, and I believe that Mr. Lowe will be

8   handling the arguments for the other motion, the stay of

9   discovery.

10          THE COURT:  Okay.  So --

11          MR. LOWE:  As well, Your Honor, because of the

12  division of labor on the defense side, Mr. Abramson is going

13  to handle arguments, at least initially, with his client

14  groups, because he has the most diverse and number of

15  clients.  So he'd like to address the Court.

16          THE COURT:  Okay.  Here's my issue:  I've got a

17  sentencing that I have to do at 3:00.  I will give you --

18  I'll give the defendants 10 minutes on the bifurcation issue

19  and then until 1:30 -- or until 2:30 on the issue of the

20  stay.  So we'll hear from the defendants on both things

21  first.  We'll give you until 2:35, and then we'll give Ms.

22  Newman from 2:35 to 2:55.

23          I'm -- I'll tell you right now I'm not going to

24  decide it today.  I'm going to take it under advisement,

25  because this -- just based on the papers, it's an interesting

1    question.

2            But why don't I hear first from plaintiff's counsel

3    on the issue of bifurcation of discovery, but I have to tell

4    you that when you put the two motions together, you want to

5    bifurcate the discovery on the Monell claims and the

6    individuals claims and then you want to stay discovery on the

7    Monell claims, because gosh, you've got to find out first

8    whether there's a constitutional violation, and then you want

9    to stay discovery on whether there's a constitutional

10   violation.

11           So basically you want to stay everything, and it

12   doesn't -- and you're -- so here's the concerns that I have:

13   Deciding these motions to dismiss will take, at best, six

14   months, might take a year, and qualified immunity, you can

15   get an interlocutory appeal, which will take two years.

16   There's a dead kid here and a community outraged, and if the

17   defendants didn't do anything wrong, then they should be

18   entitled to clear their names.  The City of Aurora, if their

19   policies are constitutional, they should -- you know, the

20   City of Aurora shouldn't be under a cloud for two years.

21           So my inclination is that a stay here would result

22   in a multi-year delay and isn't -- it isn't the way railroads

23   should work.  It may be the way, in actuality, the railroad

24   does work, but it shouldn't work that way.  Justice shouldn't

25   take that long, especially when you've got allegations as

1    serious as the ones here involving a dead young man, who

2    apparently, based on everything I've read in the complaint

3    and the answers and most of the -- nobody's saying that he

4    did anything wrong, and so the public is entitled to some

5    answers here.  And if the policies of the City of Aurora and

6    the conduct of the individual defendants is all above board

7    and constitutional and appropriate, then the sooner we get to

8    that answer, the better it is for everybody.

9         So in terms of the String Cheese factors, the

10   prompt resolution for the plaintiff is one thing, but I do

11   think that there is a public interest in seeing -- you know,

12   in not having this thing drag out for five years.  So that

13   was kind of my initial reaction, but why don't I hear first

14   on the bifurcation issue and then we'll hear on the stay, but

15   I am -- regardless of how -- I'll let you divide it however

16   you want, but I'm going to cut you off at 2:35 and let Ms.

17   Newman talk.

18        So go ahead.

19        MS. EVANS:  Thank you, Your Honor.  Isabella Evans

20   and I'll address the bifurcation issue.  I will not address

21   the bifurcation of trial issue, as that's before Judge

22   Domenico, but if the Court has questions about that, I'm

23   happy to address that as well, but I'll try and stick just to

24   the discovery issue.

25        As we (inaudible) in our motion, there are three

8

1    elements for bifurcation:  Convenience and economy to the

2    parties and the Court, separability of the issues, and

3    essential fairness.  In this case, I think although

4    bifurcation may be uncommon, this is an uncommon case and I

5    think that might be something that Ms. Newman agrees with us

6    on.

7            The scope of what's argued in the complaint is

8    vast, far greater than what you would expect to see and what

9    you typically see in these type of cases, and that unusual

10   circumstance, the uniqueness of the allegations being made,

11   as the Court pointed out, that mitigates in favor of

12   bifurcation here.

13           There's a vast amount of discovery associated with

14   the allegations related to the Monell claims, and as the

15   Court pointed out, before you can reach those Monell claims,

16   there must be an underlying constitutional violation.  To

17   assume an underlying constitutional violation at this early

18   stage in the litigation would be problematic and I think that

19   is really the breadth of plaintiffs's argument here, it's

20   assuming the outcome before that outcome has been reached.

21   And regrettable though it may be that that outcome may take

22   some time, that is the function of the judicial process at

23   this stage.  There are disputed issues of fact and law and

24   the Court is the vehicle to resolve those disputes.

25           So based on those underlying disputed issues

1   related to the constitutional violation, to assume that we'll

2   even reach a Monell fact trial would be an error.  That is

3   still very much up in the air.  And on top of that, to say

4   you have the fiduciary duty to the taxpayers to expend

5   taxpayer resources in an efficient and effective manner, the

6   cost of Monell discovery in this case will be enormous, based

7   on the scope of the allegations raised in the complaint.

8           So to address each of the factors a little bit more

9   specifically -- and I apologize if I'm going quickly, I want

10  to make sure to leave time for the individual defendants,

11  because I think there are more issues to be argued there.  So

12  I'll try and move quickly through the Monell arguments here.

13          But the first element is the convenience and

14  economy, and in this particular case, based on the unique

15  scope of what's argued in the complaint, the scope of the

16  Monell discovery is enormous.  The findings on a

17  constitutional violation could obviate the need to conduct

18  that discovery and ultimately to try those issues to a jury.

19          THE COURT:  Well, let me stop you for a second.

20  When you say the scope of the Monell discovery, that's a

21  function of it.  There's so many instances where

22  unconstitutional conduct is alleged, right?  I mean, if there

23  were only one or two instances of this happening before, it

24  wouldn't be so great; but isn't the alleged broad, vast scope

25  of the Monell discovery a function of the fact that they've

1   found 27 prior instances where arguably the police department

2   or somebody else in the City of Aurora has acted

3   unconstitutionally with respect to people based on race?

4          MS. EVANS:  Well, I think that's important, first,

5   to consider what stage we're in in the litigation.  The City

6   does not agree with the allegations that are made in the

7   complaint, and to assume that the factual accuracy or

8   correctness of those allegations at this stage, when they're

9   disputed, I think would be to assume an outcome that's not

10  guaranteed.

11         But more than that, I think that looking at the

12  scope of the complaint, unlike sort of your traditional 1983

13  suit in a Monell claim where you see prior instances alleged

14  that are closely related factually to the facts of the

15  underlying circumstance, here you see allegations raised that

16  are factually untethered from the instance involving Mr.

17  McClain, and so we're expanding the scope of what is

18  potentially a relevant or probative prior occurrence to

19  include things that traditionally you would not see as

20  factually similar, and so that expansion of the scope of

21  Monell relevance and discovery is really what makes this case

22  unique and why bifurcation is appropriate in this case.

23         THE COURT:  Well, explain -- give me an example of

24  an un- -- an example of an incident that will need -- that's

25  in the complaint and, therefore, they're entitled to

11

```
 1   discovery on, but is not factually parallel to Mr. McClain's
 2   situation?
 3             MS. EVANS:  Sure.  And Your Honor, I apologize, I
 4   don't have the paragraph number to cite to, but in the
 5   complaint, the plaintiff cites to an incidence involving an
 6   African-American man, Mr. Hassan (ph), who was asked to leave
 7   a coffee shop by Aurora police officers, who were asked to
 8   make that request by the owner of the -- or the operator of
 9   the establishment.  There was no force used, the officer is
10   -- had a pleasant, conversational tone and Mr. Hassan left
11   the coffee shop.
12             That factual scenario is completely different than
13   what's alleged to have occurred on this underlying incident.
14             THE COURT:  Okay.  All right, go ahead.  Keep
15   going.
16             MS. EVANS:  Thank you, Your Honor.  And I think one
17   other thing to consider here is, in terms of convenience and
18   economy, is when you have a vast scope of discovery like
19   we'll see in this case -- and I'll get into this in a little
20   more detail -- when you have that type of scope, you have a
21   concurrent likelihood of the need to use judicial resources
22   to resolve discovery disputes.  There are likely to be many
23   disputes because of the -- just the nature of Monell
24   discovery, and so to bifurcate discovery at this point and to
25   stay the Monell discovery would further the economy both for
```

1    the parties and the enormous cost it would take appealing and

2    assembling and arguing over requested discovery and also for

3    the Court.

4              THE COURT:  But am I correct in --

5              MS. EVANS:  I suspect --

6              THE COURT:  Am I correct in assuming that if I

7    grant your motion, grant defendants' motion, all discovery is

8    going to be stayed?

9              MS. EVANS:  With respect to the City, that would be

10   the request if they -- to stay the Monell discovery pending

11   the resolution of the individual claims, yes.

12             THE COURT:  And then if I grant their motion, all

13   discovery is going to be stayed, right?

14             MS. EVANS:  Yes.  The individual defendants have

15   requested a stay of discovery pending the resolution of

16   qualified immunity.

17             THE COURT:  Okay.  All right, go ahead.

18             MS. EVANS:  One thing I would like to bring to the

19   Court's attention here is that a large amount of discovery

20   has already taken place in this case and, frankly, an

21   unprecedentedly large amount of discovery, giving the stage

22   that the case is in currently.  Over 149,000 pages of

23   documents have been produced by the City of Aurora in

24   response to plaintiffs' request for discovery.  Two discovery

25   requests have already been served on the City and one of

13

1   those has been fulfilled while one remains outstanding.

2          So nearly 150,000 documents have been produced in

3   response to that discovery request, and that doesn't even

4   count the amount of documentation on other items that were

5   released on open records requests done by the plaintiffs'

6   office -- counsel office.

7          THE COURT:  Yeah.  Why did you all issue -- why did

8   you all issue discovery?

9          MS. EVANS:  I'll defer that mostly to the

10  individual defendants' counsel, but primarily, Your Honor, we

11  have issued that very limited scope of discovery in order to

12  prepare for our planned mediation.  We've requested only

13  items that we believe would be necessary to prepare for and

14  conduct an effective mediation.

15         THE COURT:  Yeah, but you can't -- you can't issue

16  discovery on the one hand and then -- and ask the Court to

17  stay all discovery on the other.  That's talking out of both

18  sides of your mouth, isn't it?

19         MS. EVANS:  Well, Your Honor, I think that we had

20  tried to work on some sort of informal discovery exchange

21  with plaintiff and I think we had exchanged some information

22  that way.  The City certainly provided a lot of information

23  on open records requests, but if we're going to engage in a

24  mediation, there are certain things that both sides need and

25  we've attempted to provide those things to plaintiff where

14

1   they've been requested and we're simply asking for those

2   things in return so that parties can have an effective and

3   potentially resolve this mediation using this information

4   that's available.

5            THE COURT:  Okay, I keep interrupting you.  I

6   promise I'll stop.  Go ahead and --

7            MS. EVANS:  No, not a problem.

8            THE COURT:  Go ahead and finish up and then pass

9   the baton.

10           MS. EVANS:  I just have a couple of more points and

11  I -- the reason I bring up the scope of discovery that's been

12  conducted by the City thus far is, one, to illustrate the

13  scope that we're talking about and the enormous amount of

14  taxpayer dollars that needed to be expended to review and

15  produce the documents already requested, which would increase

16  exponentially were we to proceed to depositions on this case

17  on 27 unrelated incidents, but also to point out that the

18  argument plaintiff makes with regards to prejudice is really

19  speculative at this point.

20           The argument that documents will get lost or

21  memories will fade is undermined by the fact that plaintiff

22  already has in their possession, you know, everything that

23  they can think of to ask us to give them.  And so the idea

24  that these things will become unavailable or that it will be

25  harder to obtain in the future is really undermined by the

1    fact that these things have already been provided in a timely

2    manner to the plaintiff and really that discovery in this

3    case is proceeding at sort of a breakneck, unprecedented

4    pace.  You know, discovery was served on the very first day

5    that it was able to be served under the rules and then we

6    responded to that discovery accordingly.

7            So in terms of prejudice for the Monell stay, I

8    think that is -- that is mitigated greatly by the fact that

9    almost everything plaintiff could expect to receive in terms

10   of documentation from the City has been provided.

11           And with that, I want to make sure I leave time for

12   everyone else.  So I will stop there.

13           THE COURT:  Okay.  Mr. Lowe?

14           MR. ABRAMSON:  Actually Your Honor, this is

15   Jonathan Abramson.  I'd like to make a few preliminary

16   comments and then let Mr. Lowe clean up, if that's okay with

17   the Court.

18           THE COURT:  That's fine.

19           MR. ABRAMSON:  Thank you.  So I'd like to make a

20   few comments on behalf of the Aurora Police defendants.  Mr.

21   Lowe will be making comments specific to the Aurora Fire

22   defendants and applicable to all defendants.

23           Your Honor, I think it's important to look at the

24   context of the complaint and what has been filed.  Suit has

25   been filed against 12 Aurora Police officers, and I've put

1   them into three groups, which are the groups that were used

2   in our respective motions to dismiss.  The first group is

3   Officers Roedema, Rosenblatt and Woodyard.  Those three

4   officers were involved in the initial contact with Mr.

5   McClain and the use of force.  Plaintiff brings four claims

6   against them:  An excessive force claim, an equal protection

7   claim, a state battery claim and a state negligent wrongful

8   death claim.  These defendants -- these three have filed

9   motions to dismiss asserting qualified immunity on the equal

10  protection claim.

11          The next group of officers, Matthew Green, Sergeant

12  Dale Leonard and Alicia Ward, were not involved in the

13  initial contact and use of force with Mr. McClain.  They came

14  on the scene after the initial contact and use of force and

15  that's set forth in our -- in our motion to dismiss.  That

16  the involvement with these officers -- the specific factual

17  allegations with these officers are that, while waiting for

18  medical help to arrive, Sergeant Leonard and Officer Green

19  held Mr. McClain's legs for a brief period of time while

20  medical help was on the way and Officer Ward placed pressure

21  on Mr. McClain's head and upper back, and these are the

22  allegations, if, as true, from the complaint.

23          Sergeant Leonard, Officer Ward and Officer Green

24  never subjected Mr. McClain to any pain compliance

25  techniques.  And so these -- this group was sued under Claim

1    Number 1, Section 1983, excessive force; Claim Number 2, an

2    equal protection claim; Claim Number 6, a state battery

3    claim; and a state -- Claim 7, a state negligence wrongful

4    death claim.  These defendants have sought to dismiss all

5    claims against them and have asserted qualified immunity.

6              And the final group of officers are --

7              THE COURT:  So quick question -- quick question

8    about that group.  Regardless of whether claims against them

9    proceed, they're still going to be witnesses, right, to the

10   incident, and if claims are proceeding against others who

11   have not moved to entirely dismiss the case, they're still

12   going to be witnesses, right?  So they're still likely going

13   to be deposed, am I --

14             MR. ABRAMSON:  Right.  And I -- and if the Court

15   allows me to, I'm prepared to address that in just one minute

16   if that's okay.

17             THE COURT:  Well, address it now.  Just --

18             MR. ABRAMSON:  Okay.  That's fine.

19             So that -- so that argument -- so all defendants --

20   I get that falls under the burden argument -- part of the

21   String Cheese Incident, and I'll say that there is a

22   significant burden, and I'm going to go through kind of what

23   would be left if the motion to dismiss were granted.  And so

24   the argument that they will likely be deposed anyway does

25   create a great burden.  So all -- to kind of cut to the

1    chase, there would be a few claims left against three of the

2    12 APD defendants and there are a total of 16 defendants and

3    there would be three defendants left out of 16.

4         So all defendants had been served with quite

5    detailed written discovery requests.  So if they are

6    witnesses versus parties, those would not be allowed.  Also,

7    I will say, Your Honor, that the length and the breadth of a

8    witness deposition is very different from a defendant

9    deposition.  And I've been on numerous cases with Ms. Newman

10   over many years and I can say that the depositions of

11   defendants are regularly in the five-, up to the seven-hour

12   limit, and many questions posed to defendants would not meet

13   relevance rules under -- if they were posed to a witness.  So

14   I think it does greatly change the burden and the scope of

15   discovery.

16        Your Honor, the final group of defendants are

17   Officers Dittrich, Marrero, Root, Mullins-Skordesky, Dunson

18   and Nunez, and these officers were not involved in the

19   initial contact or use of force.  There's no allegations that

20   these officers even placed a hand on Mr. McClain.  These

21   officers -- the only factual complaints against them is that

22   they basically filtered in and out of the scene and that's

23   it.  There are four claims against them and these defendants

24   have sought dismissal of all of those claims.

25        So to summarize, they're -- Claim 1 is an excessive

1    force claim against 12 officers.  Nine out of 12 are seeking

2    dismissal asserting qualified immunity.  Claim 2 is an equal

3    protection claim against 12 officers.  All officers are

4    seeking dismissal asserting qualified immunity.  Claim 6

5    involves battery.  Three of the six named officers in that

6    claim are seeking dismissal.  Claim 7 is against 12 officers

7    and nine out of the 12.

8            So if Dr. Hill, the AFD -- Aurora Fire defendants

9    and Aurora are also dismissed, that would leave three out of

10   16 named defendants left in the case.  And with regard to the

11   Aurora Police officers:  Of 42 claims made, 33 are subject to

12   a motion to dismiss.  So it would greatly narrow the scope of

13   the discovery in this case.

14           And as Ms. Evans noted, there have been thousands

15   of pages of written reports disseminated versus (inaudible).

16   There have been numerous body cam footage -- nearly all of

17   the officers had body cam footage and that's been provided to

18   plaintiff.  There are hours of video-recorded interviews of

19   several of the defendants that have been provided to

20   plaintiff.

21           And so based upon all of this information, there's

22   little question about what each and every defendant's

23   involvement in the case is.  And I would just ask the Court

24   to look at Judge Mix's opinion in Estate of Secore (ph) vs.

25   City of Westminster, which is -- the civil case number is

1    19-cv-2412.  And Judge Mix goes into a very detailed

2    discussion about qualified immunity and the Tenth Circuit and

3    Supreme Court case law that talks about not only the burdens

4    of going to trial when a qualified immunity is asserted, but

5    also the burdens of discovery, and there is going to be

6    significant burdens of discovery, Your Honor.

7           THE COURT:  How is this case different from the

8    Pitman (ph) decision that I issued (inaudible)?

9           MR. ABRAMSON:  Well, I'm going to let Mr. Lowe --

10   he was assigned that task.

11          THE COURT:  Well, since Mr. Lowe's time is limited,

12   why don't you turn it over to him then.

13          MR. ABRAMSON:  Just one last thing, Your Honor,

14   Judge Mix in her opinion did address this argument that the

15   Court should look at the viability of the -- of the motions

16   to dismiss in looking at also the String Cheese Incident

17   factors and I would ask the Court to look at her opinion on

18   that.  And I will --

19          THE COURT:  Yeah --

20          MR. ABRAMSON:  -- turn it over to Mr. Lowe.

21          THE COURT:  -- I have my own view on that which

22   I've articulated orally sometimes, but I do think there's a

23   piece -- and it's not in the String Cheese factors, but I do

24   think that looking at the viability of the motion to dismiss,

25   whether it's -- has a likelihood of success ought to be

1    considered, and judges, whether they articulate it or not,

2    probably do look at that when it comes to some of these --

3    you know, if it's a pro se inmate who's complaining that he

4    didn't get -- I don't know, that he was treated

5    unconstitutionally because he didn't get the right bandaid

6    for his scratch -- not to denigrate pro se prisoner

7    (inaudible), but we see some of those; and those, typically,

8    they stay discovery when the motion to dismiss is filed,

9    because you're looking at the motion to dismiss like that is

10   going to be granted.

11        MR. ABRAMSON:  Yeah.

12        THE COURT:  This isn't the kind of case where I can

13   look at the motion to dismiss and say, You know what, it's

14   going to be granted, just look at it on its face.  And that

15   will likely weigh in the calculus, whether somebody needs to

16   write a String Cheese 2 and include that in the factors

17   (inaudible) --

18        MR. ABRAMSON:  Well, I'll turn this over to Mr.

19   Lowe, but Your Honor, that's why I do bring up not -- the

20   personal involvement and personal participation allegations

21   against nine out of the 12 officers that I represent.  And

22   I'll turn it over to Mr. Lowe.

23        MR. LOWE:  All right, Your Honor.  So being

24   sensitive to the time that I have left and the Court's time

25   and the time of the parties, I will try to be very, very

1   succinct.

2           In response to the Court's question as to how this

3   case is distinct from this Court's decision in Pitman, simply

4   by virtue of the sheer number of parties, that's the first

5   major distinction and what we have been pointing out to the

6   Court for some time.

7           The -- as Mr. Abramson pointed out, there are 16

8   defendants in this case with something over 50 discrete

9   claims against them, and with respect to the Aurora Fire

10  defendants, there are five claims against each of them for a

11  total of ten:  A Fourteenth Amendment deliberate indifference

12  claim for failing to provide adequate medical care, a

13  Fourteenth Amendment substantive due process claim based on

14  the theory of forced administration of medication, a Fourth

15  Amendment claim for excessive force and two state law claims

16  for wrongful death, one based on negligence -- negligent and

17  one based on intentional battery.

18          As a result, the -- the majority of other claims

19  are based on a failure to intervene theory on the -- on the

20  part of the law enforcement officers, and although not

21  directly pled, that is suggested in the pleadings against the

22  AFR defendants as well.

23          However, in this case, the entitlement to qualified

24  immunity is quite strong in the opinion of the defendants

25  with respect to the vast majority of not only defendants

23

1    themselves, but the discrete claims.  And so the elements of

2    the String Cheese analysis that go to the benefit to the

3    efficiency of the litigation before the Court, I think, speak

4    very strongly toward a stay in this case, because it is in

5    everyone's best interest to determine the scope of discovery

6    and the scope of the litigation based on claims that are

7    going to survive and the number of defendants that are going

8    to move forward.

9            The second point that I wanted to make, Your Honor,

10    is that I appreciated that the Court had read and

11    characterized the briefing in this case as fairly exhausted,

12    and I also wanted to respond to the Court's statement that

13    the initial impression was, you know, the public has a right

14    and the defendants have a right to have this situation

15    articulated on by the courts and have their names cleared.

16    And a statement that these folks are entitled to qualified

17    immunity is that responsibility of the courts.  That is how

18    they can clear their names without being subject to what

19    Supreme Court authority has clearly articulated are the

20    burdens of discovery and pretrial litigation burdens.

21            And so running up on my time here, Your Honor --

22            THE COURT:  I'll ask my questions.

23            MR. LOWE:  -- as for -- go ahead.

24            THE COURT:  How do I -- why should I not follow

25    Judge Arguello's decision?  Why should I pick Judge Hegarty's

1   decision in Boyd over Judge Arguello's decision that was

2   submitted this morning?

3          MR. LOWE:  You know what, Your Honor, I -- that was

4   sent over the wire of -- I want to say about a half hour

5   before this started --

6          THE COURT:  Okay.  Tell you what --

7          MR. LOWE:  -- and I was in the process of --

8          THE COURT:  Here's what I'll let you do.

9          MR. LOWE:  -- (inaudible).

10          THE COURT:  You can, by Friday, submit a three-page

11   response addressing only that supplemental authority.  I've

12   read it, it was pretty persuasive and I want to give you a

13   fair opportunity to respond to that.  So by Friday, no longer

14   than three pages, you can address Judge Arguello's decision.

15   Okay?

16          MR. LOWE:  Okay.

17          THE COURT:  All right.

18          MR. LOWE:  And I think you characterized it, Your

19   Honor, as being -- why you should choose Judge Arguello's

20   decision over Judge Hegarty's decision?

21          THE COURT:  Right -- no.  The reverse.  If I choose

22   Judge Arguello, then you lose.

23          MR. LOWE:  Oh, I'm sorry.

24          THE COURT:  Judge Hegarty --

25          MR. LOWE:  Okay.

1          THE COURT:  -- I think granted bifurcation and

2     stayed Monell discovery, and so it's not quite your point,

3     but he stayed discovery in a case like this and granted

4     bifurcation, I think.

5          MR. LOWE:  You shall have it, Your Honor.

6          THE COURT:  All right.

7          MR. LOWE:  Before I give up my time, I would just

8     like to, on the record, point the Judge Tafoya's decision in

9     Sexton v. City of Colorado Springs, 2020 US District Lexis

10    203862, and particularly page 6 of that opinion, which

11    discusses many of the issues that we're presenting here

12    today.

13         THE COURT:  Okay.  Ms. Newman, go ahead.

14         MS. NEWMAN:  All right.  I apologize, it's going to

15    be scattershot, and I think our briefs are quite thorough, so

16    I'm hoping that the Court will ask questions as they arise.

17         But I think the primary reason -- I think the Court

18    was right on at the very beginning of this hearing on both

19    the primary reason to deny the motion to stay, as well as the

20    motion to bifurcate, because of the unbelievable length of

21    time that it's going to add.  And so the Court was talking

22    about the inevitable interlocutory appeals taking as much as

23    two years, which I think that's right.  That's -- that's, of

24    course, true and that militates against the motion to stay.

25         It's going to be even worse with regard to the

1   motion to bifurcate, because we've got all of the delays that

2   are built into the initial trial and then the motion to

3   bifurcate contemplates that we don't even get to do discovery

4   on the Monell claims until after an entire trial, which I

5   think realistically could take as long as -- if we look at,

6   for example, the Marvin Booker cases as sort of an example of

7   how these things can go, as long as 4 1/2 years from the time

8   that Elijah McClain was killed.

9          And as the Court noted, this was a young man who by

10  all -- everybody agrees was totally innocent, did nothing

11  wrong, a family who is grieving and a community that has a

12  right to know.

13         And I respectfully have to disagree with Ms. Evans'

14  commentary that this is an uncommon case.  It's a big case.

15  It's a case that's not just national, but international media

16  is paying attention to, but that doesn't make it uncommon

17  and, in fact, there's nothing about the kinds of facts that

18  have been articulated in this case that are uncommon at all.

19  In fact, it's the exact same thing that we're seeing across

20  the entire country, which is why people are so interested in

21  the outcome of it.

22         As the Court noted, the vast amount of discovery

23  that Ms. Evans is concerned about is because Aurora has had

24  so many allegations of racist brutality against it.  I don't

25  think we have to go out of our way.  Of course, I can

27

1    characterize that incident regarding a young man who's just

2    sitting in a coffee shop minding his own business, but is

3    racially targeted differently than Ms. Evans did, but I'm not

4    contemplating that we take depositions on every single other

5    case.  I think --

6              THE COURT:  Well, I am concerned about -- you know,

7    you list 27 cases, and so is there going -- give me some

8    sense of what you anticipate in terms of discovery on the 27

9    other --

10             MS. NEWMAN:  Sure.

11             THE COURT:  -- incidents.

12             MS. NEWMAN:  My expectation is that we can do that

13   through some well placed 30(b)(6) deposition.  I don't think

14   that it makes -- and from appropriate document requests, but

15   I don't think that we want to be doing, you know, 17 -- 27

16   mini-trials.  That's not a constructive use of time.

17             So I'm as sensitive as anybody to the need to not

18   do 17 trials within a trial and we would not be seeking to do

19   the discovery that way, but if we were to bifurcate, we would

20   be spending an inordinate amount of time arguing about what

21   part of the discovery goes to Monell versus what part goes to

22   Mr. McClain's incident in particular, and it would be

23   challenging because, among other things, I anticipate that

24   the officers are going to claim that they acted consistently

25   with their training, which goes to both Monell and the

1    incident itself, will act consistently with the practices of

2    the City, which goes to both Monell and to Elijah McClain's

3    claim, and we're supervised appropriately and, you know, all

4    of the same kinds of things.

5            So as Judge Arguello noted in denying the motion to

6    bifurcate in that case, the same kinds of issues would come

7    up creating unnecessary challenges and fights in the

8    discovery, even in the specific incident regarding Elijah

9    McClain.

10           THE COURT:  Well, let me ask you a quick question

11   about --

12           MS. NEWMAN:  Sure.

13           THE COURT:  -- the arguments about the different

14   groups of defendants, and part of the complexity here is

15   you've sued a lot of people and some people whose

16   culpability, arguably, is greater than others.  And so when

17   defense counsel says, Look, some of these people never even

18   touched the defendant, they just, like, showed up and were

19   wandering around the perimeter and they got sued, and the

20   argument implicitly is their motion to dismiss has some

21   merit, you know, in terms of qualified immunity at least, and

22   there's no Tenth Circuit case saying just wandering around

23   the perimeter of an incident is a constitutional violation.

24   I would assume that's what they're going to be arguing.

25           What do you say to that?  I mean, it does seem that

1   part of the complexity is of your doing when you name 13, or

2   however many defendants you named, including people who are

3   arguably tangentially involved, you invite this kind of

4   emotion.  Have you thought about cutting some people loose

5   who weren't -- didn't have hands on your client or on Mr.

6   McClain?

7          MS. NEWMAN:  Well, Your Honor, to be clear, we did

8   not name every single person who happens to be there

9   wandering around the perimeter of the case.  Who we did name

10  are the people who were on scene, who were directly standing

11  by and who specifically had the opportunity, but failed to

12  intervene, and there is a constitutionally established duty

13  to intervene.  The Marvin Booker case that I talked about

14  just a moment ago is a perfect example of that in which there

15  was a finding, that those -- that there was a clearly

16  established duty of those officers to intervene to stop the

17  excessive force by other officers who were engaged in

18  misconduct.

19         So the fact that an entire group of Aurora officers

20  both some participated physically and others stood by and

21  failed to intervene violated clearly established law in both

22  regards.  So, you know, Ms. Evans can -- I don't know who it

23  was that said they were wandering around the edges and just

24  happened to show up or something, that -- we didn't name any

25  of the people who happened to show up late and were wandering

30

1   around on the margin.  We named the people who had specific

2   opportunity to intervene and failed to do so.

3           One of the things that we're going to be doing --

4           THE COURT:  Let me just ask a follow-up question

5   and, in part, it will demonstrate my lack of familiarity with

6   the underlying facts --

7           MS. NEWMAN:  Okay.

8           THE COURT:  -- and allegations, but if it was the

9   ketamine that killed Mr. McClain and then the -- you know, if

10  paramedics show up and paramedics are doing what paramedics

11  do, and I'm an officer who's observing the paramedics doing

12  what the paramedics are doing, it -- am I really at fault if

13  the paramedics overdose or the paramedics are doing something

14  that's not medically called for?  I -- is that a

15  constitutional violation?

16          And I'm just asking, and those might not be the

17  facts, but I'm curious about a claim against somebody who,

18  you know, in theory could have jumped in and yanked the

19  needle away from the paramedic and say, No, no, no, don't

20  give him the ketamine, but is that a -- in your view, a

21  constitutional violation?

22          MS. NEWMAN:  Respectfully, Your Honor, I think that

23  that doesn't quite state the facts of the case accurately.

24  What the experts will -- will opine is that it was a

25  combination of factors that killed Elijah McClain, and indeed

1   even the force itself may likely have killed him even without

2   the administration of the ketamine, but the ketamine closed

3   the coffin, but it's entirely possible he would have died

4   from the metabolic acidosis caused by just the force itself.

5            And I apologize for invoking the Booker case again,

6   but it does provide a perfect example for many of these

7   concepts.  That's a case where there was quite a bit of force

8   and restraint used against Mr. Booker in a pretty similar way

9   to the force that was used against Elijah McClain:  Carotid

10  chokeholds and other kinds of physical force resulting in

11  metabolic acidosis leading to his death.

12           And so respectfully, I'd have to say that failure

13  to intervene in the force that was being applied against him

14  by the officers who had opportunity, who saw what was

15  happening, and who, consistent with their training, ought to

16  -- and this is a constitutional mandate -- ought to have

17  intervened, but failed to do so.  That would be a

18  constitutional violations.  And then there are separate

19  constitutional violations associated with the ketamine

20  administration.

21           So, you know, I think that the -- the fact that

22  there are so many claims and there are so many defendants is

23  part and parcel -- this shows exactly why the death of Elijah

24  McClain and the Monell issues are not separable.  There

25  was -- there were so many people who failed to do what they

1    were constitutionally required to do and so these things need

2    to be -- the discovery needs to proceed in concert and it

3    needs to be resolved in concert.

4            Likewise, the fact that there were a lot of parties

5    and a lot of claims are hardly within the factors that either

6    are articulated by the String Cheese case or -- and it

7    doesn't change the fact that the pending motions won't

8    resolve the case.  Three of the defendants didn't seek to

9    dismiss the excessive force claims against them on qualified

10   immunity, because they can't, and some of the individual

11   defendants have been fired.  So the qualified immunity

12   analysis doesn't apply to them in terms of the idea that

13   government officials shouldn't be burdened by participating

14   in litigation.  So those are a couple of additional issues

15   that are at play here.

16           But you know -- but, go ahead.  I guess I want to

17   answer the Court's questions, because -- and to clear up, I

18   guess, one more misstatement that I think the defense made.

19   The Court -- the defense talked a lot about the discovery

20   that has already occurred, but I want to note that

21   defendants' discovery goes well beyond simply things that

22   would be necessary for a mediation.  For example,

23   Interrogatory 13:  Identify each and every person you've

24   spoken to.  So, of course, this would be Elijah's parents,

25   because Elijah is dead and he can't describe what happened to

33

1   him or any of the events.  So to Elijah's parents:  Identify

2   every person that you've spoken to regarding the incident,

3   including their name, address, phone number, the date, time,

4   and place of the conversation, who it was.  I mean, these

5   things are clearly not -- who the parents talked to after

6   Elijah was killed is hardly necessary discovery for deciding

7   what should happen in the context of a mediation.

8            So I think that that was --

9            THE COURT:  Have you all scheduled a mediation?

10            MS. NEWMAN:  We have a scheduled mediation.  It is

11   set over the course of two different dates, beginning in

12   mid-April.

13            THE COURT:  Okay.  So --

14            MS. NEWMAN:  But, of course, this does show why,

15   you know, moving forward towards it, there are instances --

16   there's information that we need as we go forward in order to

17   prove the custom, policy and practice issue, in order to

18   prove the liability related issues.  And likewise, defendants

19   talked a lot about documents that have been provided.  That

20   -- there's a big difference, of course, between a document

21   dump on the one hand and providing materially to all of the

22   discovery propounded.

23            For example, we have not received substantive

24   responses regarding ketamine administrations and the

25   investigations regarding those.  So we're still looking

1    forward and trying to get the discovery that we need to be

2    able to move forward adequately.

3            And of course, the fact that the three hands on

4    defendants' body cameras were dislodged intentionally, I

5    believe, or otherwise, as defendants argue, whichever of

6    those is true, it does mean that depositions are critical,

7    because what you can see from the body cameras isn't as clear

8    as it ought to be.

9            THE COURT:  Okay.

10           MS. NEWMAN:  I'm trying to think if there are any

11   other material misstatements that need to be cleaned up, but

12   I think the Court is exactly right, the same reasoning that

13   this Court used in Pitman of course -- of course, is -- with

14   equal force here, I don't see any reason to deviate.

15           THE COURT:  Okay.  Why is Judge Hegarty wrong in

16   Boyd?  I was -- you know, he was weighing in based on his

17   experience having tried lots of Monell-type claims as a

18   litigator and overseeing them as a -- and I value his

19   experience and -- both on the magistrate judge's bench and as

20   the a federal court litigator for the U.S. Attorney's Office.

21           MS. NEWMAN:  Sure, and I, of course, respect Judge

22   Hegarty as well.  I will say that the Boyd decision is an

23   outlier.  The bifurcation is the exception, not the rule, as

24   our brief points out.  And as noted in footnote 6 of our

25   response, Boyd is distinguishable, because in Boyd, it was a

1    very small individual liability claim.  It was a traffic stop

2    with allegations of wrongful arrest and excessive force, but

3    the municipal liability claims were going to magnify it into

4    what Judge Hegarty said was probably a two-week trial in

5    contrast with a two-day trial.

6            So the distinction is that Boyd was individually a

7    very small case with -- you know, it wasn't a death case, it

8    wasn't a case involving multiple bad actors from two

9    different Aurora agencies and it wasn't a case of the same

10   kind of magnitude.  It was a very small case that had the

11   potential of ballooning into an entirely different case.

12   This case is distinct in that regard.  Just as the Court

13   notes that there are a lot of claims and a lot -- a lot of

14   parties in this case, that is very distinct in what we were

15   looking at in the Boyd vs. Montezuma County case.

16           THE COURT:  Okay, I've got five minutes left.  I

17   think it would be fair to give the defendants, since it's

18   their motion, a brief rebuttal.  So --

19           MS. NEWMAN:  Can I close --

20           MR. MORALES:  Your Honor --

21           MS. NEWMAN:  -- on one note before we do that?  One

22   one-sentence note?

23           THE COURT:  Yes.

24           MS. NEWMAN:  More than anything else, I think that

25   the Court needs to be thinking of the premise that justice

1   delayed is justice denied, and what we're talking about here

2   is a family who lost an absolutely innocent young man with an

3   entire promising life ahead of him, who had never done a

4   single thing wrong, no run-ins with the law ever.  So it's a

5   grieving community and a grieving family and they have the

6   right to move forward (inaudible).

7         THE COURT:  Okay.

8         MR. MORALES:  Your Honor, this is Peter Morales

9   from the City.  May I address the Court?

10         THE COURT:  Yes.

11         MR. MORALES:  Thank you.  I only want to take

12   issue, and I assume that the reason Ms. Newman raised this up

13   about the discovery is likely because she hasn't had the time

14   to go through it in the -- in the detail that she might

15   otherwise have had since she just received most of it.  I am

16   the counsel for the City and for the defendants who is

17   responsible for the production of that.

18         You should know that the City had an agreement with

19   Ms. Newman, which we have met, regarding rolling production

20   even before the discovery production was due.  I know that

21   there are, in fact, ketamine reports, because I'm the one who

22   helped produce them.  So I can only assume that the reason

23   she is unfamiliar with a lot of the material, and I will say

24   that it is a -- that I -- in my 35 years here with the City,

25   this is the largest production of discovery that the City has

37

1   ever engaged in.  So I'm -- I can only assume that it's a

2   lack of familiarity with the -- with the notion that there's

3   so much to review.

4            That said, I don't want any allegation out there

5   that the City is not being cooperative with respect to the

6   production of discovery.  We -- we obviously know the rules

7   of civil procedure and federal -- the local federal rules and

8   we're abiding by them in every regard, and that's all I

9   wanted to let you know about with respect to the discovery.

10  And we're -- we have yet another request for production,

11  which I'm working on right now.

12           So --

13           MS. NEWMAN:  And I want to apologize if I gave a

14  misimpression.  I -- it's true, I haven't gotten through all

15  of the documents.  I believe we have not received ketamine

16  reviews --

17           THE COURT:  Right.

18           MS. NEWMAN:  -- but we have received some reports.

19           THE COURT:  Okay.  I'm -- Mr. Lowe, you've got a

20  minute and a half.  Do you want to respond?

21           MR. LOWE:  Thank you, Your Honor.  In my -- in my

22  minute and a half, I will say that I would point to the case

23  that I previously noted for the Court from Judge Tafoya on

24  page 6 where she finds, quoting Tenth Circuit authority:

25  Discovery generally should be avoided once qualified immunity

1   is raised unless the plaintiff demonstrates how such

2   discovery will raise a genuine fact issue as to the

3   defendant's qualified immunity claim.  Citing to Martin vs.

4   County of Santa Fe, 626 Federal Appendix 736 at 740, Tenth

5   Circuit 2015; citing, in turn, Cole vs. Ruidoso at 43 F.3d

6   1373, Tenth Circuit 1994.  And I would note that in their

7   response, the plaintiffs have not asserted how any of the

8   discovery would result in a disputed issue of fact with

9   respect to the entitlement to qualified immunity of any of

10  the immunities that defendants have raised.

11          THE COURT:  Okay.  All right, thank you all very

12  much for the arguments, which I always find helpful because

13  they sort of crystalize the things that are written down in

14  the briefs.

15          With that, we'll be in recess.  I'll just ask

16  plaintiffs' counsel:  Is there anything else we need to talk

17  about or do we need to set another status conference down the

18  road or should we just -- you all wait and see what we do

19  with this motion to stay and then maybe if you want a status

20  conference, you can call chambers and ask for it.

21          Why don't we do it that way?

22          MS. NEWMAN:  That sounds fine, Your Honor.  Nothing

23  additional from the plaintiff and we will certainly let you

24  know if something comes up.

25          THE COURT:  All right.  Defense counsel, anything

1    else?

2            MR. LOWE:  One last question, Your Honor.

3            THE COURT:  Yep.

4            MR. LOWE:  Does my three pages on the motion

5    include the caption and the signature block?

6            THE COURT:  No.

7            MR. LOWE:  Okay, thank you.

8            THE COURT:  Although, just use City of Aurora, et

9    al.  It's not a very long caption, but just -- okay?

10    Anything else for the other defense counsel?

11            MR. MORALES:  No, Your Honor.

12            MS. EVANS:  No, thank you.

13            THE COURT:  All right.  We'll be in recess.  Thanks

14    very much.

15            (Whereupon, the within hearing was then in

16    conclusion at 2:56 p.m.)

17

18

19

20

21

22

23

24

25

40

```
 1                  TRANSCRIBER'S CERTIFICATION

 2   I certify that the foregoing is a correct transcript to the

 3   best of my ability to hear and understand the audio recording

 4   and based on the quality of the audio recording from the

 5   above-entitled matter.

 6

 7   /s/ Dyann Labo                    February 3, 2021

 8   Signature of Transcriber               Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```