# Dowling v. General Motors LLC

United States District Court, D. Colorado. |     September 16, 2019 |     333 F.R.D. 534 |     2019 WL 4415650

**Document Details**

| | |
|---|---|
| standard Citation: | Dowling v. Gen. Motors LLC, 333 F.R.D. 534 (D. Colo. 2019) |
| All Citations: | 333 F.R.D. 534 |

**Search Details**

| | |
|---|---|
| Jurisdiction: | Colorado |

**Delivery Details**

| | |
|---|---|
| Date: | September 30, 2021 at 6:45 PM |
| Delivered By: | Daniel Wartell |
| Client ID: | SHANEEN MCCLAIN |
| Status Icons: | |
| Inline KeyCite: | Inline KeyCite completed successfully. |

**Outline**

Synopsis (p.1)

West Headnotes (p.1)

Attorneys and Law Firms (p.2)

**ORDER** (p.3)

All Citations (p.9)

EXHIBIT 1

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

333 F.R.D. 534
United States District Court, D. Colorado.

Jamie Lee DOWLING, individually, as surviving mother of Landyn Scott Dowling, Plaintiff,

Shawn Cook, Plaintiff-Intervenor,

v.

GENERAL MOTORS LLC, and Key Safety Systems, Inc., Defendants.

Civil Action No. 15-cv-00445-KLM
|
Signed 09/16/2019

**Synopsis**

**Background:** Mother, whose daughter and son died in automobile accident, brought wrongful death action against automobile manufacturer alleging that vehicle was defective in its design and manufacture, which resulted in loss of control and subsequent failure of air bags to deploy. Following transfer to Southern District of New York, remand for approval and distribution of settlement proceeds, and intervention by son's biological father, the District Court, Kristen L. Mix, United States Magistrate Judge, 2018 WL 1566832, allocated 35% of settlement proceeds to biological father and 65% to mother. Biological father moved for attorney fees and costs.

**Holdings:** The District Court, Mix, United States Magistrate Judge, held that:

[1] under *Erie* doctrine, Rule 11 preempted Colorado attorney fee statute which allowed sanctions against a party who brought frivolous or groundless claims, and

[2] biological father was not prevailing party, precluding award of attorney fees and costs under federal rules of civil procedure.

Motion denied.

**Procedural Posture(s):** Motion for Attorney's Fees; Motion for Costs.

West Headnotes (10)

[1]  **Costs, Fees, and Sanctions** ⟶ Necessity of Authorization for Award; "American Rule"

**Costs, Fees, and Sanctions** ⟶ Statutory or contractual authorization

The District Court's basic point of reference when considering an award of attorney fees is the bedrock principle known as the "American Rule," under which each litigant pays his or her own attorney fees, win or lose, unless a statute or contract provides otherwise.

[2]  **Federal Courts** ⟶ Costs and attorney fees

Colorado attorney fee statute which allowed sanctions against a party who brought frivolous or groundless claims was procedural and conflicted with Rule 11, and, thus, under *Erie* doctrine, Rule 11 preempted Colorado statute, in wrongful death action against automobile manufacturer by mother, whose daughter and son died in automobile accident, since any award of attorney fees to son's biological father under Colorado statute was not tied to outcome of mother's wrongful death claim against manufacturer, rather biological father sought attorney fees for allegedly bad faith arguments raised in mother's motion to allocate settlement proceeds between mother and biological father, and Colorado statute did not contain any safe harbor provision similar to Rule 11. Colo. Rev. Stat. Ann. § 13-17-102; Fed. R. Civ. P. 11(c)(2).

2 Cases that cite this headnote

[3]  **Costs, Fees, and Sanctions** ⟶ Safe harbors

Rule 11's safe harbor provision is strictly enforced. Fed. R. Civ. P. 11(c)(2).

4 Cases that cite this headnote

[4]  **Federal Courts** ⟶ State or Federal Laws as Rules of Decision; Erie Doctrine

EXHIBIT 1

Dowling v. General Motors LLC, 333 F.R.D. 534 (2019)

The 🚩 *Erie* doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law.

[5] **Federal Courts** 🔑 Substance or procedure; determinativeness

The first analytical step in an 🚩 *Erie* case is to determine whether a state statute collides with any federal procedural rule; the question is not whether the federal and state rules overlap, rather, it is whether, when fairly construed, the scope of the federal rule is sufficiently broad to cause a direct collision with the state law or, implicitly, to control the issue before the court, thereby leaving no room for operation of the state law.

[6] **Federal Courts** 🔑 Substance or procedure; determinativeness

When an issue or claim has its source in state law, but there is a federal procedural rule that conflicts with the state law, a district court must apply the federal rule unless it violates the Rules Enabling Act or is unconstitutional.

1 Cases that cite this headnote

[7] **Death** 🔑 Costs

Biological father of son who died in automobile accident was not "prevailing party," precluding award of attorney fees and costs with respect to responding to motion by mother to allocate settlement proceeds in her wrongful death action against automobile manufacturer alleging that vehicle was defective in its design and manufacture, even if mother sought 0% allocation to biological father and he ultimately received 35% allocation, since allocation of settlement funds was governed by Colorado's wrongful death statute, and neither mother nor biological father, who was seeking 50% allocation, received specific allocation that they were seeking. Colo. Rev. Stat. Ann. § 13-17-201(l)(c); Fed. R. Civ. P. 54(d).

[8] **Costs, Fees, and Sanctions** 🔑 Result of Litigation; Prevailing Party

In general, a litigant who is the prevailing party for purposes of attorney fees is also the prevailing party for purposes of costs. Fed. R. Civ. P. 54(d).

[9] **Costs, Fees, and Sanctions** 🔑 Result of Litigation; Prevailing Party

**Costs, Fees, and Sanctions** 🔑 Presumptions, inferences, and burden of proof

While costs presumptively are awarded to the prevailing party, a trial court still has the discretion to not award costs; if the court exercises its discretion to not award costs, the court must state a valid reason. Fed. R. Civ. P. 54(d).

[10] **Costs, Fees, and Sanctions** 🔑 Partial success

The concept of "substantial relief," as a basis to be considered a prevailing party for the purposes of awarding costs, is considered where a plaintiff's claims are related and failure on some claims does not preclude full recovery if plaintiff achieves success on a significant, interrelated claim. Fed. R. Civ. P. 54(d)(1).

**Attorneys and Law Firms**

**\*536** Lance Alan Cooper, The Cooper Firm, Marietta, GA, Steven A. Shapiro, Fleishman & Shapiro, P.C., Denver, CO, Stuart Alan Ollanik, Ollanik Law LLC, Boulder, CO, for Plaintiff.

Gregory R. Giometti, Morgan Chantel Robinson, Taylor Robert Seibel, Gregory R. Giometti & Associates, PC, Denver, CO, for Plaintiff-Intervenor.

Charles L. Casteel, Davis Graham & Stubbs LLP, Denver, CO, for Defendants.

EXHIBIT 1

## ORDER

Kristen L. Mix, United States Magistrate Judge

This matter is before the Court on Plaintiff-Intervenor's **Motion for Attorneys' Fees and Costs Pursuant to Fed. R. Civ. P. 54(d)** [#67] [1] (the "Motion"). The Court has reviewed the Motion [#67], Response [#75], Reply [#77], exhibits, the case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#67] is **DENIED**.

### I. Background

This wrongful death action arises from the tragic deaths of Jamie Lee Dowling's ("Plaintiff") two young children in a car accident that occurred on March 9, 2013. Plaintiff filed the lawsuit in this Court on March 3, 2015, seeking to recover pursuant to the Colorado Wrongful Death Act, Colo. Rev. Stat. § 13-21-201(1)(c). *Compl.* [#1]. The Complaint [#1] alleges that Plaintiff's car, a 2008 Chevrolet Cobalt, was defective in its design and manufacture, which resulted in loss of control and subsequent failure of the air bags to deploy. The matter was transferred to the Southern District of New York on March 16, 2015, *see* [#6], and thereafter was remanded to this Court on March 10, 2017, largely for purposes of approval and distribution of settlement proceeds. *See* [#8-2]. On April 27, 2017, all settlement proceeds with respect to Plaintiff's daughter, Raylee Kay Dowling ("Raylee"), were allocated to Plaintiff by the Court. *Minute Order* [#17].

On August 10, 2017, Plaintiff filed a Motion to Allocate Settlement Proceeds [#19] (the "Motion to Allocate") with respect to her son, Landyn Scott Dowling. Plaintiff-Intervenor Shawn Willis Cook ("Cook"), who is Landyn's biological father, was permitted to intervene in this case on November 3, 2017. He thereafter filed a Response [#26] and Exhibits [#27] seeking 50% of the settlement proceeds. The Court scheduled an evidentiary hearing, which was held on January 9-10, 2018. *See* [#49, #50]. On March 30, 2018, the Court issued a Final Order and Judgment [#58] (the "Final Order") that allocated sixty-five percent of the gross settlement proceeds to Plaintiff Dowling, and thirty-five percent of the gross settlement proceeds to **\*537** Plaintiff-Intervenor Cook. The Court explicitly denied Plaintiff's request that the Court allocate the settlement proceeds <u>after</u> deduction for Plaintiff's

attorneys' fees and costs. *Final Order* [#58] at 13-14. Pursuant to Fed. R. Civ. P. 58(a) and the Final Order, the Clerk of the Court issued the Final Judgment [#59] which entered final judgment in favor of Plaintiff and Plaintiff-Intervenor against Defendants and ordered that Plaintiff and Plaintiff-Intervenor file bills of costs within 14 days of entry of the judgment. [2]

On May 4, 2018, Mr. Cook filed the instant Motion [#67] seeking attorneys' fees and costs pursuant to C.R.S. § 13-17-102 and Federal Rule of Civil Procedure 54(d) ("Rule 54(d)"). Mr. Cook avers that he is entitled to these fees and costs because Plaintiff's Motion to Allocate [#19] was "substantially groundless and substantially vexatious, [and] because at least 30 factual allegations contained in Ms. Dowling's Declaration were false, misleading, exaggerated, unsupported by any admissible evidence, or substantially or overwhelmingly refuted by evidence presented at the evidentiary hearing." *Motion* [#67] at 2-3. As such, Mr. Cook seeks "his attorneys' fees incurred in litigating against Ms. Dowling's and her counsel's substantially vexatious motion, in the total amount of $42,866.60." [3] *Id.* at 25. In support of the Motion, Mr. Cook provides the Court with a transcript of the evidentiary hearing, exhibits admitted into evidence at the hearing, and affidavits pursuant to D.C.COLO.LCivR 54.3 with attachments. *Pl.-Intervenor's Exs. A-C* [#67-1 through #67-28].

### II. Analysis

**[1]** The Court's " 'basic point of reference' when considering the award of attorney's fees is the bedrock principle known as the 'American Rule': Each litigant pays his [or her] own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Kazazian v. Emergency Serv. Physicians, P.C.*, 300 F.R.D. 672, 675 (D. Colo. 2014) (internal quotations omitted, citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–53, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010)). Mr. Cook moves for his attorneys' fees and costs incurred in intervening in this action and responding to Plaintiff's Motion to Allocate [#19] pursuant to C.R.S. § 13-17-102 and Rule 54(d). The Court addresses Mr. Cook's request under each theory in turn.

### A. C.R.S. § 13-17-102

EXHIBIT 1

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**[2]** Mr. Cook first seeks attorneys' fees pursuant to a Colorado statute that provides:

> [I]n any civil action of any nature commenced or appealed in any court of record in this state ... [t]he court shall assess attorney fees if ... it finds that an attorney or party brought or defended an action, or any part thereof, that lacked substantial justification or that the action, or any part thereof, was interposed for delay or harassment or if it finds that an attorney or party unnecessarily expanded the proceeding by other improper conduct ... As used in this article, "lacked substantial justification" means substantially frivolous, substantially groundless, or substantially vexatious.

C.R.S. § 13-17-102(2), (4).[4] Mr. Cook argues that Plaintiff's Motion to Allocate [#19] was substantially groundless and vexatious as demonstrated by Plaintiff's allegations which were, according to Mr. Cook, "false, misleading, exaggerated, unsupported by any admissible evidence, or substantially or overwhelmingly refuted by evidence presented at the evidentiary hearing." *Motion* [#67] at 5.

**\*538 [3]** In response, Plaintiff asserts the threshold argument that Mr. Cook is precluded from seeking attorneys' fees pursuant to C.R.S. § 13-17-102 because the Colorado statute is preempted by Federal Rule of Civil Procedure 11 ("Rule 11"), with which Mr. Cook failed to comply. *Response* [#75] at 2-6. Plaintiff correctly notes that this District has consistently found that Rule 11's safe-harbor provision[5] preempts C.R.S. § 13-17-102 and that therefore, failure to comply with the safe-harbor provision bars a motion for attorney's fees pursuant to C.R.S. § 13-17-102. *Response* [#75] at 3; *see, e.g.,Hanover Ins. Grp. v. iCarpets, Inc.*, No. 16-cv-01013-RBJ, 2017 WL 6524657, at *6-7 (D. Colo. Dec. 21, 2017); *Hach Co. v. In-Situ, Inc.*, No. 13-cv-02201-CBS, 2016 WL 9725765, at *10-11 (D. Colo. Nov. 22, 2016); *DeJean v. Grosz*, No. 13-cv-02381-NYW-MJW, 2015 WL

4504932, at *3 (D. Colo. July 24, 2015); *Christou v. Beatport, LLC*, No. 10-cv-02912-RBJ-KMT, 2014 WL 1293296, at *3 n.1 (D. Colo. Mar. 31, 2014); *Kazazian*, 300 F.R.D. at 676-78; *Spratt v. Leinster*, No. 06-cv-01526-WDM-KLM, 2007 WL 2412826, at *1 (D. Colo. Aug. 21, 2007); *McCoy v. West*, 965 F. Supp. 34, 35-36 (D. Colo. 1997); *In re Johnson*, 485 B.R. 642, 649 (Bankr. D. Colo. 2013). *Cf.,Diebold Enters. Sec. Sys., Inc. v. Low Voltage Wiring, Ltd.*, No. 13-cv-00505-REB-KLM, 2014 WL 1491327 (D. Colo. Apr. 14, 2014) (noting *Johnson*, 485 B.R. 642, had found the statute preempted, the court found that even assuming the statute was applicable, the request for attorneys' fees failed on other grounds).

Applying an *Erie* analysis, these courts have reasoned that C.R.S. § 13-17-102 "is merely a procedural statute regarding sanctions based on conduct in the litigation" and not substantive law under *Erie*. *Hach Co.*, 2016 WL 9725765, at *11. Thus, this District has repeatedly held "that, 'to the extent Colo. Rev. Stat § 13-17-101 *et seq.* is inconsistent with the procedural safe-harbor provisions of Rule 11, it is preempted.' " *DeJean*, 2015 WL 4504932, at *3 (quoting *Spratt*, 2007 WL 2412826, at *1; citing *Kazazian*, 300 F.R.D. at 676-77; *Martinson v. Professional Bureau of Collections of Maryland, Inc.*, No. 09-cv-02145-MSK-BNB, 2010 WL 3777282, at *3 (D. Colo. Sept. 21, 2010)); *see alsoHach Co.*, 2016 WL 9725765, at *11 ("Because the statute is procedural, the District of Colorado consistently holds § 13-17-102 preempted by Rule 11's safe-harbor provision." (collecting cases)).

Mr. Cook does not address this issue in his Motion [#67] and nowhere contends that he has complied with Rule 11's safe-harbor provision. Instead, Mr. Cook argues in his Reply that C.R.S. § 13-17-102 "is treated as substantive law under Tenth Circuit precedent [and] therefore, [ ] is not preempted by Rule 11." [#77] at 5. Mr. Cook further argues that the decisions finding C.R.S. § 13-17-102 preempted by Rule 11 under *Erie* are inapplicable to the present case because they were issued by courts sitting in federal question jurisdiction, not diversity. *Id.* at 6.

**[4]** As an initial matter, " 'the *Erie* doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law.' " *Johnson*, 485 B.R. at 645 (quoting *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 541 n.1 (2d Cir. 1956)). Thus, although

EXHIBIT 1

Mr. Cook is correct in that federal courts sitting in diversity jurisdiction must apply the substantive law of the forum state, the Court fails to see how analyzing C.R.S. § 13-17-102 under *Erie* would differ whether the Court's jurisdiction is based on diversity of citizenship or federal question. *See also Hach Co.*, 2016 WL 9725765, at *11 ("In cases involving state law claims, the court applies the substantive law of the forum state but federal procedural law.") (citations omitted).

**\*539** **[5]** **[6]** "[T]he 'first analytical step' in an *Erie* case 'is to determine whether [a state] statute collides with any federal procedural rule.' " *Scottsdale Ins. Co. v. Tolliver*, 636 F.3d 1273, 1276-77 (10th Cir. 2011) (quoting *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1539 (10th Cir. 1996)) (brackets in original). "The question is not whether the federal and state rules overlap. Rather, it is 'whether, when fairly construed, the scope of [the Federal Rule] is sufficiently broad' to cause a direct collision with the state law or, implicitly, to control the issue before the court, thereby leaving no room for operation of [the state] law." *Trierweiler*, 90 F.3d at 1539-40 (quoting *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4-5, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987)) (alteration in original) (internal quotation marks omitted). "In such a case,...we must apply the Federal Rule unless the Rule violates the Rules Enabling Act or is unconstitutional." *Tolliver*, 636 F.3d at 1277; *see McCoy*, 965 F. Supp. at 35-36 ("When a matter is covered by a Federal Rule, a federal court need not perform a full *Erie* analysis to determine whether the matter is substantive or procedural.").

Here, "[c]ourts in this district have found Rule 11's safe[-]harbor provision to be in direct conflict with [C.R.S.] § 13-17-102." *Kazazian*, 300 F.R.D. at 678 (citing *Martinson*, 2010 WL 3777282, at *3; *Spratt*, 2007 WL 2412826, at *1 (denying C.R.S. § 13-17-102 motion filed during pendency of the case for failure to comply with Rule 11's safe-harbor provision); *Wind v. Aegis Sec. Ins. Co.*, No. 06-cv-01811-EWN-BNB, 2007 WL 2045504, at *1 n.1 (D. Colo. July 10, 2007) (noting that motion under C.R.S. § 13-17-102 was untimely under Rule 11); *McCoy*, 965 F. Supp. at 35 (denying motion brought under Rule 11 and Colorado statute because "the 'safe-harbor' provision of Rule 11 controls"); *Johnson*, 485 B.R. at 649 (finding that

Bankruptcy Rule 9011 preempted C.R.S. § 13-17-102)); *see also Hach Co.*, 2016 WL 9725765, at *11 ("In this case, Rule 11 clearly covers the situation. On that basis alone, the court should be able to conclude that [C.R.S.] § 13-17-102 is preempted to the extent it conflicts with Rule 11."). "The conflict arises because although '[b]oth Rule 11 and § 13-17-102 allow sanctions against a party who has brought frivolous or groundless claims,' the Colorado statute contains no safe harbor provision like that in Rule 11." *Hanover Ins. Grp.*, 2017 WL 6524657, at *7 (quoting *Kazazian*, 300 F.R.D. at 677). Therefore, "[t]he lack of a safe harbor provision in the Colorado statute creates 'a true conflict' between Rule 11 and the state statute, so the federal rule must apply." *Id.* (quoting *Kazazian*, 300 F.R.D. at 678).

While finding a true conflict between C.R.S. § 13-17-102 and Rule 11 is sufficient for purposes of the Court's *Erie* analysis, "many opinions from this court nonetheless analyze whether [C.R.S.] § 13-17-102 is substantive or procedural." *Hach Co.*, 2016 WL 9725765, at *11 (noting courts in this District "no doubt entertain this additional analysis because the Tenth Circuit has held that 'section 13-17-102 clearly may apply to claims brought in the District of Colorado.' " (quoting *Lorillard Tobacco Co. v. Engida*, 611 F.3d 1209, 1217 (10th Cir. 2010))). [6]

Mr. Cook cites several cases for the proposition that " '[i]n the Tenth Circuit, attorney fee statutes are considered substantive' " especially where, as is here, the Court exercises diversity jurisdiction. *Reply* [#77] at 5 (quoting *Jones v. Denver Post Corp.*, 203 F.3d 748, 757 (10th Cir. 2000); citing **\*540** *Gebremedhin v. American Family Mut. Ins. Co.*, 2016 WL 738588, at *2 (D. Colo. Feb. 24, 2016) ("Statutes relating to attorney fees are substantive law in the Tenth Circuit."); *Shell v. Henderson*, 2013 WL 4838907, at *6 (D. Colo. Sept. 10, 2013) ("In the Tenth Circuit ... attorney fee statutes promulgated by state courts are considered substantive.")). However, while Mr. Cook is clearly correct in that federal courts sitting in diversity jurisdiction must apply the substantive law of the forum state, *Advanced Career Technologies, Inc. v. John Does 1-10*, 100 F. Supp. 3d 1105, 1107 (D. Colo. 2015), he fails to recognize that attorneys' fees statutes are not *always* considered substantive for purposes of *Erie*.

EXHIBIT 1

The Tenth Circuit has made clear that attorneys' fees statutes can be either substantive or procedural. *Tolliver, 636 F.3d at 1279* (citing *Jones, 203 F.3d at 757*). In addressing the language found in *Jones*, which Mr. Cook quotes, the Tenth Circuit has explained that this and other "holdings comport with the Supreme Court's determination that statutory provisions permitting an award of attorneys' fees are substantive where the statute permits the prevailing party in certain classes of litigation to recover attorneys' fees." [7] *Tolliver, 636 F.3d at 1279* (citing *Chambers v. NASCO, Inc., 501 U.S. 32, 52-53, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)*; *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 260 n.31, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)*; *Hanna v. Plumer, 380 U.S. 460, 469, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)*). As the Tenth Circuit explained more recently:

> Substantive fees are those that "are tied to the outcome of the litigation" and procedural fees are those that are "generally based on a litigant's bad faith conduct in litigation." These labels are shorthand for those attorney fees that are governed by *Erie* (substantive fees) and those that are not (procedural fees). Substantive fees are part and parcel of the cause of action over which we have diversity jurisdiction. For example, if the cause of action is for bad-faith denial of insurance coverage and state law authorizes an award of attorney fees to a successful insured, then the right to an award of attorney fees is part of the state substantive right and the federal court must recognize it. In contrast, an attorney-fee award against bad-faith conduct in the litigation has nothing to do with the nature of the cause of action and does not derive in any way from state substantive law. "[F]ee-shifting here is not a matter of substantive remedy, but of vindicating judicial authority." One way to see that *Erie* deference to state law has no purchase in this context is to note that "there is no risk that [an award of sanctions for bad-faith conduct during litigation] will lead to forum-shopping."

*Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P., 888 F.3d 455, 460-61 (10th Cir. 2017), cert. denied sub nom. Chieftain Royalty Co. v. Nutley, ––– U.S. ––––, 139 S. Ct. 482, 202 L.Ed.2d 388 (2018)* (modifications in original, citations **\*541** omitted); *see also Kazazian, 300 F.R.D. at 677 n.6* (discussing the difference between substantive fees statutes and procedural fees statutes); *Johnson, 485 B.R. at 645* ("If the [state attorneys' fee] statute

is procedural, federal law applies, but if it is substantive, then the court applies state law." (citing *Tolliver, 636 F.3d at 1279*)).

Here, Mr. Cook does not argue that his request for fees pursuant to *C.R.S. § 13-17-102* is "tied to the outcome of the litigation" and, as noted above, this District has routinely found that *C.R.S. § 13-17-102* concerns a litigant's "bad faith conduct in litigation." In *Kazazian*, the court observed that "Colorado courts characterize *§ 13-17-102* as a sanction, rather than a substantive right." *300 F.R.D. at 677* (citing *City of Aurora ex rel. Utility Enterprise v. Colo. State Engineer, 105 P.3d 595, 618 (Colo. 2005)* ("An award of attorney fees [under *§ 13-17-102*] is an important sanction against an attorney or party who improperly instigates or prolongs litigation.")); *see also Hach Co., 2016 WL 9725765, at \*11* ("*Section 13-17-102* is merely a procedural statute regarding sanctions based on conduct in the litigation, not a substantive law for further *Erie* analysis.").

The other authority Mr. Cook cites for the proposition that *C.R.S. § 13-17-102* should be applied as substantive law is unpersuasive. First, two of the cases Mr. Cook cites applied a different Colorado attorneys' fees statute, *C.R.S. § 13-17-201*, which, unlike *C.R.S. § 13-17-102*, "requires an award of fees if a Rule 12(b) motion is granted." *See Shell, 2013 WL 4838907, at \*2* (applying *C.R.S. § 13-17-101* where attorneys' fees were sought pursuant to the *Fed. R. Civ. P. 12(b)* dismissal of plaintiff's claims); *see also Gebremedhin, 2016 WL 738588, at \*2* (applying *C.R.S. § 13-17-101* where attorneys' fees were sought pursuant to the *Fed. R. Civ. P. 12(b)* dismissal of third-party claims); *Walters v. Townsend Farms, Inc., No. 13-cv-02730-CMA-CBS, 2015 WL 557178, at \*4 (D. Colo. Feb. 9, 2015)* (addressing a motion for attorneys' fees under *C.R.S. § 13-17-201* and concluding that it did not apply to the dismissal of claims pursuant to *Fed. R. Civ. P. 41(a)(1)(A)(ii)*).

Second, while the other two decisions cited by Mr. Cook purport to apply *C.R.S. § 13-17-102* as substantive law, neither decision addressed *Erie* or the issue of preemption, and both decisions were issued before the ruling in *Kazazian*. *See Wolf v. Petrock, No. 08-cv-02749-PAB-KMT, 2010*

EXHIBIT 1

**Dowling v. General Motors LLC, 333 F.R.D. 534 (2019)**

WL 2232353 (D. Colo. June 2, 2010); *New Salida Ditch Co. v. United Fire & Cas. Ins. Co.*, No. 08-cv-00391-JLK, 2009 WL 5126498, at *12 (D. Colo. Dec. 18, 2009), *aff'd sub nom.*, 400 F. App'x 338 (10th Cir. 2010). Moreover, both decisions simply considered the application of C.R.S. § 13-17-102 within the context of a case's summary dismissal but, ultimately, did not grant the request for fees pursuant to that statute. *Wolf*, 2010 WL 2232353, at *2 (considering a request for attorneys' fees pursuant to C.R.S. § 13-17-102 but ultimately finding the statute inapplicable to the dismissal of federal claims); *New Salida Ditch Co.*, 2009 WL 5126498, at *12 (considering a request for attorneys' fees pursuant to C.R.S. § 13-17-102 after summary judgment entered in defendant's favor but declining to award fees until plaintiff showed cause why the request should not be granted).

Here, adjudication of the Motion to Allocate did not dispose of Plaintiff's claims against Defendants. Although the Court acknowledges that the Motion to Allocate pertained to the only issue truly at dispute in this matter, the Court's role in this case is much broader. *See Suggestion of Remand* [#8-1] at 1 (stating that this case was remanded to the Court "*in its entirety* ... to oversee approval of the settlement and distribution of the settlement in accordance with Colorado's wrongful death statute.") (emphasis added). Thus, it cannot be said that the attorneys' fees Mr. Cooks seeks pursuant to the Motion to Allocate are "tied to the outcome of the litigation" or "part and parcel of the cause of action over which [the Court] [has] diversity jurisdiction." *Chieftain*, 888 F.3d at 460. Rather, Mr. Cook seeks attorneys' fees for the allegedly bad faith arguments raised in the Motion to Allocate which is an ancillary dispute to the claims against Defendants. Mr. Cook cites no authority to support the conclusion that, under these circumstances, the invocation of **\*542** C.R.S. § 13-17-102 constitutes a substantive right to attorneys' fees rather than a sanction.

Therefore, as this District has previously held, because C.R.S. § 13-17-102 "does not contain a similar safe harbor provision, the Court finds that a true conflict exists between Rule 11's safe harbor provision and § 13-17-102." *Kazazian*, 300 F.R.D. at 678 (citing *Tolliver*, 636 F.3d at 1277). Mr. Cook does not dispute that he failed to comply with Rule 11(c). Accordingly, the Court finds that Rule 11

preempts C.R.S. § 13-17-102 and **denies** the Motion [#67] to extent that Mr. Cook seeks attorneys' fees pursuant to C.R.S. § 13-17-102.

**B. Federal Rule of Civil Procedure 54(d)**

**[7]  [8]**  Mr. Cook next seeks attorneys' fees pursuant to Rule 54(d) of the Federal Rules of Civil Procedure. That rule provides: "[u]nless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees-- should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). Rule 54(d) further provides that "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A). "In general, the litigant who is the prevailing party for purposes of attorney's fees is also the prevailing party for purposes of costs." *Barber v. T.D. Williamson, Inc.*, 254 F.3d 1223, 1234 (10th Cir. 2001). A motion for attorneys' fees pursuant to Rule 54(d) must be timely filed, [8] "specify the judgment and the statute, rule, or other grounds entitling the movant to the award"; "state the amount sought or provide a fair estimate of it"; and "disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made." Fed. R. Civ. P. 54(d)(2)(B).

**[9]**  "As is apparent from the language of Rule 54(d)(1), 'the determination of who qualifies as a prevailing party is central to deciding whether costs are available.' " *Barber*, 254 F.3d at 1233-34 (quoting Wright & Miller, *Federal Practice & Procedure* § 2667). Generally, " 'the litigant in whose favor judgment is rendered is the prevailing party for purposes of Rule 54(d)(1).' " *Id.* at 1234 (quoting Wright & Miller, *Federal Practice & Procedure*, § 2667) (brackets omitted). "[W]hile costs presumptively are awarded to the prevailing party, ... a trial court still has the discretion to act under Rule 54(d)(1). *Id.* If the court exercises its discretion to not award costs, the court must state a valid reason." *Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 722 (10th Cir. 2000).

Where "neither side entirely prevailed, or when both sides prevailed, or when the litigation was thought to be the result of fault on the part of both parties, some courts have denied costs to both sides." *Hach Co.*, 2016 WL 9725765, at *17 (quoting *Barber*, 254 F.3d at 1234-35; citing *Howell Petroleum Corp. v. Samson Res. Co.*, 903 F.2d 778, 783 (10th Cir. 1990)

EXHIBIT 1

Dowling v. General Motors LLC, 333 F.R.D. 534 (2019)

("The court was within its discretion to refuse to award costs to a party which was only partially successful."); *Rogers v. United States*, No. 97-2666-JWL, 2000 WL 382015, at *2 (D. Kan. Mar. 17, 2000) (denying costs to both sides because both were partially successful); *All W. Pet Supply Co. v. Hill's Pet Prod. Div., Colgate-Palmolive Co.*, 153 F.R.D. 667, 669-70 (D. Kan. 1994) (same; collecting cases)). "Denying costs to both sides has been found within the trial court's discretion where ... neither party prevailed on its claims." *Id.* (citing Wright & Miller, *Federal Practice and Procedure* § 2668 n.31). **\*543** Ultimately, however, where "the court exercises its discretion[,] the identification of the prevailing party may [in the end] become so unimportant as to be almost immaterial." *Barber*, 254 F.3d at 1235 (quoting *Roberts v. Madigan*, 921 F.2d 1047, 1058 (10th Cir. 1990)) (brackets in original).

In the Motion, Mr. Cook argues that he is entitled to the costs he incurred because he prevailed on Plaintiff's Motion to Allocate [#19], "as the Court awarded him a substantial percentage of the relief he sought in its Final Order and Judgment." [#67] at 26. Mr. Cook asserts that, although he sought a 50% apportionment and was ultimately allocated only 35% by the Court, he is still deemed a "prevailing party" given that 35% of the gross settlement proceeds is substantial relief, particularly where the Motion to Allocate sought a 0% allocation for Plaintiff-Intervenor. *Id.*

As an initial matter, Mr. Cook does not provide the Court with any Tenth Circuit authority demonstrating that an award of attorneys' fees and costs pursuant to Rule 54(d) is applicable to these circumstances, i.e., where an intervening party petitions for and obtains a partial allocation of settlement proceeds from the underlying lawsuit. *See generally Motion* [#67]; *Reply* [#77]. Nevertheless, applying the Rule 54(d) rubric to the dispute at hand, the Court agrees with the arguments raised by Plaintiff that Mr. Cook is not the "prevailing party" with respect to Plaintiff's Motion to Allocate [#19] and is thus, not entitled to attorneys' fees and costs pursuant to Rule 54(d). [9]

As Plaintiff correctly notes, the allocation of settlement funds in this case was governed by Colorado's Wrongful Death Statute, which provides that the "father and mother shall have an equal interest in the judgment" where the death of a minor child is involved and the parents are living apart, unless one parent moves to not allocate the funds equally. C.R.S.A. § 13-21-20(l)(c); *see Response* [#75] at 13. Plaintiff's Motion to Allocate [#19] sought an Order from the Court deviating

from this presumptive equal allocation while, in opposition, Mr. Cook sought equal allocation of the settlement funds. The Court granted Plaintiff's Motion to Allocate on this point by awarding 65% of the settlement to Plaintiff and 35% of the settlement to Mr. Cook. *Final Order* [#58] at 14. In light of this, the Court agrees with Plaintiff that "[t]he fact that the [C]ourt did not choose the specific allocation amount urged by either party does not somehow make [Mr.] Cook the prevailing party." *See* Howell Petroleum Corp., 903 F.2d at 783; *Rogers*, 2000 WL 382015, at *2; *All W. Pet Supply Co.*, 153 F.R.D. at 669-70. Indeed, the Court's Final Order [#58] granted in part and denied in part the Motion to Allocate. This outcome, as Plaintiff states, means that neither side can claim a complete victory or a complete loss. *Response* [#75] at 14.

In Mr. Cook's Reply, he reiterates that he obtained substantial relief in the allocation while Plaintiff's Motion to Allocate sought a 0% allocation of settlement proceeds to him. [#77] at 8. Therefore, Mr. Cook argues that even if Plaintiff " 'prevailed' at all on her Motion to Allocate, [he] obtained a greater percentage of what he was seeking compared with what Ms. Dowling was seeking." *Id.* at 8-9 ("[Plaintiff-Intervenor] obtained 70% of his requested relief (35% of 50% requested), whereas [Plaintiff] obtained only 65% of her requested relief (65% of 100% requested).").

The Court finds this argument unavailing. First, Mr. Cook cites no authority for this assertion. Second, the Court finds no authority for the proposition that "substantial relief" (for purposes of a prevailing party analysis) is measured by dividing the dollar amount a party sought by the amount that party ultimately obtained.

[10] Generally speaking, the concept of "substantial relief" is considered where a plaintiff's "claims are related [and] failure on some claims [does] not preclude full recovery **\*544** if plaintiff achieves success on a significant, interrelated claim."

*Jane L. v. Bangerter*, 61 F.3d 1505, 1512 (10th Cir. 1995);

*see Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."). Again, whether this concept even applies to a dispute over the allocation of settlement proceeds is questionable at best given that the cases cited above involved civil rights litigation and a claim for fees pursuant to 42 U.S.C. § 1988. Regardless, neither Plaintiff nor Mr. Cook obtained the relief that either

EXHIBIT 1

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

party sought. While Mr. Cook may have obtained 5% more of the relief he sought compared to Plaintiff, the Court fails to see how this distinction makes a difference when Plaintiff obtained a larger share of the settlement proceeds that was above the presumptive equal share under Colorado's Wrongful Death Statute.

Accordingly, for the reasons stated above, the Court **denies** the Motion [#67] to the extent that Mr. Cook seeks attorneys'

fees and costs pursuant to Fed. R. Civ. P. 54(d). *See Amarel v. Connell*, 102 F.3d 1494, 1523 (9th Cir. 1996) ("In the event of a mixed judgment, however, it is within the discretion of a district court to require each party to bear its own costs.");

*accord. Barber*, 254 F.3d at 1235.

### III. Conclusion

For the reasons set forth above,

IT IS HEREBY **ORDERED** that the Motion [#67] is **DENIED**.

### All Citations

333 F.R.D. 534

### Footnotes

1   "[#67]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

2   Concurrently with this Order, the Court grants in part and denies in part Plaintiff's Motion to Alter/Amend March 30, 2018 Order and Judgment [#62] which, among other things, amends the Final Judgment [#59] to reflect that judgment is not entered in favor of Plaintiffs against Defendants and that Plaintiffs may not collect their costs against Defendants pursuant to the judgment. *Order* [#82].

3   According to the Motion, $42,866.60 accounts for 70% of the attorneys' fees Mr. Cook incurred in this matter. [#67] at 25. In addition to this amount, Mr. Cook also seeks $1,991.74 in costs incurred in this matter. *Id.* at 27.

4   Generally, the Court holds a hearing on a request for attorneys' fees, but since "[n]either party has requested a hearing ... the Court finds that both sides have waived their right to a hearing." *Kazazian*, 300 F.R.D. at 675.

5   Unlike C.R.S. § 13-17-102, "Rule 11(c)(2) requires that a party seeking sanctions for a violation of Rule 11(b) serve its motion on the opposing party twenty-one days before filing it, thereby providing the opposing party 'a safe harbor during which time she could have dismissed her case without fear of sanctions under Rule 11.' " *Hanover Ins. Grp. v. iCarpets, Inc.*, No. 16- cv-01013-RBJ, 2017 WL 6524657, at *7 (D. Colo. Dec. 21, 2017) (quoting *Kazazian*, 300 F.R.D. at 676-77). Rule 11's " 'safe harbor' provision is strictly enforced in this circuit." *Wolf v. Petrock*, No. 08-cv-02749-PAB-KMT, 2010 WL 2232353, at *2 (D. Colo. June 2, 2010) (citing *Roth v. Green*, 466 F.3d 1179, 1192-93 (10th Cir. 2006) (holding that substantial compliance with Rule 11's "safe harbor" provision was not sufficient)).

6   To the extent that Mr. Cook relies on the Tenth Circuit's statement in *Lorillard* "that C.R.S. § 13-17-102 'clearly may apply to claims brought in the District of Colorado[,]' " *Reply* [#77] at 6 (quoting 611 F.3d at 1217), the Court finds this statement unpersuasive for the reasons stated in *Hach Co.* There, the court noted that *Lorillard* cites *Harrison v. Luse*, 760 F. Supp. 1394, 1400 (D. Colo. 1991), *aff'd*, 951 F.2d 1259, 1991 WL 270031 (10th Cir. 1991) (unpublished opinion), which predated the 1993 Amendment that introduced Rule 11's safe-harbor provision and that *Lorillard* "does not discuss preemption or whether the movant had complied with Rule 11's safe harbor." 2016 WL 9725765, at *11. While the court in *Hach Co.*

EXHIBIT 1

acknowledged that "that the Tenth Circuit has not expressly analyzed the preemption issue between Rule 11 and § 13-17- 102," the court nevertheless found that "Colorado courts [had] provide[d] clarity, 'characteriz[ing] § 13–17–102 as a sanction, rather than a substantive right.' " *Id.* (quoting *Kazazian*, 300 F.R.D. at 677).

7    Although Mr. Cook correctly notes that *Tolliver* did not specifically address C.R.S. § 13- 17-102, the Court does not agree with Mr. Cook's contention that *Tolliver's* "general framework" is inapplicable to the present dispute. *Reply* [#77] at 6-7; *see Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.,* 888 F.3d 455, 460-61 (10th Cir. 2017), *cert. denied sub nom.Chieftain Royalty Co. v. Nutley,* —— U.S. ——, 139 S. Ct. 482, 202 L.Ed.2d 388 (2018) (reiterating *Tolliver's* "general framework" with respect to the difference between attorneys' fee statutes that are substantive or procedural); *Kazazian*, 300 F.R.D. at 677 n.6 (applying *Tolliver* to the issue presented here, whether a request for attorneys' fees pursuant to C.R.S. § 13-17-102 is substantive or procedural). To the extent that Mr. Cook argues that *Tolliver* does not apply to this matter because it was futile for Plaintiff to comply with Rule 11's safe-harbor provision, Mr. Cook does not cite any legal authority in support of this proposition. Moreover, the Court fails to see how compliance with Rule 11's safe-harbor provision was futile given that Mr. Cook's Motion [#67] primarily attacks statements made in Ms. Dowling's Declaration [#19-2] which was filed as an attachment to the Motion to Allocate [#19] approximately five months before the January 9-10, 2018 motion hearing. The purposes of the safe-harbor provision include "protecting litigants from sanctions whenever possible in order to mitigate Rule 11's chilling effect ... and encouraging the withdrawal of papers that violate the rule without involving the district court[.]" 5A Charles Alan Wright et al., *Federal Practice and Procedure* § 1337.2 (4th ed.). Thus, as the advisory committee notes, "a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention)." Fed. R. Civ. P. 11(b) and (c) advisory committee's note to 1993 amendment.

8    Here, there is no contention that Plaintiff-Intervenor's Motion [#67] is untimely and the fact that the Court has subsequently directed the Clerk of the Court to enter an Amended Final Judgment does not require Plaintiff-Intervenor to refile the Motion. *SeeRadtke v. Caschetta*, 822 F.3d 571, 574 (D.C. Cir. 2016) (holding that a fee petition filed within fourteen days of the initial final judgment but before an amended judgment was entered still satisfies the "no later than" requirement of Rule 54); Fed. R. Civ. P. 54 advisory committee's notes (1993) ("A new period for filing will automatically begin if a new judgment is entered following ... the granting of a motion under Rule 59."). To the extent that Plaintiff argues Rule 54 does not apply at this stage of the proceedings because the Court's Final Order [#58] was not, in fact, a final order and judgment for purposes of Rule 54, *Response* [#75] at 12 n.8, the Court disagrees for the reasons stated in the Court's concurrent Order [#82] regarding Plaintiff's Motion to Alter/Amend March 30, 2018 Order and Judgment [#62].

9    Plaintiff's point that the Motion to Allocate [#19] addressed an issue ancillary to the claims in this case is well-taken given that those claims were resolved by the GM Settlement. Regardless of whether Rule 54(d) is the appropriate avenue for Mr. Cook to seek attorneys' fees and costs based on the Final Judgment [#59], the Court agrees with Plaintiff that "[t]here is no prevailing party" in this circumstance and that "Mr. Cook did not prevail in the action over [Plaintiff]." *Response* [#75] at 12.

---

**End of Document**                                                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 1

# Dowling v. General Motors LLC

United States District Court, D. Colorado. |     March 30, 2018 |     Not Reported in Fed. Supp. |     2018 WL 1566832

| Document Details | | Outline |
|---|---|---|
| KeyCite: | **KeyCite Yellow Flag - Negative Treatment** | Attorneys and Law Firms (p.1) |
| | Judgment Amended by Dowling v. General Motors LLC, D.Colo., September 16, 2019 | **FINAL ORDER AND JUDGMENT** (p.1) |
| standard Citation: | Dowling v. Gen. Motors LLC, No. 15-CV-00445-KLM, 2018 WL 1566832 (D. Colo. Mar. 30, 2018) | |
| All Citations: | Not Reported in Fed. Supp., 2018 WL 1566832 | All Citations (p.5) |

**Search Details**

| | |
|---|---|
| Jurisdiction: | Colorado |

**Delivery Details**

| | |
|---|---|
| Date: | September 30, 2021 at 6:45 PM |
| Delivered By: | Daniel Wartell |
| Client ID: | SHANEEN MCCLAIN |
| Status Icons: | |
| Inline KeyCite: | Inline KeyCite completed successfully. |

EXHIBIT 1

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Dowling v. General Motors LLC, Not Reported in Fed. Supp. (2018)

KeyCite Yellow Flag - Negative Treatment

Judgment Amended by Dowling v. General Motors LLC, D.Colo., September 16, 2019

2018 WL 1566832
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

Jamie Lee DOWLING, individually, as surviving
mother of Landyn Scott Dowling, Plaintiff,
Shawn Cook, Plaintiff–Intervenor,
v.
GENERAL MOTORS LLC, and Key
Safety Systems, Inc., Defendants.

Civil Action No. 15–cv–00445–KLM
|
Signed 03/30/2018

**Attorneys and Law Firms**

Lance Alan Cooper, The Cooper Firm, Marietta, GA, Steven A. Shapiro, Fleishman & Shapiro, P.C., Denver, CO, for Plaintiff.

Charles L. Casteel, Davis Graham & Stubbs, LLP, Denver, CO, for Defendants.

Gregory R. Giometti, Morgan Chantel Robinson, Gregory R Giometti & Associates, PC, Denver, CO, for Plaintiff–Intervenor.

**FINAL ORDER AND JUDGMENT**

Kristen L. Mix, United States Magistrate Judge

**\*1** This matter is before the Court on Plaintiff's **Motion to Allocate Settlement Proceeds Re: Landyn Scott Dowling, Deceased** [#19] [1] (the "Motion"). The Court has reviewed the Motion [#19], Response [#26], Reply [#32], exhibits, transcript of the hearing [#56; #57], the case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#19] is **GRANTED in part** and **DENIED in part**.

**I. Background**

This wrongful death action arises from the tragic deaths of Jamie Lee Dowling's ("Plaintiff") two young children in a car accident that occurred on March 9, 2013. Plaintiff filed the lawsuit in this Court on March 3, 2015. *Compl.* [#1]. The Complaint [#1] alleges that Plaintiff's car, a 2008 Chevrolet Cobalt, was defective in its design and manufacture, which resulted in loss of control and subsequent failure of the air bags to deploy. The matter was transferred to the Southern District of New York on March 16, 2015, *see* [#6], and thereafter was remanded to this Court on March 10, 2017, for purposes of approval and distribution of settlement proceeds. *See* [#8–2]. On April 27, 2017, all settlement proceeds with respect to Plaintiff's daughter, Raylee Kay Dowling ("Raylee"), were allocated to Plaintiff by the Court. *Minute Order* [#17].

On August 10, 2017, Plaintiff filed a Motion to Allocate Settlement Proceeds [#19] with respect to her son, Landyn Scott Dowling ("Landyn"). Shawn Willis Cook ("Cook"), who is Landyn's biological father, was permitted to intervene in this case on November 3, 2017. He thereafter filed a Response [#26] and Exhibits [#27] seeking 50% of the settlement proceeds. The Court scheduled an evidentiary hearing, which was held on January 9–10, 2018. *See* [#49, #50]. At the hearing, the Court heard testimony from Plaintiff, Aaron Buettner (Plaintiff's husband), Dana Valderas (Plaintiff's mother), Calvin Dowling (Plaintiff's father), Christopher Michael Allen (Plaintiff's friend), and Jamie Perdue (Plaintiff's friend and former roommate) on behalf of Plaintiff. The Court also heard testimony from Mr. Cook, Janna Conn (Plaintiff's former friend and babysitter), Shirley Williams (pastor at Plaintiff's former church), and Amy Cook (Mr. Cook's mother) on behalf of Mr. Cook.

The following is a summary of relevant testimony from the hearing. Plaintiff and Mr. Cook met and began dating in high school. They attended different schools. Plaintiff became pregnant while she was a junior in high school, after Mr. Cook had graduated from high school. Plaintiff testified that she rented a small house and lived with Mr. Cook while she was still pregnant. Mr. Cook testified that Plaintiff found the house and Mr. Cook rented it for the couple to live in together, but that Plaintiff never actually lived there. Landyn was born on November 2, 2007. Plaintiff testified that Mr. Cook did not see Landyn more than approximately a half-dozen times in his life, that Mr. Cook refused to sign the birth certificate, that Mr. Cook refused to ever help financially with Landyn's care, and that Landyn never stayed the night with Mr. Cook or his family. During Landyn's life of less than five and one-

EXHIBIT 1

half years, Plaintiff lived in at least eleven different places and at one point moved approximately 500 miles away from where Landyn was born without notifying Mr. Cook. Plaintiff provided very little evidence regarding how she paid Landyn's expenses. She testified that she worked as a ranch hand, in medical offices and as a waitress, but that she was also attending school. She presented no testimony or documentary evidence about her earnings or Landyn's expenses during his life. It is also clear that Plaintiff had romantic relationships with several other men during Landyn's lifetime.

**\*2** Mr. Cook testified that he has a learning disability and seizure disorder. He stated that he visited Landyn at the hospital when he was born, that he and Plaintiff completed a DNA test which confirmed Mr. Cook's paternity, and that he provided money to Plaintiff for Landyn's support approximately every week or every other week for the first several years of Landyn's life. Mr. Cook testified that he knew that a father could enforce legal rights, but that he was stymied by the fact that his name was not on Landyn's birth certificate. He testified that when he visited Plaintiff and Landyn at the hospital after Landyn's birth, he asked Plaintiff if he needed to sign the birth certificate and she responded in the negative. Mr. Cook further testified that he wanted to see Landyn more, and that in 2011, he met with an attorney who drew up "some paperwork" to establish Mr. Cook's parental rights and obligations. Mr. Cook's mother and then-girlfriend went to Plaintiff's house to get Plaintiff's signature on the document, entitled "Application for a New Birth Certificate Based on Parentage." Plaintiff refused to sign it, became angry and violent, and then called Mr. Cook to tell him that he would never see his son again.

Plaintiff moved to Colorado, assisted by her "friend" Michael Wilson, in March 2013. On March 9, 2013, Plaintiff had a car accident and both Landyn and Raylee died. Mr. Cook testified that at Landyn's funeral, Plaintiff arranged to have it announced that Michael Wilson, not Mr. Cook, was the father of both children.

## II. Legal Standard

Pursuant to the Colorado Wrongful Death Act, the mother and father of a deceased minor child without descendants "shall have an equal interest in the judgment" related to the wrongful death of the child. Colo. Rev. Stat. § 13–21–201(1)(c). However, "[f]or cases in which the father and mother are divorced, separated, or living apart, a motion may be filed

by either the father or the mother...requesting the court to apportion fairly any judgment awarded in the case." Colo. Rev. Stat. § 13–21–201(1)(c)(II). The parties do not argue that the statute's use of the term "judgment" precludes its application to settlement proceeds, the funds at issue in this case, and precedent appears to interpret the term "judgment" as non-exclusive. *See Campbell v. Shankle*, 680 P.2d 1352, 1353–54 (Colo. App. 1984) (addressing the settlement proceeds recovered by a plaintiff in a wrongful death action and explaining that "the proper method for distribution of monies recovered in connection with a wrongful death action must be derived exclusively from the terms of the wrongful death statute"); *see also Klancke v. Smith*, 829 P.2d 464, 466 (Colo. App. 1991) (same). After holding a hearing, the court must determine the percentage of the proceeds to be awarded to each parent. Colo. Rev. Stat. § 13–21–201(1)(c)(III). "In making such a determination, the court shall consider each parent's relationship with the deceased, including custody, control, support, parental responsibility, and any other factors the court deems pertinent." *Id.*

## III. Analysis

As an initial matter, the Court finds that Plaintiff's testimony lacks credibility overall, and specifically as to the nature of Mr. Cook's relationship with their son. [2] More specifically, the Court finds that her contentions that Mr. Cook was physically abusive towards her, *Tr.* [#56] at 109, that he was not interested in a relationship with Landyn and never provided financial support, *Tr.* [#56] at 115–17, and that Mr. Cook saw Landyn less than a half-dozen times during Landyn's life, *Tr.* [#56] at 27–28, were squarely contradicted by testimony of Mr. Cook and his mother, whose testimony was credible. The Court further notes that many of Plaintiff's most outrageous written assertions against Mr. Cook in her affidavit in support of the Motion [#19–2] were not repeated in her oral testimony, thereby creating further doubts about her credibility. [3] Indeed, the Court has difficulty believing Plaintiff's unsupported testimony because much of it appears to be fabricated. [4]

**\*3** The Court finds credible Mr. Cook's testimony that he tattooed Landyn's name (correctly spelled) on his arm when his son was born, *Tr.* [#57] at 6–8, that Plaintiff found and then Mr. Cook rented a house for Plaintiff and himself to reside in during her pregnancy with Landyn, *Tr.* [#56] at 194–95, that he and Plaintiff had a photograph taken at Wal-Mart of

EXHIBIT 1

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Landyn when the baby was about one week old, Tr. [#56] at 197–98, that Mr. Cook and his mother regularly provided money to Plaintiff to assist with Landyn's care before Plaintiff moved away, Tr. [#56] at 198–99, that Plaintiff refused to permit Mr. Cook to visit Landyn on certain occasions, Tr. [#56] at 200–02, and that the Cook family arranged visits, including overnight stays, with Landyn. Tr. [#56] at 202.

Given these findings, to the extent that Plaintiff contends that Mr. Cook should be entirely denied settlement proceeds due to his alleged lack of involvement with his son, the Motion [#19] lacks merit. The Court now turns to consideration of the factors listed in Colo. Rev. Stat. § 13–21–201(1)(c)(III).

**A. Custody and Control**
The Court finds that Plaintiff had primary custody and control of Landyn during his lifetime. However, the Court is troubled by the lack of evidence regarding the nature of the mother/child relationship. Plaintiff herself provided very little testimony about the nature of that relationship: she testified that, on looking at Landyn for the first time, she felt that he was perfect and that her "heart didn't know what to do." Tr. [#56] at 31. Despite Plaintiff's very general representation of a normal mother/child relationship with Landyn, Plaintiff's former friend and babysitter, Janna Conn, a mother of four children, testified credibly through tears to the contrary. Ms. Conn stated that she had observed Plaintiff's "extremely abusive" treatment of Landyn, including hitting him "a lot," putting "her fingers in his mouth and pull[ing] him" and "smack[ing] him while she was doing that," including with a wooden spoon. Ms. Conn further testified that she "bought [Plaintiff] some child rearing books" to try to help her learn to properly discipline Landyn. She stated that she "saw a side of [Plaintiff] that was kind of scary." Tr. [#56] at 167. Ms. Conn stated that after the children's death, Plaintiff called her and "apologized to me for being a bad mom." Tr. [#56] at 171. While these statements are not determinative, they reflect a relationship between Plaintiff and Landyn that was undoubtedly less than ideal.

It also appears to the Court that Mr. Cook was not entirely to blame for his lack of significant involvement in the custody and control of Landyn, and consequent lack of a consistent relationship with him. The Court finds that Mr. Cook made efforts to be a part of Landyn's life, which Plaintiff thwarted. Mr. Cook credibly testified about his desire to have a relationship with his son, the financial support that he provided, and submitted photographs that document Mr.

Cook as a proud parent of a toddler. Tr. [#57] at 17, 18, 20; Tr. [#56] at 198–99; [#26–4].

The Court also finds credible the testimony of Mr. Cook's mother regarding their efforts to establish Mr. Cook's parental rights and obligations in 2011, when Landyn was approximately three years old. Mrs. Cook testified that Mr. Cook met with a lawyer and completed paperwork to "get Shawn's name on the birth certificate," which Mrs. Cook and Mr. Cook's then-girlfriend took to Plaintiff's apartment for her signature. Tr. [#57] at 51–53; See Exh. 14: Application for New Birth Certificate Based on Parentage. The Court further finds credible Mrs. Cook's testimony that during this encounter, Plaintiff became angry and violent, "screaming and then she pushed" Mr. Cook's girlfriend. Mrs. Cook further stated that Plaintiff then threatened that she would take Landyn away and that Mr. Cook would never see him again. Tr. [#57] at 52–53. In fact, after Mr. Cook's mother presented the Application to Plaintiff, Plaintiff called Mr. Cook and told him that he would never see his son again. Tr. [#56] at 204–05. Mr. Cook testified that after that incident in 2011, he could not reach Plaintiff via her cell phone and did not know where she lived with Landyn after that time. Tr. [#56] at 205–07. He was not aware that Plaintiff had moved to Alpine, Texas, which was more than 500 miles away. Tr. [#56] at 206. Mr. Cook's testimony that he was unable to reach Plaintiff because the cell phone number he had for her was disconnected is corroborated by the fact that, after initially denying that she had ever changed her cell phone number, Plaintiff admitted on cross-examination that she did in fact obtain a new cell phone number after moving to Alpine. Tr. [#56] at 99.

**\*4** The Court further finds credible Mrs. Cook's testimony about Plaintiff's behavior. Mrs. Cook testified that while Plaintiff was dating Mr. Cook before her pregnancy, she asked permission to live at the Cook home (where Shawn Cook also resided) because she was taking extra classes at a school that was much closer to the Cook home than her own home. Mrs. Cook stated that she and her husband decided that it was better for Plaintiff to remain living with her mother. Tr. [#57] at 31–32. Mrs. Cook further stated that she first saw Landyn "a couple of weeks after he was born," as Mr. Cook picked him up and brought him to the Cook family home because Mrs. Cook wanted to do a DNA test. Tr. [#57] at 33. She recalled that Mr. Cook "helped [Plaintiff] out a lot" during Landyn's first year, and that he "would actually go stay with her at her mother's house and help care for the baby....He bought her a crib. He bought diapers. He's bought her – the baby clothes. What Landyn needed he would provide." Tr. [#57]

EXHIBIT 1

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

at 35. Mrs. Cook further testified that she and her husband had a crib in their home for Landyn, and that she offered to watch Landyn so Plaintiff could complete her schooling. *Tr*. [#57] at 36–37. She identified photographs of Landyn at her home taken at Christmas in 2008, and stated that Plaintiff brought Landyn to the Cook family home on that occasion. *Tr*. [#57] at 40; Exh. 1. Mrs. Cook explained that during 2009, Mr. Cook saw Landyn two or three times a week at their home where Mrs. Cook was helping to care for him, and that Landyn frequently spent the night there. *Tr*. [#57] at 41–43. She stated that Plaintiff "demanded money every time she came" to the Cook family home. "[S]he wanted money and, under the circumstances, if we wanted to see Landyn we had to pay her." *Tr*. [#57] at 42–43. Mrs. Cook stated that Mr. Cook started spending less time with Landyn in 2010 because his relationship with Plaintiff was deteriorating. "[H]e tried all the time to call and see if he could see his son and she wouldn't allow it and we'd get into arguments. She would call me on the phone also because I asked her if we could see Landyn." *Tr*. [#57] at 44–45. Mrs. Cook explained that although Plaintiff demanded money "every time she would show up" at the Cook home, Mrs. Cook refused to give her cash because "I didn't know what it was going for." Instead, Mrs. Cook stated that if Landyn needed medicine, she would write a check to a pharmacy or obtain the medicine herself. *Tr*. [#57] at 46. Mrs. Cook recounted a strange conversation with Plaintiff in 2010 where Plaintiff indicated that she had met a "traveling doctor from Oklahoma" and they had gotten married. *Tr*. [#57] at 46–47. Shortly after that conversation, Plaintiff's daughter Raylee, who also died in the accident, was born. In June of 2011, the Cook family had a family reunion and Landyn stayed at the family home for four days, including overnights. *Tr*. [#57] at 50. Plaintiff telephoned Mrs. Cook and promised to bring Landyn to visit Mr. Cook and his family around Christmas-time in both 2011 and 2012, and then failed to call or appear on both occasions. *Tr*. [#57] at 54–56. After Plaintiff moved away from the area where Landyn was born, she refused to tell Mrs. Cook where she was living. *Tr*. [#57] at 55. The record amply demonstrates that Plaintiff attempted to manipulate both Mr. Cook and his parents in an effort to obtain funds or gifts before allowing Mr. Cook to spend time with his son.

**B. Support**

As discussed above, the Court finds Plaintiff's statement that she provided 100% of Landyn's financial support not credible. Specifically, Plaintiff's bald-faced statements in her Motion [#19] that Mr. Cook "abandon[ed] his son at birth," that he "provid[ed] not one nickel of financial support or one day of

care and responsibility" for Landyn, and that Landyn never spent the night with Mr. Cook are patently untrue. *See Motion* [#19] at 2.

Mr. Cook testified that he provided financial support in the form of cash or purchasing supplies at Wal–Mart every one or two weeks during the first several years of Landyn's life, and that he gave Plaintiff as much money as he could, aside from the gas money he needed, while making $10 per hour at his job. *Tr*. [#56] at 198–99. Although Mr. Cook did not have documentary proof of those purchases or payments, the Court nevertheless finds his testimony credible, particularly considering Mr. Cook's and his mother's testimony that Mr. Cook reads and spells at a second-or third-grade level, was enrolled in special education classes at school and that Mr. Cook's mother handles Mr. Cook's bank account to this day. *Tr*. [#56] at 192; [#57] at 10. Mr. Cook also credibly testified that he bought Plaintiff a set of tires on one occasion, and that he paid Plaintiff "a couple or three hundred dollars" more than once. *Tr*. [#57] at 23. In addition, Mrs. Cook testified that she provided "day care checks" to Plaintiff as well as other financial support. *Tr*. [#57] at 51.

Mr. Cook conceded that his financial contributions to Plaintiff decreased in 2010 because Plaintiff would only let him see Landyn when he gave her money. He became hesitant to turn cash over to Plaintiff because his visits with Landyn were getting shorter and Plaintiff's monetary demands were getting higher. *Tr*. [#56] at 201. Mr. Cook credibly testified that he would have been fine with paying weekly child support for Landyn if he had been able to see his son, and that he would have enforced his parental rights to see his son if his name had been on the birth certificate, or if he could have found out where Plaintiff was living in order to do so. *Tr* [#57] at 17, 18, 20. Mrs. Cook's testimony about her attempt to obtain Plaintiff's signature on the Application for a New Birth Certificate Based on Parentage supports this testimony. *Tr*. [#57] at 51–53; Exh. 14. Mr. Cook also paid Plaintiff $7,500 out of a $30,000 insurance settlement arising from Landyn's death for "back child support." *Tr*. [#57] at 25; Exh. 15. [#27–11].

**C. Parental Responsibility**

With respect to parental responsibility, the Court finds particularly troubling Plaintiff's assertions that it was Mr. Cook's responsibility to seek a court order regarding visitation with Landyn, *Tr*. [#57] at 14, and that Mr. Cook "never took any responsibility for the child" and "abandoned" him. *Brief* [#19–1] at 14. In light of Plaintiff's numerous complaints

EXHIBIT 1

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

about Mr. Cook and his alleged behavior toward her and Landyn, her assertion that she wanted Mr. Cook to go to court to enforce his parental rights and also wanted Landyn to have a relationship with Mr. Cook is simply unworthy of belief. *Tr.* [#56] at 115. Moreover, her own failure to obtain a custody and support order for Landyn given her alleged repeated abusive and destructive encounters with Mr. Cook during Landyn's life is patently incongruous. This inconsistency further impairs her credibility. Finally, her allegation that Mr. Cook denied Landyn attention and affection is flatly contradicted not only by his testimony and demeanor during the hearing, but also by Mr. Cook's numerous photographs of and with Landyn. [#26–4].

### D. Attorneys' Fees

 **\*5**  Plaintiff asserts that the Court may only allocate the net settlement proceeds, after payment of attorneys' fees and costs. [#19] at 2. In support of that contention, Plaintiff cites a single case, *Clint v. Stolworthy*, 357 P.2d 649, 650 (Colo. 1960). In *Stolworthy*, the Colorado Supreme Court addressed the question of whether an heir who personally suffered no pecuniary loss from the death of the decedent could nevertheless share in the proceeds of a judgment obtained by the decedent's widow under the Colorado Wrongful Death Act. Based on the explicit language of the statute, the court concluded that the proceeds should be divided among heirs. In reaching its decision, the *Stolworthy* court merely noted as background information that the widow had received a net sum from the wrongful death judgment "after payment of attorneys fees and other expenses *which were conceded* to be necessary and reasonable." *Id.* (emphasis added). The Court engaged in no analysis regarding the propriety of this concession, nor did the Court discuss any statutory requirement for deduction of fees and expenses from the gross

judgment proceeds before further allocation. Simply stated, *Stolworthy* does not stand for the proposition that the Court must only allocate the net proceeds available after payment of fees and expenses, and the Court has not located any other legal authority, in the statute itself or elsewhere, which so dictates. Indeed, Plaintiff's request appears to be based on a private fee agreement between herself and her counsel ("Plaintiffs [sic] seek an Order allowing payment of attorney fees on the total amount of recovery per the terms of the fee agreement." [#19] at 2.). The terms of the fee agreement are not before the Court, nor is any dispute relating to it. Hence, to the extent that Plaintiff requests that the Court enter an Order allocating the settlement proceeds after deduction for attorneys' fees and costs, the Motion is **DENIED in part.**

### IV. Conclusion

In light of the factors set forth in the statute, the facts adduced at the hearing and the Court's assessment of the parties' credibility,

IT IS HEREBY **ORDERED** that the Motion [#19] is **GRANTED in part** and **DENIED in part**. The Court allocates the gross settlement proceeds with respect to Landyn Scott Dowling as follows: sixty-five percent to Plaintiff and thirty-five percent to Intervenor Shawn Cook, and judgment shall enter accordingly.

The Clerk of Court is directed to close this case.

### All Citations

Not Reported in Fed. Supp., 2018 WL 1566832

### Footnotes

1    [#19] is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

2    Among other falsehoods, Plaintiff admitted that she falsely told an unspecified person or persons at the hospital at the time of the accident that Mr. Wilson was her husband so that he could make medical decisions and contact her parents. *Tr.* [#56] at 58–59; 107. She testified that she had the same phone number "the whole time when [she was] dating Mr. Cook to now," although she recanted that testimony on cross examination. *Tr.* [#56] at 57, 98–99. She admitted that she told the minister who was conducting the funeral service for

EXHIBIT 1

the children to announce that Mr. Wilson was the children's father. *Tr.* [#56] at 107–108. She testified that even after the funeral she refused to acknowledge that Mr. Cook was Landyn's father, *Tr.* [#56] at 108, going so far as to deny his paternity to an insurance company after Landyn's death, despite a conclusive DNA test within a few weeks of Landyn's birth confirming Mr. Cook's paternity. *Tr.* [#56] at 108; Exh. 5.

3    For example, in Plaintiff's affidavit she alleged that she took Landyn to Mr. Cook's parents' home for a boating outing with the Cooks' other grandchildren, but when she discovered that the Cooks had life preservers for every child other than Landyn, she refused to allow him to go. [#19–2] at 3. Although Plaintiff did not repeat this allegation during her in-court testimony, Mrs. Cook squarely refuted it (over no objection from Plaintiff's counsel), stating: "That's not true. I have 36 life jackets in my attic and several in the boat and my rule is nana's rule. Any of my grandchildren go on the boat dock, they have to have a life jacket. We go on the boat. We go swimming in the lake. They have to have a life jacket on." *Tr.* [#57] at 48.

4    For purposes of clarity and thoroughness, the Court specifically finds that Plaintiff's testimony about a telephone call with Mr. Cook two to three months before Landyn's death lacks credibility, and the Court therefore affords it no weight. More specifically, Plaintiff testified that she asked Mr. Cook about having a relationship with Landyn and said she was "tired of chasing him" (despite admitting that she had moved 500 miles away approximately a year earlier and had had no further contact with Mr. Cook since that time), and that Mr. Cook allegedly responded that he was "out" of any relationship with Landyn. Mr. Cook denied that the conversation occurred. *Tr.* [#56] at 49; 207.

---

**End of Document**                                                             © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 1

# Dowling v. General Motors LLC

United States District Court, D. Colorado. |    September 16, 2019 |    Not Reported in Fed. Supp. |    2019 WL 4410004

**Document Details**

| | |
|---|---|
| standard Citation: | Dowling v. Gen. Motors LLC, No. 15-CV-00445-KLM, 2019 WL 4410004 (D. Colo. Sept. 16, 2019) |
| All Citations: | Not Reported in Fed. Supp., 2019 WL 4410004 |

**Search Details**

| | |
|---|---|
| Jurisdiction: | Colorado |

**Delivery Details**

| | |
|---|---|
| Date: | September 30, 2021 at 6:45 PM |
| Delivered By: | Daniel Wartell |
| Client ID: | SHANEEN MCCLAIN |
| Status Icons: | |
| Inline KeyCite: | Inline KeyCite completed successfully. |

**Outline**

Attorneys and Law Firms (p.1)

**ORDER** (p.1)

All Citations (p.11)

EXHIBIT 1

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Dowling v. General Motors LLC, Not Reported in Fed. Supp. (2019)

2019 WL 4410004
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

Jamie Lee DOWLING, individually, as surviving
mother of Landyn Scott Dowling, Plaintiff,
Shawn Cook, Plaintiff-Intervenor,
v.
GENERAL MOTORS LLC, and Key
Safety Systems, Inc., Defendants.

Civil Action No. 15-cv-00445-KLM
|
Signed 09/16/2019

**Attorneys and Law Firms**

Lance Alan Cooper, Cooper Firm, The, Marietta, GA, Steven A. Shapiro, Fleishman & Shapiro, P.C., Denver, CO, for Plaintiff.

Gregory R. Giometti, Taylor Robert Seibel, Giometti & Mereness PC, Morgan Chantel Robinson, Gregory R Giometti & Associates, PC, Denver, CO, for Plaintiff-Intervenor.

Charles L. Casteel, Davis Graham & Stubbs LLP, Denver, CO, for Defendants.

**ORDER**

Kristen L. Mix, United States Magistrate Judge

**\*1** This matter is before the Court on Plaintiff's **Motion to Alter/Amend March 30, 2018 Order and Judgment** [#62] [1] (the "Motion"). Plaintiff-Intervenor filed a Response [#70] in opposition to the Motion and Plaintiff filed a Reply [#74]. Plaintiff represents that both Defendants do not oppose the Motion. *Motion* [#62] at 1. The Court has reviewed the Motion, the Response, the Reply, the exhibits thereto, the case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#62] is **GRANTED in part and DENIED in part**.

**I. Introduction**

The most significant dispute at issue in the Motion [#62] is about Plaintiff's attorneys' fees. Despite multiple opportunities, counsel failed to adequately address the issue both prior to and at a two-day hearing on the merits of the underlying dispute. Now, after subsequent entry of judgment by the Court, Plaintiff essentially seeks a "do-over" regarding attorneys' fees. Counsel's only previous references to the issue were citation to an inapplicable case in Plaintiff's hearing brief and belated submission of a purported stipulated document showing the alleged amount of fees incurred. As discussed in more detail below, Plaintiff's current efforts to address the omission are too little too late. In the absence of admissible evidence, stipulated evidence and/or applicable legal authority, the Court cannot amend the judgment to award the fees requested.

**II. Background**

This wrongful death action arises from the tragic deaths of Jamie Lee Dowling's ("Plaintiff") two young children in a car accident that occurred on March 9, 2013. Plaintiff filed the lawsuit in this Court on March 3, 2015, seeking to recover pursuant to the Colorado Wrongful Death Act, Colo. Rev. Stat. § 13-21-201(1)(c). *Compl.* [#1]. The Complaint [#1] alleges that Plaintiff's car, a 2008 Chevrolet Cobalt, was defective in its design and manufacture, which resulted in loss of control and subsequent failure of the air bags to deploy. The matter was transferred to the Southern District of New York on March 16, 2015, *See* [#6], and thereafter was remanded to this Court on March 10, 2017, for purposes of approval and distribution of settlement proceeds. *See* [#8-2]. On April 27, 2017, all settlement proceeds with respect to Plaintiff's daughter, Raylee Kay Dowling ("Raylee"), were allocated to Plaintiff by the Court. *Minute Order* [#17].

On August 10, 2017, Plaintiff filed a Motion to Allocate Settlement Proceeds [#19] (the "Motion to Allocate") with respect to her son, Landyn Scott Dowling. Shawn Willis Cook ("Plaintiff-Intervenor"), who is Landyn's biological father, was permitted to intervene in this case on November 3, 2017. He thereafter filed a Response [#26] and Exhibits [#27] seeking 50% of the settlement proceeds. The Court scheduled an evidentiary hearing, which was held on January 9-10, 2018, regarding apportionment of the settlement proceeds. *See* [#49, #50]. On March 30, 2018, the Court issued a Final Order and Judgment [#58] (the "Final Order") that allocated sixty-five percent of the gross settlement proceeds to Plaintiff Dowling, and thirty-five percent of the gross

EXHIBIT 1

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.  1

Case 1:20-cv-02389-DDD-NRN   Document 100-1   Filed 10/29/21   USDC Colorado   Page 21 of 32

Dowling v. General Motors LLC, Not Reported in Fed. Supp. (2019)

settlement proceeds to Plaintiff-Intervenor Cook. The Court explicitly denied Plaintiff's request that the Court allocate the settlement proceeds after deduction for Plaintiff's attorneys' fees and costs. *Final Order* [#58] at 13-14. Pursuant to Fed. R. Civ. P. 58(a) and the Final Order, the Clerk of the Court issued the Final Judgment [#59] which, as relevant here, entered final judgment in favor of Plaintiff and Plaintiff-Intervenor against Defendants and ordered that Plaintiff and Plaintiff-Intervenor file bills of costs within 14 days of entry of the judgment.

**\*2** On April 27, 2018, Plaintiff filed the instant Motion [#62] seeking to amend the Final Order and Final Judgment. The Motion [#62] does not seek modification of the percentage allocation of settlement proceeds. [#62] at 1. Instead, Plaintiff seeks to modify the Final Order and Final Judgment as follows:

(1) withdraw the final judgment and amend the Order to clarify that it is not a final judgment, that the case is not closed, and that no costs are awarded;

(2) amend the Order to make clear that it does not preclude deduction from each beneficiary's share of the gross settlement proceeds as may be required by the Orders of the MDL Court or by the settlement agreement; and (3) amend the Order to provide that Plaintiff's counsel's attorney fees and costs of obtaining the settlement with the Defendants ... will be paid to Plaintiff's counsel during disbursement of settlement proceeds, and that the proceeds net of those fees and costs, and net of MDL and settlement costs, will be distributed to Plaintiff Dowling and Plaintiff-Intervenor Cook in accordance with the percentage allocations determined by the Court in the Order.

*Id.* at 19.

After Plaintiff filed the Motion, Plaintiff-Intervenor filed his Motion for Attorneys' Fees and Costs Pursuant to Fed. R. Civ. P. 54(d) [#67] (the "Fee Motion") on May 4, 2018. Subsequently, the parties filed the Stipulated Motion and Notice to Dismiss Claims Against Defendants Only [#79] (the "Stipulation") on August 21, 2018. Pursuant to that Stipulation, and concurrently with this Order, Defendants were dismissed from the case with prejudice. *Minute Order* [#81].

### III. Legal Standard

The Court must first determine the applicable legal standard. The Motion [#62] states that it is filed pursuant to Fed. R. Civ. P. 59(e) "and other authorities cited herein[.]" [#62] at 1. The Motion [#62] states that it is "also timely as it seeks attorney fees" pursuant to Fed. R. Civ. P. 54(d)(2). [2] *Id.* at 14. While the Response [#70] also applies the Rule 59(e) standard, Plaintiff's Reply [#74] then contends that "the heightened standard for consideration of a Rule 59 motion should not apply" because the Order should be considered a ruling on a motion, not a final judgment. *Reply* [#74] at 4. Plaintiff then advocates that the Court should simply "review this Motion [#62] as it would any motion for reconsideration." [3] *Id.* In ascertaining what legal standard to apply, the Court will not pre-judge the merits of Plaintiff's arguments. Thus, because final judgment has entered in this case, the Court applies the standard set forth in Rule 59(e). *See Trotter v. Regents of Univ. of N.M.*, 219 F.3d 1179, 1183 (10th Cir. 2000) ("Regardless of how it is styled, courts consider a motion filed within [28] days of the entry of judgment that questions the correctness of the judgment to be a Rule 59(e) motion."). [4] Moreover, a motion asking the Court to vacate the judgement is recognized as a Rule 59(e) motion.

*Miller v. Leavenworth-Jefferson Elec. Co-op., Inc.*, 653 F.2d 1378, 1380 (10th Cir. 1981) (collecting cases); *See Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997) ("[A] motion will be considered under Rule 59(e) when it involves reconsideration of matters properly encompassed in a decision on the merits." (quotations omitted)).

**\*3** " 'Rule 59(e) allows a party to direct the district court's attention to newly discovered material evidence or a manifest error of law or fact, and enables the court to correct its own errors and thus avoid unnecessary appellate procedures.' " *Etherton v. Owners Ins. Co.*, No. 10-cv-00892-PAB-KLM, 2013 WL 5443068, at \*1 (D. Colo. Sept. 30, 2013), *aff'd*, 829 F.3d 1209 (10th Cir. 2016) (quoting *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996)). "Grounds for granting a Rule 59(e) motion include '(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.' " *Somerlott v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144, 1153

Dowling v. General Motors LLC, Not Reported in Fed. Supp. (2019)

(10th Cir. 2012) (quoting *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)); *see also Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (Rule 59(e) relief is appropriate where "the court has misapprehended the facts, a party's position, or the controlling law."). "Clear error is '(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.' " *Etherton*, 2013 WL 5443068, at *1 (quoting *United States v. Farr*, 701 F.3d 1274, 1286 (10th Cir. 2012)). "An error is 'manifest' if it is 'plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record.' " *Id.* (quoting Black's Law Dictionary 582 (8th ed. 2004)).

However, "[Rule 59(e)] 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.' " *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quoting *Wright & Miller, Federal Practice and Procedure* § 2810.1, 127-28 (2d ed. 1995)). Additionally, "Rule 59 'does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to judgment.' " *Etherton*, 2013 WL 5443068, at *2 (quoting *Moro*, 91 F.3d at 876); *see also Servants of Paraclete*, 204 F.3d at 1012 (Filing a motion pursuant to Rule 59 is not appropriate "to revisit issues already addressed or advance arguments that could have been raised in prior briefing."). Ultimately, "[t]he decision to grant or deny a Rule 59 motion is committed to the Court's discretion." *Id.* (citing *Phelps*, 122 F.3d at 1324).

## IV. Analysis

As an initial matter, Plaintiff-Intervenor argues that the Motion [#62] should be summarily denied because it seeks to introduce new evidence into the record and assert new arguments that could have been, but were not, presented to the Court during the months of litigation preceding the entry of the Final Order [#58] and Final Judgment [#59]. *Response* [#70] at 2, 5-7. The Court agrees with Plaintiff-Intervenor to an extent, as discussed in Sections B and C of this Order, with respect to two of the three modifications

the Final Order sought by Plaintiff. However, as to Plaintiff's procedural objections to specific language found in the Final Order and Final Judgment, the Court finds that consideration of these objections is appropriate given that they are not based on arguments that could have been previously raised. With this understanding, the Court proceeds to address the three modifications to the Final Order and Final Judgment that Plaintiff seeks in the Motion.

**A. Whether the Final Judgment must be vacated and whether the Final Order must be amended to clarify that it is not a "Final" Order.**

Plaintiff contends that the Final Judgment [#59] must be vacated and that the Court's Final Order [#58] must be amended to reflect that it is not in fact a "final" order. *Motion* [#62] at 3-7. First, Plaintiff argues that the Final Order [#58] does not resolve all claims among all parties and therefore is not a "final judgment" pursuant to Fed. R. Civ. P. 54(b). *Id.* at 4. Second, Plaintiff advises the Court for the first time that the settlement agreement reached with Defendant General Motors (the "GM Settlement") requires, among other things, that a stipulation of dismissal be filed in this matter before the funds can be disbursed by the Settlement Administrator. *Id.* at 6. Therefore, according to Plaintiff, the Final Order [#58] "made a legal error in sua sponte ending this entire case" and "must be amended to: delete the words 'Final' and 'Judgment' from the title of the order; delete the instruction on the last page of the order that 'judgment shall enter accordingly'; and delete the last page's direction to the clerk 'to close this case.' " *Id.* at 5-6. Additionally, Plaintiff states that the Court must vacate the Clerk of the Court's Final Judgment [#59]. *Id.* at 6.

### 1. Vacating the Final Judgment

*4 First addressing Plaintiff's argument that the Final Judgment [#59] must be vacated, Rule 54 defines "judgment" as "any order from which an appeal lies," Fed. R. Civ. P. 54(a), and further states:

> When an action presents more than one claim for relief ... or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated,

EXHIBIT 1

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). The Court's Final Order [#58] neither invoked Rule 54(b) nor expressly determined that there was no just reason for delay. However, based on the allocation determination, the Court ordered that "judgment shall enter accordingly" and directed the Clerk of the Court to close this case. *Final Order* [#58] at 14. Following the Final Order, the Clerk of the Court entered the Final Judgment which ordered, among other things, "that final judgment is hereby entered in favor of Plaintiff, Jamie Lee Dowling, Plaintiff-Intervenor, Shawn Cook and against Defendants, General Motors, Key Safety Systems, Inc." [#59] at 1. As stated above, the Final Judgment further ordered that "the plaintiff and intervenor may have their costs by filing a bill of costs within 14 days of entry of judgment." *Id.* at 2.

Plaintiff's point that the Final Order "did not adjudicate the rights and liabilities of Defendants in this case" is well-taken. *See Motion* [#62] at 5. While it is true, as Plaintiff-Intervenor argues, that the only issue for adjudication before the Court was the percentage allocation of the settlement proceeds between the two parents, the entirety of the Court's role in this matter is broader. *Response* [#70] at 15. Although the Court resolved the issue of allocation of the proceeds between Plaintiff and Plaintiff-Intervenor, the issue of the rights and liabilities between Plaintiff and Defendants was apparently not fully resolved at the time the Court issued its Final Order. Notably, the Suggestion of Remand [#8-1] filed by the Southern District of New York states:

The parties have agreed that it would be appropriate to remand the case *in its entirety* for the purpose of allowing the transferor court (in this case, the United States District Court for the District of Colorado) to oversee approval of the settlement and distribution of the settlement in

accordance with Colorado's wrongful death statute.

(emphasis added). Plaintiff-Intervenor asserts that "the only logical interpretation of the Final Order and Judgment as applicable to the Defendants is that the Defendants must abide by the Court's allocation determination, which they have already agreed to do in the GM Settlement." *Response* [#70] at 16 n.4. While the Court agrees with this interpretation to the extent that it applies to the Final Order, it remains true that Plaintiff's claims against Defendants were not, and have not been, adjudicated on the merits. Thus, the Court finds that it was a clerical error for the Final Judgment to state that judgment had been entered in favor of Plaintiff and Plaintiff-Intervenor against Defendants.

**\*5** However, given that the claims against Defendants have now been dismissed and are no longer pending, *see Minute Order* [#81], the Court finds that it need not vacate the Final Judgment in its entirety. Rather, to simply reflect the fact that all claims in the case have been resolved and correct the clerical error regarding entry of judgment against Defendants, the Court directs the Clerk of the Court to enter an Amended Final Judgment which deletes the following language from the Final Judgment [#59]:

It is FURTHER ORDERED that final judgment is hereby entered in favor of Plaintiff, Jamie Lee Dowling, Plaintiff-Intervenor, Shawn Cook and against Defendants, General Motors, Key Safety Systems, Inc.

It is FURTHER ORDERED that pursuant to Fed. R. Civ. P. 54(d)(1) and the procedures set forth in D.C.COLO.LCivR 54.1, the plaintiff and intervenor may have their costs by filing a bill of costs within 14 days of entry of judgment.

Accordingly, the Motion [#62] is **granted** to the extent that Plaintiff asks the Court to amend the Final Judgment [#59].[5]

### 2. Amending the Final Order

To the extent that Plaintiff argues that the Final Order [#58] must be amended "to be 'un-finaled' to allow this case to be finished," the Court disagrees. *Motion* [#62] at 5. While the Court acknowledges that the Final Order [#58] did not address the claims against Defendants, the text of the Final Order already makes this abundantly clear. The Final Order makes no reference to Defendants or the claims against them, and explicitly addresses the limited issue of settlement allocation

EXHIBIT 1

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

between Plaintiff and Plaintiff-Intervenor. Thus, although the Final Order states that "judgment shall enter accordingly," it is obvious that the judgment to be entered related only to the settlement allocation dispute between Plaintiff and Plaintiff-Intervenor.

Moreover, the Court fails to see why the terms "Final" and/or "Judgment" must necessarily be deleted from the Final Order. Again, as is clear from its context, the Final Order was a "Final Order and Judgment" only insofar as it resolved the only dispute before the Court, i.e., the allocation of settlement proceeds between Plaintiff and Plaintiff-Intervenor. As to the appealability concerns raised by Plaintiff, *See id.* at 4-5, the Court recognizes that, pursuant to U.S.C. 28 § 1291, the Tenth Circuit has "jurisdiction only over 'final' decisions of the district court—that is, those decisions that 'leave nothing for the [district] court to do but execute the judgment.' " *Albright v. UNUM Life Ins. Co. of Am.*, 59 F.3d 1089, 1092 (10th Cir. 1995) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)) (brackets omitted). However, as the case cited by Plaintiff further notes, the " 'label used to describe the judicial demand is not controlling' " when the Tenth Circuit considers "whether the judgment constitutes a 'final decision' under § 1291[.]" *Id.* (quoting *United Bonding Ins. Co. v. Stein*, 410 F.2d 483, 486 (3d Cir.1969) (per curiam), *overruled on other grounds*, *Cohen v. Bd. of Trustees of the University of Med. and Dentistry*, 867 F.2d 1455, 1467 (3d Cir. 1989)).

**\*6** While it *may* be true that the Court's Final Order [#58] was not appealable at the time it was entered, as Plaintiff contends, given the status of Plaintiff's claims against Defendants and given that the Court did not invoke Rule 54(b) in the Final Order, that is no longer the case. The claims against Defendants have now been dismissed pursuant to the parties' Stipulation [#79] and, on the Court's entry of this Order and concurrent adjudication of Plaintiff-Intervenor's Fee Motion [#67], there remains nothing left for the Court "to do but execute the [amended] judgment." *Albright*, 59 F.3d at 1092. Moreover, disposition of Plaintiff's present Motion restarts the parties' time for filing a notice of appeal. *See* Fed. R. App. Proc. 4(a)(4)(A)(iv). Accordingly, the Motion [#62] is **denied** to the extent that Plaintiff asks the Court to amend the Final Order [#58] to clarify that it is not in fact a "Final Order".

**B. Whether the Final Order must be amended to clarify that allocation is net of costs imposed by Orders in the MDL and the GM Settlement.**

Plaintiff next argues that the Final Order [#58] must be amended to clarify that it "does not preclude deduction from each beneficiary's share of the gross settlement proceeds as may be required by the Orders of the MDL Court or by the settlement agreement." *Motion* [#62] at 16. According to Plaintiff, "[c]ertain deductions from the gross settlement amount are required to be made before any Plaintiff (or Plaintiff Intervenor) can obtain settlement funds, pursuant to Orders in the MDL proceeding and provisions of the Agreement-Release." *Motion* [#62] at 7. Specifically, Plaintiff states that the required deductions account for MDL attorney fees, MDL costs, settlement costs, and lien administrator fees. *Id.* at 7-8.

As an initial matter, to the extent that Plaintiff asks the Court to adjudicate the parties' compliance with Orders of the MDL Court at this stage, this issue was never presented to the Court with respect to the Motion to Allocate [#19]. *See* *Servants of Paraclete*, 204 F.3d at 1012. Indeed, as Plaintiff-Intervenor notes, compliance with Orders of the MDL Court appears to have not been an issue for Plaintiff when she sought allocation of all settlement proceeds with respect to her daughter, Raylee. *See Response* [#70] at 16; *Plaintiff's Unopposed Motion to Approve Allocation of Settlement Proceeds Re: Raylee Kay Dowling, Deceased* [#16]. Moreover, Plaintiff's Motion cites no authority "requiring an amendment to the Final Order [#58] in order for the parties to comply with the GM Settlement and MDL Orders." *Response* [#70] at 16.

Regardless, Plaintiff's contention on this point is moot given that Plaintiff-Intervenor does not object to paying his 35% portion of the MDL costs and agrees to stipulate to those deductions required by the MDL Orders and GM Settlement. [6] *Response* [#70] at 16-17. Additionally, the Court agrees with Plaintiff-Intervenor that nothing in the Final Order [#58] precludes or prevents the parties from satisfying their obligations under any MDL Order or the GM Settlement. Thus, the Court finds no reason for amending the Final Order [#58] on these grounds. Accordingly, the Motion [#62] is **denied** to the extent that Plaintiff asks the Court to amend the Final Order to clarify that it does not preclude certain deductions from the parties' allocation as may be required by Orders of the MDL Court or by the GM Settlement.

EXHIBIT 1

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Dowling v. General Motors LLC, Not Reported in Fed. Supp. (2019)

**C. Whether the Final Order should be amended to clarify that the allocation is based on net settlement proceeds after pro rata payment to Plaintiff's counsel of their fees and costs under the common fund doctrine.**

The majority of Plaintiff's Motion concerns the amount of attorney's fees to which Plaintiff's counsel believe they are entitled. *See* [#62] at 8-19. Specifically, Plaintiff's counsel argue that they should be paid based on the gross settlement amount pursuant to the "common fund doctrine," which provides that attorneys should be paid " 'out of the monetary fund that the litigation has produced.' " *Id.* at 9 (quoting *Kuhn v. State*, 924 P.2d 1053, 1057 (Colo. 1996)). Plaintiff's counsel argues that they are entitled to the fees on the gross settlement amount because the funds were obtained solely through their efforts, as Plaintiff-Intervenor did not intervene until the GM Settlement was reached and the case was remanded from the MDL for allocation of settlement funds. *Id.* at 8-14.

**\*7** In certain circumstances, Colorado courts have applied the common fund doctrine as a common law form of equitable relief that provides fees to attorneys who advocate for the benefit of others. *Hawes v. Colorado Div. of Ins.*, 65 P.3d 1008, 1015 (Colo. 2003). The rationale behind the doctrine is that all parties who benefit from the creation of the common fund should share the fees in order to avoid unjust enrichment of passive beneficiaries. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "The common fund doctrine applies when a plaintiff, either as an individual or a class representative, creates, increases, or preserves a monetary fund for the benefit of an ascertainable class of persons similarly situated." *Kuhn*, 924 P.2d at 1058. The Colorado Supreme Court has set forth two requirements for the common fund doctrine to apply: "(1) that all beneficiaries are similarly situated; and (2) that but for the plaintiff's actions, the beneficiaries would have been forced to institute the litigation themselves in order to achieve any benefit." *Trevino v. HHL Fin. Servs., Inc.*, 945 P.2d 1345, 1347 (Colo. 1997), *as modified on denial of reh'g* (Oct. 20, 1997).

As an initial matter, the Court agrees with Plaintiff-Intervenor that the arguments raised in the Motion [#62] regarding the common fund doctrine are clearly an attempt to relitigate an issue which the Court has already adjudicated, i.e., whether the Court was required to allocate net settlement proceeds, after payment of Plaintiff's attorneys' fees and costs. *See Final Order* [#58] at 13-14. Therefore, in order for the Court to reconsider this issue and grant the relief Plaintiff's counsel now seeks, the Motion must indicate either (1) an intervening

change in the controlling law, (2) new evidence previously unavailable, or (3) the need to correct clear error or prevent manifest injustice. *Somerlott*, 686 F.3d at 1153 (quotation marks and citations omitted). Otherwise, the Court must deny the Motion to the extent that Plaintiff's counsel simply seeks "to relitigate old matters, or [ ] raise arguments or present evidence that could have been raised prior to the entry of judgment.' " *Exxon Shipping Co.*, 554 U.S. at 485 n.5 (citation omitted).

After a careful review of the proceedings in this matter and the arguments and evidence presented in Plaintiff's Motion [#62], the Court finds that none of the three grounds for granting a motion pursuant to Rule 59(e) have been demonstrated. Rather, the Court concurs with Plaintiff-Intervenor that the arguments asserted in the Motion rely on new evidence and raise new issues "that were not presented to the Court during the months of litigation leading up to the entry of the" Final Order [#58]. *Response* [#70] at 2. It is further apparent from the proceedings summarized below that Plaintiff's counsel could have, but did not, raise such evidence and arguments prior to the Court's Final Order. Thus, for the reasons more fully discussed below, the Court finds no basis under Rule 59(e) for considering Plaintiff's counsel's new contention that the Court must apply the common fund doctrine to award them fees from Plaintiff-Intervenor's settlement allocation.

**1. Summary of Proceedings**

Plaintiff's Motion to Allocate [#19] initiated the dispute over the allocation of settlement proceeds with respect to her son. In the Motion to Allocate, Plaintiff stated without citing any legal authority or evidence:

Plaintiffs [sic] also request an Order approving payment of the attorney fees on the amount of the recovery of wrongful death proceeds and of litigation costs to plaintiffs' [sic] counsel. Pursuant to the Colorado wrongful death act, Ms. Dowling was a proper plaintiff authorized to bring this action for the benefit of all claimants, and to contract with counsel for representation. Plaintiffs [sic] seek an Order allowing payment of attorney fees on the total amount of recovery

EXHIBIT 1

per the terms of the fee agreement. The allocation hearing should be scheduled to determine allocation of the net proceeds, after payment of fees and costs.

**\*8**  [#19] at 2.

In support of the Motion to Allocate, Plaintiff attached a Memorandum [#19-1]. Plaintiff's Memorandum was almost entirely devoted to arguments and evidence as to why "[t]he Court should allocate 100% of the proceeds to [Plaintiff] and 0% to [Plaintiff-Intervenor]," without making any distinction between net and gross settlement proceeds. [#19-1] at 15; *see also id.* at 1-14 ("[T]he court should allocate 100% of the wrongful death proceeds to the parent that provided and took responsibility for 100% of Landyn's care an [sic] support, and 0% to the absent father who abandoned his son, took 0% responsibility, and provided 0% of Landyn's care and support."). In a footnote, Plaintiff explained that "the settlement amount is strictly confidential" and that this amount need not and should not be disclosed to Plaintiff-Intervenor. *Id.* at 13 n.2.

Plaintiff's only argument in the Memorandum as to why the distribution should be based on net proceeds, after deduction of attorneys' fees, was as follows:

> The person who brings the action under the authority of the Wrongful Death Act is permitted to contract for representation in such an action, and it is the net proceeds, after deduction of attorney's fees and costs in obtaining the recovery, that are available for distribution in accordance with the Act. *Clint v. Stolworthy,* 357 P.2d 649, 650 (Colo. 1960).

*Id.* at 14. Finally, Plaintiff attached twelve exhibits to her Motion to Allocate [#19], all of which pertained to Plaintiff's arguments regarding the percentage allocation of settlement proceeds. While the GM Settlement was not included for confidentiality reasons, none of the exhibits contained any information whatsoever regarding Plaintiff's fee agreement

with counsel, fees incurred as a result of the GM Settlement, or the difference between net and gross settlement proceeds.

On October 16, 2017, Plaintiff filed her Reply [#32] in further support of the Motion to Allocate [#19]. There, Plaintiff stated the following with respect to attorneys' fees: "[t]he Cook brief does not contest that the issue presented is the allocation of the net settlement proceeds after deduction of attorney's [sic] fees and costs." *Reply* [#32] at 7. Plaintiff's Reply [#32] contained no other argument and presented no additional evidence on the issue.

The evidentiary hearing on Plaintiff's Motion to Allocate [#19] began on January 9, 2018. At the start of the hearing, the Court noted that Plaintiff had not disclosed the amount at issue to Plaintiff-Intervenor based on the parties' briefing, and asked counsel if that information had since been disclosed. *Tr. of January 9, 2018 Hearing* [#56] at 6:4-8. Plaintiff's counsel stated that the amount had since been disclosed and then handed the Court a document that purported to show the gross and net amounts of the settlement.[7] *Id.* at 6:9-7:1; *see Pl.'s Ex. 6* [#62-6]. This document, however, was never admitted into evidence and contained no calculation or further explanation regarding attorneys' fees or costs. Notably, this was the first time the Court had any information whatsoever about the gross and net amounts of the settlement proceeds. Yet, there was no further discussion regarding attorneys' fees or the distinction between gross and net amounts at that time.

**\*9**  During his opening statement, Plaintiff's counsel made no mention of net versus gross proceeds or attorneys' fees. *Id.* at 13:5-17:4. Moreover, there was no evidence presented during the two-day hearing regarding this issue, apart from the document tendered by Plaintiff's counsel at the beginning of the hearing that showed the gross and net settlement amounts. At the conclusion of the proceedings, the Court specifically went over the exhibits that had been admitted and asked counsel if they wished to tender any additional exhibits for admission into the record, and they declined to do so. *Tr. of January 10, 2018 Hearing* [#57] at 68:11-69:5. Neither party made any mention of allocating only net proceeds in their closing statements and Plaintiff's counsel made no argument relating to net proceeds or attorneys' fees in his rebuttal closing. *Id.* at 69:10-94:19.

However, just as the Court was about to conclude the hearing, Plaintiff's counsel raised the issue of the gross versus net difference. *Id.* at 95:3-96:15. He stated that he thought both parties had "agreed in writing that the net amount is the

EXHIBIT 1

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**Dowling v. General Motors LLC, Not Reported in Fed. Supp. (2019)**

amount at issue." *Id.* at 95:16-14. The Court asked him for further explanation, and counsel stated that the attorneys' fees were "for obtaining the funds that we're now dividing." *Id.* at 96:8-9. Plaintiff's counsel then reasserted that the parties "had agreed" to that amount. *Id.* at 96:15. However, when the Court asked counsel for Plaintiff-Intervenor if that was correct, he stated:

> Your Honor, we -- at this point in time, we haven't seen any fee agreement. We haven't seen any, you know, itemization of the time spent to achieve that award. All we know is that's what they're claiming the net amount is. We don't know what the total costs they incurred were. That is their representation of what the net amount is.

*Id.* at 96:18-24. In response, the Court stated that Plaintiff-Intervenor's counsel had an affirmative obligation to contradict the amount of fees presented by Plaintiff with evidence, but that he had not done so. *Id.* at 96:25-97:3. The Court then stated:

> So what I have to go on is what I have in front of me. What I have in front of me is a written statement that says that the amount at issue is the amount at issue after attorneys' fees.
>
> I can't speculate that this is not the correct amount in the absence of any

evidence to that fact. So that's the number that I'm going to go with. *Id.* at 97:4-10. However, the Court made no ruling with regard to the foundational issue of whether attorneys' fees should be deducted from the gross settlement proceeds before allocation. The Court took the Motion to Allocate [#19] under advisement and concluded the hearing. *Id.* at 94:20-23, 97:11-13.

As it relates to the instant Motion [#62], the Court makes two observations with respect to the record prior to the Court's Final Order [#58] as it pertained to the issue of Plaintiff's attorneys' fees and net versus gross settlement proceeds.

First, although the Court understood that Plaintiff was seeking an allocation of net proceeds, the Court could

not conclude that Plaintiff-Intervenor had so agreed based on the record at that time. Plaintiff's Reply in support of the Motion to Allocate [#19] simply assumed (in one sentence) that this issue was no longer in contention given that Plaintiff-Intervenor's brief in response was silent on whether the allocation should be based on net settlement proceeds, after deduction of attorneys' fees and costs. *Reply* [#32] at 7. However, much like Plaintiff's Memorandum [#19-1], Plaintiff-Intervenor's Response focused on the issue of percentage allocation and did not differentiate between net and gross settlement proceeds. *See generally* [#26]. In fact, by contending that "a 100% allocation to Ms. Dowling should be denied," [#26] at 2, the most reasonable inference was that Plaintiff-Intervenor was speaking to allocation of the gross proceeds, not net proceeds. *see also id.* at 23 (Plaintiff-Intervenor requesting that the Court "allocate the settlement proceeds resulting from the death of Landyn between Mr. Cook and Ms. Dowling, in an amount not less than 50% to Mr. Cook[.]"). Thus, the Court could not simply construe these statements as Plaintiff-Intervenor's concession that the Court should only allocate net proceeds.

**\*10** As to Plaintiff's counsel's assertion in the waning minutes of the two-day hearing that both parties had agreed that the net amount was the amount at issue, the statement by Plaintiff-Intervenor's counsel in response hardly conveyed such an agreement. According to Plaintiff-Intervenor's counsel, Plaintiff had simply disclosed an amount representing the net settlement proceeds without an itemization of attorneys' fees and costs. To the extent that Plaintiff believed the parties had reached such an agreement, her counsel could have sought a stipulation to that effect but did not. Moreover, given that this issue was raised at the conclusion of the hearing with limited discussion, Plaintiff's counsel could have sought leave to brief the issue after the hearing but did not. Thus, based on the record before it, the Court could not conclude that Plaintiff-Intervenor had agreed to a net settlement allocation which deducted Plaintiff's attorneys' fees.

Second, regardless of whether the parties had *agreed* to deduct fees and allocate only net proceeds, the Court had to determine whether the *law* permitted the deduction. Given that the issue was not meaningfully raised during the evidentiary hearing, the Court had to rely solely on the parties' briefing to determine the issue. Plaintiff's briefing, however, was not informative on this issue and largely ignored any distinction between net and gross settlement proceeds. Plaintiff's Motion requested that the

Court "approv[e] payment of the attorney fees on the amount of the recovery of wrongful death proceeds and of litigation costs to plaintiffs' [sic] counsel" and stated in conclusory fashion that the Court needed to "determine allocation of the net proceeds, after payment of fees and costs." [#19] at 2. Plaintiff's Memorandum cited only one case in support of this request and made no mention of the common fund doctrine. [#19-1] at 14 (citing ▯ *Stolworthy*, 357 P.2d at 650). Her Reply [#32] in further support, as stated above, merely presumed that Plaintiff-Intervenor had waived the issue. Finally, Plaintiff's counsel did not attach a single exhibit to Plaintiff's briefing and did not seek to admit any evidence during the hearing regarding this issue. While Plaintiff's counsel handed the Court a document purporting to show the net and gross settlement amounts that Plaintiff-Intervenor had clearly not stipulated to, counsel did not seek to admit this document into evidence.[8]

Based on the foregoing, the Court was left to determine whether it should allocate the net settlement proceeds, after payment of attorneys' fees and costs, based on the single case cited in Plaintiff's Memorandum [#19-1]. The Court found that this case, ▯ *Stolworthy*, 357 P.2d 649, did "not stand for the proposition that the Court must only allocate the net proceeds available after payment of fees and expenses[.]" *Final Order* [#58] at 13. Additionally, the Court stated that it had not located any other legal authority, in the Colorado Wrongful Death statute or elsewhere, which dictated this particular outcome. *Id.* The Court further noted that Plaintiff's request appeared "to be based on a private fee agreement between herself and her counsel" but that the "terms of the fee agreement [were] not before the Court, nor [was] any dispute relating to it." *Id.* at 13-14. Thus, the Court denied Plaintiff's request that the allocation be based on net settlement proceeds after deduction for attorneys' fees and costs, and concluded that an allocation of gross proceeds was appropriate. *Id.* at 14. The instant Motion [#62] followed.

### 2. Plaintiff's Motion

**\*11** As is evident from the above summary, the issue of whether Plaintiff's counsel were entitled to fees from the settlement proceeds was clearly before the Court prior to entry of the Final Order. Moreover, Plaintiff's counsel had at least three opportunities to address the issue in the Motion to Allocate [#19], Reply [#32], and during the two-day hearing. Despite these opportunities, Plaintiff's counsel failed to offer well-developed arguments, adequate legal

authority, or admissible evidence to demonstrate why the Court was required to allocate net settlement proceeds after deducting their fees and costs. Faced with an unfavorable ruling, it is apparent to the Court that Plaintiff's counsel now seek to remedy their previous failures by relying on the common fund doctrine and new evidence to relitigate the issue. However, while this doctrine and new evidence may have been persuasive if offered while Plaintiff's Motion to Allocate was still pending, their use at this stage contravenes the purpose of Rule 59(e) and must therefore be rejected. ▯ *Exxon Shipping Co.*, 554 U.S. at 485 n.5 (citation omitted).

It is undisputed that the common fund doctrine is a legal theory that was never mentioned in Plaintiff's prior briefing or by Plaintiff's counsel during the hearing. *See* [#62] at 8-14. Plaintiff's counsel provide no adequate explanation as to why this theory was not raised previously. Therefore, their reliance on the doctrine now amounts to nothing more than making a legal argument that could have been raised before in order to get a "second bite at the apple." *Stauffer v. Blair*, No. 12-cv-01702-WYD-MJW, 2013 WL 941442, at \*1 (D. Colo. Mar. 11, 2013) (quoting *Mantle Ranches, Inc. v. U.S. Park Serv.*, 950 F. Supp. 299, 300 (D. Colo. 1997)); *See Meyers Warehouse, Inc.*, 2014 WL 5113323, at \*3 (finding a claim for attorney fees pursuant to the common fund doctrine inappropriately raised under Rule 59(e) where the theory had not been raised before the court "in any form in any prior filing").

Plaintiff further avers that amending the allocation is appropriate under the common fund doctrine because Plaintiff-Intervenor either waived any objection to an allocation of the net settlement amount or agreed to this allocation prior to the hearing. *Id.* at 14-18. This argument, however, is impermissible under Rule 59(e) in two respects. First, the argument is premised on issues Plaintiff's counsel already raised in Plaintiff's prior Reply [#32] and during the hearing. ▯ *Servants of Paraclete*, 204 F.3d at 1012 (stating Rule 59(e) is "not appropriate to revisit issues already addressed"); *Sayed v. Broman*, 2014 WL 3862635, at \*2 (D. Colo. Aug. 6, 2014) ("A Rule 59(e) motion is not a new opportunity to revisit issues already addressed or to advance arguments that could have been raised previously."). Second, Plaintiff's counsel supports this argument in the Motion [#62] with new evidence that was available before the hearing but was not offered.[9] ▯ *Etherton*, 2013 WL 5443068, at \*2 ("Rule 59 ... certainly does not allow a party to introduce new evidence ... that could and should have been presented to the

EXHIBIT 1

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

district court prior to the judgment." (quotation marks and citation omitted)).

**\*12** Finally, Plaintiff contends that her attorneys' fees are reasonable "[b]ased on the accounting and documentation" attached to the Motion which were never provided to the Court previously. *Motion* [#62] at 18-19. This documentation includes Plaintiff's fee agreement and an itemization of costs allocable to Landyn's claim, which were never produced until now. This is despite the fact that they were directly implicated at the end of the hearing by Plaintiff-Intervenor's objection to Plaintiff's characterization that the parties had "agreed" to allocate the net settlement amount. *Tr. of January 10, 2018 Hearing* [#57] at 96:18-22 (Plaintiff-Intervenor's counsel stating: "at this point in time, we haven't seen any fee agreement. We haven't seen any, you know, itemization of the time spent to achieve that award. All we know is that's what they're claiming the net amount is."). Plaintiff also attaches a revised version of the document Plaintiff's counsel handed the Court during the hearing which, notably, provides a different and more detailed calculation of the net settlement amount.

Plaintiff's attorneys argue, without citing any legal authority, that they "should not be found to lose the right to recover their fees and advanced costs due to any arguable delay in presenting the details of the issue, where they reasonably believed the issue to be uncontested." *Motion* [#62] at 14. However, as stated above, "Rule 59 'does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment.' " *Etherton,* 2013 WL 5443068, at \*2 (quoting *Moro,* 91 F.3d at 876). Plaintiff's attorneys fail to adequately explain why the arguments and evidence they rely on in the Motion [#62] could not have been offered to the Court previously other than to reassert their prior belief that that their entitlement to fees was a non-issue. In her Reply, Plaintiff argues:

> [I]t is appropriate for this Court to consider Plaintiff's Common Fund law [sic] because, although Plaintiff stated in both her brief and at the hearing that attorneys' fees and costs related to settlement made with GM should come out of the gross settlement proceeds, Plaintiff never had to go further because Cook never disputed that the parties' allotment of the settlement would be made after attorneys' fees and costs were taken off of the gross settlement, and so agreed in writing.

Since Cook had expressly not disputed this approach, it was not fully litigated. Because Cook never disputed the issue, neither party briefed it, and the Court did not have the benefit of the underlying law supporting Plaintiff's argument when it entered the March 30th Order. Plaintiff's discussion of the applicable law is appropriate even if Rule 59(e) applies because the Court's March 30th Order may have misapprehended the Plaintiff's position and the controlling law supporting it since no real dispute was before the Court on this issue and it was thus not briefed by either side.

[#74] at 5. Plaintiff cites no legal authority for this argument other than stating the general principle that " 'a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law.' " *Id.* at 5 (quoting *Servants of Paraclete,* 204 F.3d at 1012).

However, it is unclear how the Court could have misapprehended Plaintiff's position on whether the common fund doctrine should apply given that it was not raised at any point prior to entry of the Final Order [#58]. Rather, as demonstrated by the proceedings summarized above, any misapprehension of a party's position appears to have been on the part of Plaintiff and not the Court. Simply stated, Plaintiff's counsel erred by assuming that Plaintiff-Intervenor had either waived any objection, or agreed, to allocate net proceeds without providing an enforceable stipulation *or* any evidence to that effect, and by failing to provide applicable legal authority for Plaintiff's contention that the Court should allocate net proceeds instead of gross proceeds. Based on the parties' statements at the conclusion of the hearing and the arguments Plaintiff's attorneys now assert, it is clear that the issue of Plaintiff's attorneys' fees was an issue lurking in the background between the parties outside the Court's view throughout these proceedings. Nevertheless, despite the lack of any stipulation on the record, Plaintiff's counsel never brought the issue to the Court's attention and simply assumed that the Court would rule in their favor on the basis of waiver of a claim to gross proceeds by Plaintiff-Intervenor. This mistake cannot be attributed to the Court, however. The Court fails to perceive any clear error in the Final Order, based on the evidence in the record at that time, that affects Plaintiff's substantial rights and which seriously affects the fairness of these proceedings. *Etherton,* 2013 WL 5443068, at \*1 (quoting *United States v. Farr,* 701 F.3d 1274, 1286 (10th Cir. 2012)). Thus, the Court finds no basis under Rule

EXHIBIT 1

Dowling v. General Motors LLC, Not Reported in Fed. Supp. (2019)

59(e) for considering Plaintiff's newly-raised contention that the Court must apply the common fund doctrine to award Plaintiff attorneys' fees from Plaintiff-Intervenor's settlement allocation. *Sayed,* 2014 WL 3862635, at *2.

**\*13** Moreover, assuming *arguendo* that Plaintiff's argument regarding the common fund doctrine is properly raised under Rule 59(e), it is not clear that the doctrine applies in this instance. Although it may be equitable to require those who benefit from a common fund to share in the costs of obtaining such a fund, the equities are less compelling when one of those sharing the fund had no knowledge of creation of the fund nor any opportunity to participate in its creation. *Aff. of Pl.-Intervenor Cook* [#70-2] (Plaintiff-Intervenor attesting to having no knowledge of the underlying litigation, including the GM Settlement, until he received correspondence from Plaintiff's counsel on or about November 11, 2016, after conclusion of the GM Settlement); *See* Trevino, 945 P.2d at 1349 (suggesting that application of the common fund doctrine is limited to cases in which a party actually had a right to intervene in the litigation producing a fund and elected not to do so on an active basis"). The Court fails to see the equity in requiring a party like Plaintiff-Intervenor, who was not informed of the GM lawsuit and remained entirely unrepresented in that action, to pay fees to Plaintiff's counsel under the common fund doctrine, when those efforts had little to do with protecting his interests and those attorneys were subsequently adverse to him. *See* In re Estate of Kay, 792 S.E.2d 907, 916 (S.C. Ct. App. 2016), *aff'd in part, rev'd in part on other grounds*, 816 S.E.2d 542 (S.C. 2018) ("Although attorney's services might have benefitted all parties, fees cannot be awarded when the interests of the parties are adverse."); Domenella v. Domenella, 513 N.E.2d 17, 20 (Ill. App. Ct. 1987) (finding attorney was not entitled to fees from respondents under common fund doctrine where "he failed to identify respondents or join them in the probate proceedings, he did not disclose their interests to the court, and he performed no services to advance or protect their interests"; The common fund doctrine is not applicable here because the plaintiff sought to preserve his own interest and only coincidentally benefitted others."). Finally, Plaintiff-Intervenor notes that the MDL created a "Common Benefit Fund" to which Plaintiff-Intervenor agrees to contribute and out of which Plaintiff's counsel is already being paid. *Response* [#70] at 13. While Plaintiff's attorneys contend that they, personally, will only obtain a small portion of this fund, they fail to adequately address Plaintiff-Intervenor's larger point that it would be inequitable to require Plaintiff-Intervenor to pay his portion of his gross recovery to the Common Benefit Fund, plus pay for his own counsel who helped obtain his portion of the gross settlement proceeds, and, in addition, pay Plaintiff's counsel under the common fund doctrine. *See Reply* [#74] at 21 n.9; *Response* [#70] at 13-14. Plaintiff-Intervenor represents that this would amount to approximately 60% of his gross recovery being paid in attorneys' fees which, in addition to the reasons stated above, the Court finds to be neither fair nor reasonable. [10]

Accordingly, the Court the Motion [#62] is **denied** to the extent that Plaintiff seeks an order that the settlement allocation be made net of the pro rata payment to Plaintiff's counsel of their fees and costs under the common fund doctrine.

### V. Conclusion

For the reasons set forth above,

IT IS HEREBY **ORDERED** that the Motion [#62] is **GRANTED in part** and **DENIED in part**. The Motion is **granted** to the extent that Plaintiff seeks the below amendments to the Final Judgment [#59]. The Motion is **denied** in all other respects.

IT IS FURTHER **ORDERED** that the Final Judgment [#59] is **AMENDED**. The Clerk of the Court shall enter an Amended Final Judgment which deletes the following language from the Final Judgment [#59] currently on the docket:

> It is FURTHER ORDERED that final judgment is hereby entered in favor of Plaintiff, Jamie Lee Dowling, Plaintiff-Intervenor, Shawn Cook and against Defendants, General Motors, Key Safety Systems, Inc.

> It is FURTHER ORDERED that pursuant to Fed. R. Civ. P. 54(d)(1) and the procedures set forth in D.C.COLO.LCivR 54.1, the plaintiff and intervenor may have their costs by filing a bill of costs within 14 days of entry of judgment.

### All Citations

Not Reported in Fed. Supp., 2019 WL 4410004

EXHIBIT 1

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Dowling v. General Motors LLC, Not Reported in Fed. Supp. (2019)

---

## Footnotes

1    "[#62]" is an example of the convention the Court uses to identify the docket number assigned to a specific
     paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used
     throughout this Order.

2    The Court does not construe Plaintiff's Motion [#62] as a motion for attorneys' fees pursuant to Rule 54(d)(2)
     for several reasons. First, an "award [of attorneys' fees] is uniquely separable from the cause of action" that
     is settled by a court's judgment on the merits, and therefore a post-judgment request for attorney's fees is not
     considered a motion to amend or alter the judgment under Rule 59(e) of the Federal Rules of Civil Procedure."

     *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 373 n.10 (1984) (internal quotation
     marks and citations omitted). Second, Plaintiff's supporting Affidavit [#10] does not comply with the Local
     Rule requirements and Plaintiff has not provided sufficient information in the Motion for Plaintiff- Intervenor
     to ascertain whether the efforts and time allegedly expended by Plaintiff's counsel were reasonable. *See*
     D.C.COLO.LCivR 54.3(b) (requiring a motion for attorney fees to include "a detailed description of the services
     rendered, the amount of time spent, the hourly rate charged, and the total amount claimed"). Third, as the
     Court finds in its concurrent Order regarding Plaintiff- Intervenor's Fee Motion [#67], the Court agrees with
     Plaintiff that neither party can be considered a "prevailing party" with respect to the Motion to Allocate [#19]
     for purposes of Rule 54(d).

3    Regarding this request in Plaintiff's Reply [#74], the Tenth Circuit has stated: "The federal rules do not
     recognize a motion to reconsider. A litigant seeking reconsideration must file a motion to alter or amend

     judgment pursuant to Fed. R. Civ. P. 59(e), or a motion seeking relief from judgment under Fed. R. Civ.
     P. 60(b)." *Ysais v. Richardson*, 603 F.3d 1175, 1178 n.2 (10th Cir. 2010).

4    The Clerk of the Court issued the Final Judgment [#59] on March 30, 2018, and Plaintiff filed her Motion
     [#62] twenty-eight days thereafter on April 27, 2018. Accordingly, Plaintiff's Motion is timely pursuant to Rule
     59(e). Fed. R. Civ. P. 59(e) ("A motion to alter or amend a judgment must be filed no later than 28 days after
     the entry of the judgment.").

5    Plaintiff makes an ancillary argument that the Final Judgment [#59] "against Defendant should be withdrawn
     because it is inconsistent with the settlement agreement, which provides for resolution of the case against
     Defendants by dismissal, not judgment." *Motion* [#62] at 6. Specifically, Plaintiff contends that the GM
     Settlement requires "a document in compliance with the appropriate statutory, common law, or court
     requirements dismissing with prejudice any pending lawsuit against" Defendants. *Id.* at 6 (citation, internal
     quotation marks, emphasis omitted). The Court first notes that this purported requirement of the GM
     Settlement was not brought to the attention of the Court prior to entry of the Final Judgment. Moreover, given
     that the claims against Defendants have now been dismissed and the Court amends the Final Judgment [#59]
     to clarify that judgment was not entered against Defendants, the Court finds this ancillary argument moot.

6    The Court does not include the amounts here in order to protect the confidentiality of the settlement amount.

7    Although the transcript indicates otherwise, the audio recording of the hearing confirms that Plaintiff's counsel,
     rather than Plaintiff-Intervenor's counsel, made this statement in response to the Court's inquiry and provided
     this document to the Court. Plaintiff notes this transcription error in her Motion [#62] at 16 n.14.

8    Contrary to Plaintiff's argument, *see Motion* [#62] at 17, the Court's statement that this is "the number that I'm
     going with" was not a ruling on the issue of whether the allocation *must* be of net proceeds, after deduction
     of attorneys' fees and costs. *Tr. of January 10, 2018 Hearing* [#57] at 96:25-97:1-10. It was simply an
     acknowledgment that the Court would accept Plaintiff's representation that the net proceeds dollar amount
     was as it appeared on the document.

9    Aside from the facts that no evidence regarding this "agreement" was ever presented to the Court prior to
     entry of the Final Order [#58] and that the only real mention of the parties' so- called agreement came in the
     final minutes of the hearing, Plaintiff's reliance on the December 27, 2017 letter from Plaintiff-Intervenor's
     counsel to Plaintiff's counsel, [#62-5], is not persuasive for at least two reasons. First, the letter is clearly

a settlement demand, and hence inadmissible into evidence under Fed. R. Evid. 408(a), which precludes using such a document to "prove or disprove the validity or amount of a disputed claim." By attaching this letter to her Motion [#62], Plaintiff is attempting to use it to prove the "validity" of the net amount of the disputed claim, a purpose which is expressly forbidden by the Rule. Second, even assuming that the letter is somehow admissible, the Court concurs with Plaintiff-Intervenor that the content of the letter does not lead to the conclusion that Plaintiff-Intervenor agreed to dispute only the net proceeds. *Response* [#70] at 6. To construe Plaintiff-Intervenor's counsel's statement in the letter that "if this matter proceeds to [a] hearing, Mr. Cook will seek to recover 50% of the net recovery amount" as an agreement that only the net proceeds were at issue is a stretch, especially in light of the letter's demand for more information about how the fees were incurred and the November 8, 2017 email from Plaintiff-Intervenor's counsel, *Pl.-Intervenor's Ex. 1* [#70-1], expressly declining to stipulate to a net amount. Like the remainder of the letter, that statement is best characterized as a mere negotiating position.

10   Because the Court denies Plaintiff's request for attorneys' fees under the common fund doctrine, the Court does not consider Plaintiff-Intervenor's request that such fees be offset to account for his own legal costs regarding the Motion to Allocate. *Response* [#70] at 14-15.

---

End of Document                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 1